**CIRCUIT COURT OF MARYLAND FOR ANNE ARUNDEL COUNTY**

| | |
|---|---|
| **DAVID ESCOBAR JR.,**<br>Plaintiff,<br>**v.**<br>**Independence Home Loans, LLC ("IHL");**<br>and<br>**AM Communication Labs Inc ("AMCOMLABS");**<br>and<br>**Mortgage Pipeline LLC ("MP"),**<br>Defendants. | **Case No.: C-02-CV-25-3012**<br>**THIRD AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**<br><br>(FEDERAL TELEPHONE CONSUMER PROTECTION ACT (47 U.S.C. § 227), MARYLAND TELEPHONE CONSUMER PROTECTION ACT (MD. CODE, COM. LAW § 14-3201 ET SEQ.), THE MARYLAND TELEPHONE SOLICITATIONS ACT (MD. CODE, COM. LAW § 14-4501 ET SEQ.), THE MARYLAND CONSUMER PROTECTION ACT (MD. CODE, COM. LAW § 13-101 ET SEQ.), INTRUSION UPON SECLUSION, AND INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS)<br><br>**DEMAND FOR JURY TRIAL** |

RECEIVED
SEP 04 2026
AA County Clerk

## INTRODUCTION

**This Third Amended Complaint is filed in compliance with the Court's Order granting Defendant Independence Home Loans, LLC's Motion for More Definite Statement. It adds no party, asserts no new or additional claim for relief against any Defendant, and seeks no relief greater than that sought in the Second Amended Complaint. Its amendments are confined to identifying which Defendant is alleged to have done what, and the record on which each allegation rests.**

Plaintiff David Escobar Jr. is a Maryland resident, having lived in the state since 2019 following his honorable separation from active-duty military service. After nine years of honorable service, Mr. Escobar now receives benefits through a 100% disability rating from the

U.S. Department of Veterans Affairs (VA), including eligibility for the VA Home Loan Program.

In February 2022, Mr. Escobar and his wife purchased their home in Anne Arundel County using the VA Home Loan Program, a government-sponsored initiative designed to help veterans secure housing for their personal occupancy.

Beginning on or about July 7, 2025, Mr. Escobar began receiving repeated, unsolicited phone calls on his personal cellular number from telemarketers attempting to sell mortgage refinancing and equity-leveraging products related to his VA-backed loan. Mr. Escobar never provided consent to receive such solicitations regarding real estate or consumer loan services. During his initial conversation with one of the callers, Mr. Escobar clearly and unequivocally revoked any alleged consent to future calls for the same purpose.

Despite his explicit revocation, the calls did not stop. Instead, they escalated, totaling one hundred six (106) separate telemarketing attempts between July 7, 2025 and December 9, 2025, with an additional call on February 18, 2026. Mortgage Pipeline LLC acted as marketing agents for Defendant Independence Home Loans, LLC ("IHL"), attempting to generate sales leads for IHL under the guise of providing information about veteran refinancing and home-equity options.

Through post-filing discovery, including subpoena records from SignalWire, Inc., Plaintiff has now identified the specific entities and individuals responsible for operating the calling infrastructure. Ten (10) of the fifteen (15) telephone numbers used to call Plaintiff are registered to a single SignalWire account operated by Defendant AM Communication Labs Inc. ("amcomlabs"), headquartered in Kirkland, Washington.

Further discovery, including subpoena responses from amcomlabs, has now identified Defendant Mortgage Pipeline LLC, a Florida limited liability company, as the entity that directly placed the telemarketing calls to Plaintiff using the amcomlabs/ReadyMode infrastructure. Call detail records produced by amcomlabs identify "Mortgage Pipeline" as Client ID 30796, and every outbound call to Plaintiff's number originated from that client account. The caller who identified himself as "Joseph" calling on behalf of "Mortgage Pipeline" during Plaintiff's October 1, 2025 recorded call was an agent of this same entity.

Together, Defendants operated, controlled, or directed the telemarketing infrastructure used to place the unlawful calls at issue, and are jointly and severally liable with IHL for the violations alleged herein.

## PARTIES

1. Plaintiff David Escobar Jr. is a natural person residing in Anne Arundel County, Maryland. He is a 100% disabled veteran of the United States Armed Forces and a consumer within the meaning of applicable federal and Maryland consumer protection statutes. Plaintiff has been subjected to repeated, unsolicited telemarketing calls made as part of Defendants' coordinated marketing campaign. He brings this action individually and as a private attorney general to enforce his rights and the public interest under applicable law.

2. Defendant Independence Home Loans, LLC ("IHL") is a for-profit limited liability company organized under the laws of Arizona, with its principal office located at 4343 N. Scottsdale Road, Suite 100, Scottsdale, Arizona 85251, as listed in the Nationwide Multistate Licensing System (NMLS ID 2524174). IHL conducts business in Maryland and maintains a registered Maryland resident agent, Cogency Global Inc., located at 1519

York Road, Lutherville, Maryland 21093. At all relevant times, IHL acted directly and through its agents, contractors, and marketing affiliates to carry out the telemarketing conduct alleged herein. IHL is the "seller" within the meaning of 16 C.F.R. § 310.2(ee) whose goods or services were promoted through the unlawful telemarketing campaign.

3. AM Communication Labs Inc., ("amcomlabs"), is a business entity headquartered at 11335 NE 122nd Way, Suite 105, Kirkland, Washington 98034. amcomlabs operates a SignalWire telecommunications account containing approximately 519,900 telephone numbers spanning 404 area codes, including 7,450 Maryland numbers. Ten (10) of the fifteen (15) telephone numbers used to call Plaintiff are registered to the amcomlabs SignalWire account, as SignalWire's subpoena response confirms, and upon information and belief an eleventh, (240) 800-9702, is held on the same account. amcomlabs is a "telemarketer" within the meaning of 16 C.F.R. § 310.2(hh) and a person who makes or causes to be made a "telephone solicitation" within the meaning of Md. Code, Com. Law §§ 14-4501(f) and 14-4502(b)(1), as it initiated and conducted the outbound telephone calls on behalf of IHL. amcomlabs is registered with the Federal Communications Commission ("FCC") as an "Interconnected VoIP" provider under FCC Form 499 (Filer ID 834408), with its Chief Executive Officer listed as Jason Jantz. In that filing, amcomlabs affirmatively represents to the FCC that it provides telecommunications services in all fifty states and the District of Columbia, including Maryland. Despite representing to the FCC that it provides telecommunications services in Maryland, amcomlabs has not registered as a foreign entity with the Maryland State Department of Assessments and Taxation ("SDAT") as required by Md. Code, Corps. & Ass'ns § 7-202 for foreign corporations doing business in this State. (See Exhibit AG.) Moreover,

amcomlabs is not registered as a business entity with the Washington State Secretary of State, despite claiming a principal office in Kirkland, Washington, and is therefore operating a telecommunications business involving approximately 519,900 telephone numbers without having legally organized or registered as a business entity in any state. (See Exhibit AE.)

4. ReadyMode.com, Inc. ("ReadyMode") is a corporation organized under the laws of British Columbia, Canada, that operates a proprietary hosted call center and predictive dialer platform. ReadyMode's own Terms and Conditions (last updated September 25, 2025) formally identify AM Communication Labs Inc. as ReadyMode's "affiliate" and define the platform as "Readymode's proprietary hosted Call Center Suite software . . . where the voice-related services are provided by AM Comm and its Third-Party carrier vendors." ReadyMode and amcomlabs share a common CEO, Defendant Jason Jantz, and common legal counsel, Joseph P. Bowser of Roth Jackson Gibbons Condlin PLC, who filed amcomlabs' FCC numbering authorization application, serves as amcomlabs' agent for service of process on its FCC Form 499, and simultaneously authors TCPA compliance content published on ReadyMode's website. SignalWire subpoena records further confirm the integrated nature of the operation: the amcomlabs SignalWire account contains twenty-three (23) named user accounts, including twelve (12) with @amcomlabs.io email addresses and ten (10) with @readymode.com email addresses. ReadyMode and amcomlabs hold a "perpetual, irrevocable, world-wide, and royalty-free license" to access all subscriber call detail records, call dispositions, and call recordings — meaning both entities had full visibility into the 107 calls placed to Plaintiff. Accordingly, this Complaint treats amcomlabs and ReadyMode as a single integrated

operation, and references to "amcomlabs" include ReadyMode unless otherwise specified. Notably, amcomlabs certified to the FCC in its Form 499 filing that it is "not affiliated with a foreign carrier," a representation that is potentially false given ReadyMode's status as a Canadian corporation providing the dialer platform through which amcomlabs' voice services are delivered.

5. Defendant Mortgage Pipeline LLC ("Mortgage Pipeline") is a Florida limited liability company (Document No. L25000140545), formed on March 22, 2025, with its principal address at 777 SE 20th Street, Suite 255, Fort Lauderdale, Florida 33316. Its registered agent and sole manager is Defendant Grant Maier. Mortgage Pipeline is identified in amcomlabs' call detail records as Client ID 30796, and one hundred three (103) of the one hundred seven (107) outbound calls to Plaintiff's telephone number — the calls identified in Exhibit B-1 as Tiers A, A-2 and B — originated from the Mortgage Pipeline client account within the amcomlabs/ReadyMode platform. The caller who identified himself as "Joseph" during the October 1, 2025 recorded call stated he was calling on behalf of "Mortgage Pipeline," directly linking this entity to the calls. Mortgage Pipeline operated under the fictitious trade name "VA Mortgage Pipeline" during the calls to Plaintiff, a name not registered in Maryland or Florida and designed to falsely imply affiliation with the U.S. Department of Veterans Affairs. Mortgage Pipeline is a "telemarketer" within the meaning of 16 C.F.R. § 310.2(hh) and a person who makes or causes to be made a "telephone solicitation" within the meaning of Md. Code, Com. Law §§ 14-4501(f) and 14-4502(b)(1), as it initiated and conducted the outbound telephone calls to Plaintiff on behalf of IHL using the amcomlabs telecommunications infrastructure. Despite conducting a sustained telemarketing campaign directed at

Maryland consumers using Maryland telephone numbers, and despite possessing Plaintiff's Maryland address and personal information obtained during the calls, Mortgage Pipeline has not registered as a foreign limited liability company with the Maryland SDAT as required by Md. Code, Corps. & Ass'ns § 4A-1002 for foreign limited liability companies transacting business in this State. (See Exhibit AF.)

**JURISDICTION AND VENUE**

6. This Court has subject-matter jurisdiction over this action pursuant to Md. Code, Courts & Judicial Proceedings § 1-501, because the amount in controversy exceeds $30,000, and this action arises under the laws of the United States and the State of Maryland, including 47 U.S.C. § 227 and Md. Com. Law § 14-3201 and § 14-2201, which expressly authorize private rights of action in state court.

7. This Court has personal jurisdiction over Defendant IHL pursuant to Md. Code, Courts & Judicial Proceedings § 6-103(b)(1) and (b)(4), because IHL transacts business within Maryland, maintains a registered agent in Maryland, and purposefully directed the telemarketing conduct at issue toward a Maryland resident.

8. This Court has personal jurisdiction over Defendant amcomlabs pursuant to Md. Code, Courts & Judicial Proceedings § 6-103(b)(1) and (b)(4). amcomlabs transacts business in Maryland and has committed tortious acts causing injury in Maryland. Specifically:

   (a) amcomlabs is registered with the FCC as an Interconnected VoIP provider (Form 499, Filer ID 834408) and affirmatively lists Maryland among the jurisdictions in which it provides telecommunications services;

   (b) amcomlabs maintains an inventory of approximately 7,450 Maryland telephone numbers across the (240), (301), (410), (443), and (667) area codes;

(c) amcomlabs purchased ten (10) of the telephone numbers used to place the unlawful calls to Plaintiff, a Maryland resident, using Maryland area code numbers configured with spoofed caller-ID displaying "Oakland, MD" to create the false appearance of local origin; and

(d) amcomlabs engages in a persistent course of conduct directed at Maryland, as evidenced by its FCC registration, its thousands of Maryland telephone numbers, and the telemarketing calls placed to Maryland consumers on behalf of IHL. Despite this extensive activity in Maryland, amcomlabs has failed to register as a foreign corporation with the Maryland SDAT as required by Md. Code, Corps. & Ass'ns § 7-202. Under §§ 7-301 and 7-302, a foreign corporation that does business in this State without registering is subject to penalty and may not maintain suit in the courts of this State, although its failure to register does not impair the validity of its acts or prevent it from defending this action. Plaintiff pleads amcomlabs' failure to register as evidence that it conducted its Maryland operations without the disclosure Maryland law requires, and not as a substitute for the long-arm grounds set out above.

9. This Court has personal jurisdiction over Defendant Mortgage Pipeline LLC pursuant to Md. Code, Courts & Judicial Proceedings § 6-103(b)(1) and (b)(4). Mortgage Pipeline, through its use of the amcomlabs/ReadyMode predictive dialer platform, initiated one hundred three (103) telemarketing calls to Plaintiff, a Maryland resident, using Maryland area code telephone numbers. The call detail records amcomlabs produced under subpoena identify Client ID 30796 ("Mortgage Pipeline") as the source of ninety-six (96) of those calls to Plaintiff's number, (240) 429-2465; Plaintiff's carrier records and the

registration of the calling numbers to the amcomlabs SignalWire account establish the remaining seven (7). This course of conduct constitutes transacting business in Maryland and committing a tortious act causing injury in this State. Despite this extensive course of conduct directed at Maryland, Mortgage Pipeline has failed to register as a foreign entity with the Maryland SDAT as required by Md. Code, Corps. & Ass'ns § 4A-1002. (See Exhibit AF.) Pursuant to § 4A-1007(b), Mortgage Pipeline's failure to register does not impair the validity of its acts or prevent it from defending this action. Pursuant to § 4A-1007(c), because Mortgage Pipeline is doing business in this State without registration, it has appointed the Department as its agent for service of process with respect to causes of action arising out of doing business in this State, and service may be effected through SDAT.

10. Venue is proper in this Court under Md. Code, Courts & Judicial Proceedings § 6-201(a) and (b), because Plaintiff resides in Anne Arundel County and the acts giving rise to this Complaint occurred in this County.

## FACTUAL ALLEGATIONS

### Background

11. In July 2019, Plaintiff David Escobar Jr. honorably separated from the United States Armed Forces after nine years of active-duty service. Upon separation, Plaintiff met all eligibility requirements established by the U.S. Department of Veterans Affairs ("VA") and applicable federal law, including the required length of service, duty status, and character-of- service determination to qualify for all related VA benefits. (See Exhibit C.)

12. In June 2021, Plaintiff subscribed to and began maintaining his personal cellular telephone number, (240) 429-2465, through his wireless carrier, T-Mobile USA, Inc. Plaintiff has continuously used this number as his primary personal telephone. (See Exhibit A.)

13. On February 8, 2022, Plaintiff exercised benefits afforded to him as a veteran and purchased a home in Anne Arundel County, Maryland, utilizing the VA Home Loan Program, a federal benefit administered by the VA to assist eligible veterans in purchasing homes for personal occupancy. (See Exhibit G.)

14. As of the date of this Amended Complaint, Plaintiff continues to live in his home in Anne Arundel County. He has no plans, nor has he expressed interest to any third parties, on leveraging his limited equity, refinancing, or selling his home.

**Initial Telemarketer Outreach**

15. On July 7, 2025, Plaintiff received two telephone calls to his personal cellular number. The first, from (240) 226-6572, was missed. The second, from (240) 226-6712, was answered. Both calls appeared to originate locally from Oakland, Maryland, and were not flagged by Plaintiff's cellular carrier as potential spam. (See Exhibit B.)

16. Upon answering the second call from (240) 226-6712, Plaintiff was greeted by an individual identifying only by first name and no business. Maryland law, Md. Com. Law § 13-301(10), requires telephonic solicitors to clearly identify their trade name and the entity they represent. The caller did not do so. Instead, the caller falsely suggested an affiliation, approval, or sponsorship with the VA, the type of misrepresentation described in Md. Com. Law § 13-301(1), (2), and (9).

17. The caller proceeded to confirm highly specific personal and financial details, including Plaintiff's full name, residential address, VA-backed loan status, current estimated property value, and remaining loan balance. The accuracy of the caller's questions and references to Plaintiff's VA loan misled Plaintiff into believing the call was made under the authority of, or with information provided by, the U.S. Department of Veterans Affairs, and that the purpose was to educate Plaintiff on available VA benefits.

18. Only near the end of the less-than-two-minute conversation did Plaintiff realize that the caller was a telemarketer attempting to sell mortgage- refinancing and equity-leveraging services, not a representative of any VA program. The caller failed to disclose that the purpose of the call was to sell goods or services, as required by Md. Com. Law § 14-3201 - § 14-3202 and 16 C.F.R. 310.4(d)(2), and further failed to identify the kind of service solicited, contrary to Md. Com. Law § 13-301(10)(iii) and 16 C.F.R. 310.4(d)(3). Had Plaintiff known from the outset that the call was a commercial solicitation, he would not have provided or confirmed any personal or financial information.

19. At the time, Plaintiff's mortgage had approximately 27 years of maturity remaining, and prevailing market interest rates were at their highest levels in years. Plaintiff made a financially reasonable and informed decision to decline the solicitation. To prevent further contact, Plaintiff expressly stated that he was not interested in any refinancing or loan services and revoked any and all consent for future telemarketing calls related to his VA loan or home equity. The telemarketer verbally acknowledged Plaintiff's revocation and ended the call and reasonably believed the matter was concluded and that his do-not-call request would be honored.

**The Calling Campaign, by Number and by Actor**

20. For approximately two weeks following Plaintiff's initial do-not-call request on July 7, 2025, no further calls were received. However, beginning on July 23, 2025, at 7:08 p.m., the calls abruptly resumed and continued, totaling one hundred seven (107) separate telemarketing attempts related to the same subject matter, mortgage refinancing and VA-related loan products. (See Exhibit B-1.)

21. In its Opposition to Plaintiff's Motion for Preliminary Injunction, IHL further identified September 15, 2025 as the date of a specific warm transfer to an IHL loan officer. During these calls, the IHL representatives confirmed Plaintiff's prior discussions with the solicitors, reviewed his VA-loan information, and attempted to solicit refinancing. These warm transfers, confirm that the solicitors were acting on behalf of IHL to generate leads and transfer interested consumers directly to its loan officers.

22. Plaintiff determined that all one hundred seven (107) calls were placed using a rotating cluster of at least fifteen (15) telephone numbers (ten beginning with the local prefix (240) 226-XXXX), all exhibiting identical caller-ID behavior (rejecting return calls and displaying local areas as the origin). The numbers used were:

| Phone Number | Displayed Local Area |
|---|---|
| **(240) 226-6572** | Oakland, MD |
| **(240) 226-7350** | Oakland, MD |
| **(240) 226-6712** | Oakland, MD |
| **(240) 226-7226** | Oakland, MD |
| **(240) 226-7375** | Oakland, MD |

| | |
|---|---|
| **(240) 226-7347** | Oakland, MD |
| **(240) 226-6724** | Oakland, MD |
| **(240) 226-7135** | Oakland, MD |
| **(240) 226-7127** | Oakland, MD |
| **(240) 226-6649** | Oakland, MD |
| **(240) 800-9702** | Bethesda, MD |
| **(240) 433-5517** | Silver Spring, MD |
| **(240) 502-9284** | Silver Spring, MD |
| **(240) 443-3768** | Oxon Hill, MD |

23. Despite the repeated use of the same local prefix, every answered call featured identical call scripts, coordinated timing, and direct transfers to loan officers — establishing that the callers operated as agents, contractors, or lead-generation partners as part of a single, unified telemarketing campaign controlled or knowingly accepted by IHL.

24. For each of the one hundred seven (107) telemarketing calls, Plaintiff's carrier (T-Mobile) displayed the caller identification as originating from within Maryland, and none were flagged as 'Spam Likely.' This is because amcomlabs, acting in coordination with Independence Home Loans and Mortgage Pipeline, assigned every call a STIR/SHAKEN attestation level of 'A' (full attestation), affirmatively certifying to downstream carriers that the caller was authorized to use the calling number. This 'A' attestation caused T-Mobile to treat the calls as verified and legitimate, preventing them from being flagged as spam and enabling them to reach Plaintiff without any warning. This uniform presentation caused Plaintiff to believe that the calls were legitimate, locally placed, and

possibly solicited or welcomed. Each of the calling numbers used by the solicitors was configured to reject incoming calls, including attempts from Plaintiff's own cellular number. When dialing any of these numbers, calls were immediately disconnected or rejected, never routed to a live agent, voicemail system, or business line associated with the solicitor or any identifiable organization.

25. By rotating among these fifteen (15) numbers and configuring each to block return calls, the solicitors used technology designed to conceal their true identity and calling origin. This technique caused the calls to display a false or substitute caller-ID number rather than the actual number from which they originated, preventing Plaintiff from returning calls or reaffirming his revoked consent. Such practices are consistent with Md. Com. Law § 14-4502(B)(1)(i)-(iii), which prohibits telemarketers from failing to transmit accurate caller identification, intentionally preventing caller-ID transmission, or using technology to display a different number in order to conceal the caller's identity.

26. Of the one hundred seven (107) calls received from these fifteen (15) numbers, Plaintiff answered forty-three (43). During each answered call, the solicitors identified themselves only by first name and used false or generic trade names such as "VA Mortgage Pipeline," "Veteran Financial Services," "VA Mortgage Review," or "VA Home Loan Center." These names were not registered Maryland businesses and were used to create the false impression of affiliation or approval by the U.S. Department of Veterans Affairs. The callers did not clearly, affirmatively, or expressly state the true trade name of the business represented, as required by Md. Com. Law § 13-301(10)(i), and their representations were misleading and deceptive within the meaning of § 13-301(1), (2), and (9).

27. Among the one hundred seven (107) telemarketing calls received, one call was placed on July 25, 2025, at 8:01 p.m. Eastern Time, after the hours permitted for telephone solicitations under Md. Com. Law § 14-4502(c)(1), which restricts calls between 8 p.m. and 8 a.m. in the called party's time zone.

28. Mortgage Pipeline also placed thirty-one (31) calls that represented the fourth or subsequent solicitation within a single 24-hour period on the same subject matter, exceeding the limit established by Md. Com. Law § 14-4502(c)(2).

29. Without being able to return calls and unable to identify the actual calling party, Plaintiff began to document the calling campaign, he attempted to record several of the last calls using his iPhone. All but three calls were immediately terminated by the callers after recording notification. On October 1, 2025, Plaintiff received an inbound call from (240) 226-6724. After hearing the recording disclosure automatically generated by Plaintiff's iPhone, the caller identified himself only as "Joseph," stating that he was calling on behalf of "Mortgage Pipeline." When Plaintiff asked the caller to provide the company's Maryland mortgage licensing (NMLS) number or website, the caller admitted he did not know the number and stated that the company had no website, despite it being https://www.mortgagepipeline.com. The caller then attempted to solicit information about Plaintiff's VA-backed home loan and offered to transfer him to a "licensed mortgage professional" for refinancing options. When Plaintiff questioned the legitimacy of the company, the caller abruptly disconnected the call. This recorded interaction reflects the same pattern documented throughout this Complaint. (See Exhibit F.)

30. The solicitors exhibited a consistent pattern of abruptly disconnecting calls whenever Plaintiff attempted to record the conversation or pressed for identifying information such

as the company's name, licensing number, or website as he did in every call he answered. This pattern suggests that the solicitors were trained or instructed to terminate calls rather than comply with Maryland disclosure requirements, further demonstrating a coordinated effort to avoid accountability under state law.

31. On October 6, 2025, Plaintiff sent a formal written demand to Defendant IHL, both to its principal office in Scottsdale, Arizona, and to its registered Maryland agent, Cogency Global Inc., by certified mail. The letter, titled "Formal Demand to Cease and Desist Unlawful Telephone Solicitations," directed IHL to immediately stop all telephone calls, text messages, and related solicitations to Plaintiff's personal cell phone number. Plaintiff also requested that IHL remove his information from all marketing and affiliate call lists and provide written confirmation of compliance within ten (10) business days. (See Exhibit H.)

32. Also on October 6, 2025, Plaintiff filed an official complaint with the Maryland Office of Financial Regulation regarding the conduct described in this Complaint. In his filing, Plaintiff requested that the Office investigate Independence Home Loans for its telemarketing practices, including the repeated and harassing calls made to him, and to determine whether similar conduct may be affecting other veterans and consumers within the State of Maryland (See Exhibits D & E).

**IHL's Direct Contact with Plaintiff**

33. In addition to the one hundred seven (107) telemarketing calls placed through the amcomlabs/ReadyMode infrastructure described above, IHL also contacted Plaintiff directly through text messages sent by an IHL representative identifying herself as "Avery with Independence Home Loans." Plaintiff did not independently contact IHL or

initiate any relationship with it. Rather, IHL obtained Plaintiff's name, cellular telephone number, and mortgage information exclusively through the warm-transfer leads generated by the very telemarketing campaign described in this Complaint — the same campaign that Mortgage Pipeline conducted on IHL's behalf through the amcomlabs infrastructure using spoofed telephone numbers and fictitious trade names. Avery's text messages to Plaintiff were therefore the direct downstream product of the unlawful telemarketing operation: Mortgage Pipeline's telemarketers called Plaintiff without consent, obtained or confirmed his personal and financial information under false pretenses, warm-transferred him to IHL's loan officers, and IHL then used that information to open a mortgage file in Plaintiff's name and assign "Avery" to follow up by text message. IHL's subsequent text messages to Plaintiff — sent from telephone numbers separate from the fifteen (15) spoofed calling numbers identified in this Complaint and explicitly identifying IHL by name rather than a fictitious trade name — establish that IHL had direct, personal knowledge of Plaintiff, received and acted upon the leads generated by the illegal calling campaign, maintained an active file containing his mortgage information, and was actively soliciting him to complete a mortgage application that originated from an unconsented telemarketing call. IHL subsequently denied each of these facts in three separate written communications.

34. On September 18, 2025, at 5:38 p.m., Plaintiff received an unsolicited text message from telephone number (240) 792-7117 stating: "Hey David! It's Avery with Independence Home Loans. We started your mortgage application but didn't get to wrap it up. It only takes a few minutes- do you have time for a quick call with one of our mortgage experts now? Txt 'remove' to end conversation." At 7:48 p.m., a follow-up message from the

same number stated: “Let me know when you get a chance.” Plaintiff responded “Stop” and received an automated unsubscribe confirmation. (See Exhibit X.) Plaintiff had never contacted Independence Home Loans, never visited its website, never submitted a mortgage application, and never provided his telephone number to IHL or any entity acting on its behalf. The only way IHL obtained Plaintiff's name, telephone number, and mortgage information was through the warm-transfer leads generated by Mortgage Pipeline's illegal telemarketing calls — calls that Plaintiff had repeatedly and explicitly asked to stop. Avery's reference to having “started your mortgage application” confirms that IHL received Plaintiff's information from the warm transfers, opened a mortgage file in his name without his knowledge or consent, and then used the contact information obtained through the illegal campaign to solicit him further. This text message establishes that, as of September 18, 2025: (a) IHL knew Plaintiff by first name; (b) IHL had begun processing a mortgage application for Plaintiff based on information obtained from the unlawful telemarketing campaign; (c) IHL maintained Plaintiff's cellular telephone number in its marketing systems; and (d) an IHL representative named “Avery” was personally assigned to solicit Plaintiff to complete an application he never initiated.

35. On October 2, 2025, Plaintiff — having already made more than forty (40) verbal do-not-call requests during answered telemarketing calls and recognizing that Defendants continued to deny responsibility for the calling campaign — elected to re-subscribe to the (240) 792-7117 text message thread for the purpose of confirming the identity of the party contacting him. Under both federal and Maryland law, consent to receive communications may be freely given and freely revoked at any time; Plaintiff's decision to re-engage with IHL's text messaging system on October 2 was an exercise of his right

to give and withdraw consent and does not waive, diminish, or otherwise affect any claim arising from the prior unconsented telemarketing calls or from subsequent calls placed after Plaintiff again revoked consent. At 6:40 p.m., "Avery with Independence Home Loans" responded: "Hey David! It's Avery with Independence Home Loans. We began your mortgage paperwork but didn't get to cross the finish line. It's just a few quick minutes — are you free right now for a short call with our mortgage pro? Txt 'remove' to end conversation." Plaintiff replied "Sure," and Avery responded: "Sounds good, calling now." Plaintiff's iPhone call log confirms that an incoming call from (240) 792-7117 was received at 6:47 p.m. on October 2, 2025, and lasted sixteen (16) minutes. (See Exhibit I.) During this call, Plaintiff spoke with an IHL loan officer who reviewed proposed mortgage loan interest rates with Plaintiff. At 6:52 p.m. — five minutes into the call — Plaintiff received a text message from telephone number (913) 689-8623 containing three items: "independencehl.com" (IHL's website), "nmlsconsumeraccess.com" (the NMLS Consumer Access verification portal), and "#2512726" (an NMLS individual identifier). (See Exhibit Y.) NMLS records confirm that NMLS #2512726 is Owen James Dixon, a mortgage loan originator whose registered telephone number is (913) 689-8623 — the same number that texted Plaintiff during the call. Dixon sent Plaintiff IHL's website URL, identifying himself as representing Independence Home Loans. However, Dixon's NMLS registration shows that he is authorized to represent NEXA Mortgage, LLC (NMLS# 1660690), not Independence Home Loans, raising questions about the corporate relationship between IHL and NEXA Mortgage that IHL has not disclosed. Moreover, Dixon's NMLS record lists twelve (12) active state mortgage loan originator licenses — in Arizona, Colorado, Georgia, Kansas, Maine, New Jersey, New Mexico, Oklahoma,

Oregon, Texas, Virginia, and Washington — but does not include Maryland. Dixon was therefore conducting mortgage origination activities with a Maryland consumer without the required Maryland mortgage loan originator license. (See Exhibit AD.)

36. On October 6, 2025 — the same day Plaintiff sent his formal cease-and-desist letter to IHL and filed his complaint with the Maryland Office of Financial Regulation — Plaintiff received another unsolicited text message, this time from telephone number (571) 517-9xxx, stating: "Hey David! It's Avery with Independence Home Loans. We began your mortgage paperwork but didn't get to cross the finish line. It's just a few quick minutes — are you free right now for a short call with our mortgage pro? Txt 'remove' to end conversation." Plaintiff replied "Remove" and received an automated opt-out confirmation that read: "You have successfully opted out. Reply START to resubscribe. -Independence Home Loans." (See Exhibit Z.) The opt-out confirmation message was branded with IHL's name, confirming that the text messaging platform was operated by or on behalf of IHL, not a third-party vendor.

37. The use of a second telephone number — (571) 517-9xxx, a Virginia area code — to send substantively identical text messages from the same IHL representative ("Avery") referencing the same mortgage paperwork demonstrates that IHL operated a multi-number text messaging campaign in addition to the multi-number calling campaign conducted through the amcomlabs infrastructure. Both campaigns targeted Plaintiff by name and referenced mortgage services.

**IHL's Denials Contradicted by Its Own Conduct**

38. Seven days after "Avery with Independence Home Loans" texted Plaintiff by name and arranged a sixteen-minute telephone call with him, and seven days after Avery texted

Plaintiff again from a different number on the same day Plaintiff mailed his cease-and-desist letter, IHL responded to Plaintiff's cease-and-desist, stating that it was "unable to locate any call record or other evidence indicating that our company directly contacted your number." IHL further stated that it partnered with "reputable third-party lead generation companies" who "connect with individuals who have expressed interest in our products or services," and that these vendors had "all confirmed that [Plaintiff is] on their Do Not Contact list." IHL did not identify any of its vendors by name. (See Exhibit N.)

39. On or about October 20, 2025, at the direction of the Maryland Office of Financial Regulation and in direct response to Plaintiff's regulatory complaint, IHL submitted an official written response to the OFR. (See Exhibit AA.) In this response — a formal regulatory communication submitted to a state financial oversight agency — IHL made the following material representations:

(a) IHL stated that it "partners with reputable third-party lead generation companies to connect with individuals who have expressed interest in our products or services," implying that Plaintiff had expressed interest in IHL's services and that the calls were therefore solicited. Plaintiff never expressed interest in IHL's products or services; the calls were unsolicited.

(b) IHL stated: "We initially received a letter in the mail from David Escobar on 10/8/2025" and that "Mr. Escobar was immediately added to our internal do not contact list on 10/8/2025 upon IHL's receipt of the letter." This representation frames IHL's receipt of the cease-and-desist letter as its first notice that Plaintiff did not wish to be contacted. In fact, Plaintiff had made more than forty (40) verbal do-not-call requests during answered telemarketing calls between July 7 and October 1, 2025,

and IHL's own representative "Avery" had texted Plaintiff by name on September 18, October 2, and October 6, 2025, from IHL-controlled telephone numbers — demonstrating that IHL had Plaintiff's contact information, an active mortgage file in his name, and direct personal contact with him well before October 8.

(c) IHL stated: "Prior to this letter, we have no record of Mr. Escobar requesting not to be contacted by Independence Home Loans; had Mr. Escobar stated he did not wish to be contacted, he would have promptly been added to our do not contact list at that time." This statement is directly and demonstrably false. On September 18, 2025, Plaintiff texted "Stop" to IHL's number (240) 792-7117 and received an automated unsubscribe confirmation from IHL's own text messaging system. On October 6, 2025, Plaintiff texted "Remove" to IHL's number (571) 517-9xxx and received an IHL-branded opt-out confirmation. IHL's own systems therefore contain at least two documented instances of Plaintiff requesting not to be contacted prior to the October 6 cease-and-desist letter — requests that IHL's automated platform acknowledged and confirmed. IHL's representation to the Maryland OFR that it had "no record" of Plaintiff requesting cessation was false.

(d) IHL stated that it "contacted any lead generation vendors to inform them of this change as well; all confirmed Mr. Escobar was listed on their do not contact lists." IHL did not identify these vendors by name. Moreover, Plaintiff received an additional telemarketing call on December 9, 2025, nearly two months after IHL's claimed notification to its vendors, demonstrating that the vendors' alleged "confirmation" was either never obtained or never effective.

(e) IHL stated: "Independence Home Loans has no relationship with COGENCY GLOBAL INC." Cogency Global Inc. is IHL's own registered Maryland resident agent, as confirmed by IHL's NMLS registration (NMLS# 2524174) and Maryland licensing records. IHL's denial of any relationship with its own registered agent in an official regulatory response raises serious questions about the candor and reliability of IHL's other representations to the OFR.

40. On October 23, 2025, Plaintiff submitted a written rebuttal to the Maryland OFR challenging IHL's October 20 response. In his rebuttal, Plaintiff informed the OFR that the Office's handling of his complaint had been incomplete — that his complaint had not requested to be placed on a "Do Not Contact" list, but rather alleged repeated telemarketing calls after revoked consent, false or misleading claims of VA affiliation, and the use of multiple caller IDs to disguise the calls' origin. Plaintiff specifically identified the Maryland Telephone Consumer Protection Act (§ 14-3201), the Maryland Consumer Protection Act (§ 13-301), and the federal Telemarketing and Consumer Fraud and Abuse Prevention Act (15 U.S.C. §§ 6101-6108) and Telephone Consumer Protection Act (47 U.S.C. § 227) as the statutes IHL had violated. Plaintiff requested that the OFR refrain from closing his case, investigate IHL and its telemarketing vendors, require disclosure of all lead-generation partners, determine whether the vendors acted under IHL's direction or control, and take enforcement action as appropriate. (See Exhibit AB.)

41. On October 31, 2025, the OFR's assigned examiner, Sarala Chhetri, Financial Non-Depository Examiner for the Maryland Office of Financial Regulation, Maryland Department of Labor, emailed Plaintiff confirming that the OFR had received his rebuttal

and had "contacted IHL again for their review and response to your rebuttal." (See Exhibit AC.) The OFR's decision to re-open the matter and require a second response from IHL — after Plaintiff had identified specific statutory violations that IHL's initial response failed to address — demonstrates that the regulator did not find IHL's October 20 response satisfactory or dispositive.

42. On or about November 6, 2025 — in direct response to the OFR's second inquiry prompted by Plaintiff's rebuttal — IHL, through its General Counsel, Eddie Pantiliat of Hymson Goldstein Pantiliat & Lohr, PLLC, submitted a letter to Plaintiff stating that IHL had conducted "a thorough internal investigation" and that "[e]ach vendor has confirmed compliance" and "no statutory violations occurred." This letter was IHL's second and final response to the Maryland OFR's regulatory inquiry, submitted at the regulator's direction after Plaintiff had specifically identified the statutory violations IHL's initial response ignored — including revoked-consent violations, false VA affiliation claims, and spoofed caller-ID numbers. IHL was therefore given two separate opportunities to review its records, investigate the calling campaign, and provide truthful information to the state regulatory agency charged with overseeing its Maryland mortgage lending license. On both occasions — even after being put on notice of the specific statutory provisions at issue — IHL chose to deny knowledge of the calls, deny that Plaintiff had ever requested cessation, and declare that no violations occurred. IHL's willingness to make these representations twice to a state financial regulator, in the face of a detailed rebuttal identifying the specific laws violated, demonstrates that IHL's denials were not the product of an inadequate investigation but a deliberate strategy to avoid accountability. IHL's representation that "no statutory violations occurred" — submitted

twice to a state financial regulator as the formal basis for closing Plaintiff's complaint — is directly contradicted by every category of evidence set forth in this Complaint, including IHL's own text messages to Plaintiff, the call detail records produced by amcomlabs, the warm-transfer admissions in IHL's own court filings, and the continued calling that persisted even after IHL claimed its vendors had "confirmed compliance." Either IHL's investigation was not thorough — meaning its representations to Plaintiff, to the Maryland Office of Financial Regulation, and to this Court were recklessly made — or IHL knew of its direct contacts with Plaintiff and chose to deny them, meaning its representations were knowingly false. The fact that IHL doubled down on its denials after the OFR required a second response — rather than correcting the record when given the opportunity — strongly supports the latter inference, and further supports a finding that Defendants' violations were willful and knowing, warranting treble damages under all applicable statutes.

43. IHL's representations in these three communications are directly and demonstrably contradicted by IHL's own conduct. At the time IHL claimed it was "unable to locate any call record," IHL's own representative "Avery" had: (a) sent Plaintiff at least two text messages from two different telephone numbers, each explicitly identifying "Independence Home Loans" by name; (b) referenced mortgage paperwork that IHL had begun processing for Plaintiff — paperwork that could only have originated from the warm-transfer leads generated by the same telemarketing campaign IHL denied knowledge of; (c) arranged and placed a sixteen-minute telephone call to Plaintiff on October 2, 2025, just eleven days before IHL's October 13 denial; and (d) sent an additional text message to Plaintiff on October 6, 2025, the very day Plaintiff mailed his

cease-and-desist letter, just seven days before IHL's denial. Furthermore, IHL's own branded automated opt-out system confirmed "Independence Home Loans" as the sender, establishing that IHL — not a third-party vendor — controlled the text messaging platform used to contact Plaintiff. The existence of Avery's text messages and the mortgage file she referenced are themselves proof that IHL received, processed, and acted upon the fruits of the illegal telemarketing campaign. IHL cannot claim ignorance of the calling campaign while simultaneously possessing a mortgage file for a consumer whose information was obtained exclusively through that campaign.

44. Despite IHL's representations that its vendors had "all confirmed" that Plaintiff was on their Do Not Contact lists, Plaintiff received an additional telemarketing call on December 9, 2025, from telephone number (240) 502-9284, nearly two months after IHL's October 13 letter and one month after Eddie Pantiliat's November 6 letter. This call was placed after the filing of this lawsuit on October 17, 2025, demonstrating that Defendants' telemarketing operation continued unabated notwithstanding Plaintiff's formal demands, regulatory complaints, active litigation, and IHL's own assurances. In its Opposition to Plaintiff's Motion for Preliminary Injunction, IHL dismissed this post-filing call as "unsupported."

45. In its Opposition to Plaintiff's Motion for Preliminary Injunction, IHL further identified September 15, 2025 as the date of a specific warm transfer to an IHL loan officer. During this call, the IHL representative confirmed Plaintiff's prior discussions with the solicitors, reviewed his VA-loan information, and attempted to solicit refinancing. This admission establishes that IHL had actual knowledge of Plaintiff as a warm-transferred lead no later than September 15, 2025 — twenty-eight days before its October 13 letter claiming it

could not locate any records. Taken together with the text messages from "Avery with Independence Home Loans" on September 18, October 2, and October 6, IHL's denial of knowledge is not merely inaccurate — it is a deliberate misrepresentation made to Plaintiff, to a state financial regulator, and to this Court.

**Discovery of the Calling Infrastructure**

46. Following the filing of this lawsuit, Plaintiff served a subpoena duces tecum on SignalWire, Inc., a cloud telecommunications provider. SignalWire produced records establishing the following critical facts:

(a) Ten (10) of the fifteen (15) telephone numbers used to call Plaintiff are registered to a single SignalWire account operating under the name "amcomlabs," held by Defendant AM Communication Labs Inc., headquartered at 11335 NE 122nd Way, Suite 105, Kirkland, Washington 98034.

(b) Ten (10) of the subject numbers were purchased on May 26, 2025, within a four-minute window (20:52-20:56 UTC), forty-two (42) days before the first call to Plaintiff on July 7, 2025. The coordinated, near-simultaneous purchase of ten of the eleven Maryland area code numbers demonstrates premeditated campaign setup, not coincidence.

(c) The amcomlabs SignalWire account contains approximately 519,900 telephone numbers spanning 404 area codes, including 7,450 Maryland numbers. The scale of this inventory indicates a large-scale, industrial telemarketing operation, not a small lead-generation business.

(d) The amcomlabs SignalWire account contains twenty-three (23) named user accounts, including twelve (12) with @amcomlabs.io email addresses and ten

(10) with @readymode.com email addresses, confirming that amcomlabs and ReadyMode operate as related entities under common control.

(e) SignalWire records contain no outbound call data for the ten Subject Numbers held on that account, despite Plaintiff having received ninety-eight (98) calls from those numbers. This absence confirms that the calls were routed through ReadyMode's predictive dialer platform using SIP trunking, with the Subject Numbers serving only as spoofed caller-ID presentation numbers, not as originating trunk lines. The actual call detail records are maintained within ReadyMode's systems, a Canadian-based company.

(f) The eleventh Maryland number, (240) 226-2870, was identified in the amcomlabs inventory but is not among the eleven Subject Numbers in this case, suggesting the campaign used additional numbers beyond those Plaintiff identified.

47. The SignalWire records further contained 1,288 IP addresses associated with the amcomlabs account, all identical across the ten subpoenaed number files, confirming centralized control of the entire calling operation. (See Exhibit L.)

**Identification of Mortgage Pipeline LLC as the Caller**

48. Following the filing of this lawsuit, Plaintiff served a subpoena on amcomlabs. In response, amcomlabs produced call detail records ("CDRs") and subscriber documentation that identify Mortgage Pipeline LLC as the entity that directly placed the telemarketing calls to Plaintiff. (See Exhibit M.)

49. The CDRs produced by amcomlabs establish the following:

(a) Every outbound call to Plaintiff's telephone number, (240) 429-2465 (formatted as 12404292465 in the CDR data), originated from Client ID 30796, identified in the amcomlabs system as "Mortgage Pipeline."

(b) The CDRs record both completed calls (SIP code 200) and calls terminated by the called party (SIP code 487). A SIP code of 200 records only that the network completed the call; it does not distinguish a call answered by Plaintiff from one answered by voicemail or answered and immediately terminated. The number of SIP 200 records in the CDRs therefore exceeds the forty-three (43) calls Plaintiff answered and spoke on.

(c) Every call carried a STIR/SHAKEN attestation level of "A" (full attestation), meaning amcomlabs' infrastructure affirmatively certified to downstream carriers that the caller was authorized to use the calling number. This "A" attestation caused Plaintiff's carrier (T-Mobile) not to flag the calls as spam, enabling the calls to reach Plaintiff without warning.

(d) All calls were routed through a single server IP address, 108.178.56.74, further confirming centralized operation through the ReadyMode predictive dialer platform.

50. amcomlabs also produced a ReadyMode/AM Communication Labs Inc. Order Form (Response ID 49529), dated May 22, 2025, which establishes the contractual relationship between Mortgage Pipeline LLC and the amcomlabs calling platform. The Order Form identifies: (See Exhibit O.)

(a) The subscriber as "Mortgage Pipeline LLC," with Grant Maier listed as the billing contact;

(b) The company providing the service as "Readymode.com Inc. ('Company')," with Jason Jantz identified as CEO;

(c) The Order Form was completed in approximately fifty-five (55) seconds from start to electronic signature, evidencing that no meaningful review of Mortgage Pipeline's intended use of the platform, compliance with telemarketing laws, or verification of its claimed business identity was conducted — directly contradicting amcomlabs' representations to the FCC that it conducts Know Your Customer ("KYC") screening of its subscribers.

51. Florida Division of Corporations records confirm that Mortgage Pipeline LLC (Document No. L25000140545) was formed on March 22, 2025, just two months before the Order Form was signed and approximately three-and-a-half months before the first call to Plaintiff on July 7, 2025. Grant Maier is listed as the sole manager, registered agent, and authorized person. The entity's principal address is 777 SE 20th Street, Suite 255, Fort Lauderdale, Florida 33316. The brief timeline from formation to the commencement of the calling campaign suggests that Mortgage Pipeline LLC was created specifically for the purpose of conducting the telemarketing operation at issue, likely in coordination with IHL considering the short timeline. (See Exhibit S.)

52. The CDR evidence conclusively links the "Mortgage Pipeline" entity identified in the amcomlabs system to the caller who identified himself as "Joseph" calling on behalf of "Mortgage Pipeline" during Plaintiff's recorded call on October 1, 2025 (Exhibit F). It further links Mortgage Pipeline LLC to the fictitious trade name "VA Mortgage Pipeline" used during calls to Plaintiff, as described in paragraph 26 — the amcomlabs client name "Mortgage Pipeline" is a shortened form of the same fictitious trade name used to

mislead Plaintiff into believing the calls were affiliated with the U.S. Department of Veterans Affairs.

**amcomlabs' FCC Representations and Contradictory Conduct**

53. Defendant amcomlabs has made extensive representations to the Federal Communications Commission ("FCC") in multiple filings, each submitted under penalty of perjury, regarding its commitment to prevent illegal robocalling, caller-ID spoofing, and fraud on its telecommunications platform. These filings include: (i) its application for Direct Access to Numbers under 47 C.F.R. § 52.15(g)(3)(ii); (ii) its FCC Form 499 registration (Filer ID 834408); and (iii) its Robocall Mitigation Database filing (RMD0002926) and accompanying Robocall Mitigation Plan, last recertified by Jason Jantz on February 25, 2026, under penalty of perjury. As set forth below, amcomlabs' actual conduct in connection with the telemarketing campaign targeting Plaintiff contradicts each of these sworn representations.

54. In its application for Direct Access to Telephone Numbers, amcomlabs certified to the FCC under 47 C.F.R. § 52.15(g)(3)(ii)(C) that it would not use telephone numbers obtained through the numbering system "to facilitate illegal robocalls, illegal spoofing, or fraud." amcomlabs further acknowledged under § 52.15(g)(3)(ii)(B) its obligation to comply with all applicable state laws and registration requirements in the jurisdictions where it provides service. (See Exhibit Q.) In direct contradiction of this sworn certification, amcomlabs provided the very telephone numbers obtained under this authorization to Mortgage Pipeline LLC, which used them to conduct an illegal robocalling and spoofing campaign targeting Plaintiff — the precise conduct amcomlabs certified it would prevent.

55. In its FCC Form 499 (Filer ID 834408), amcomlabs affirmatively listed all fifty states and the District of Columbia, including Maryland, as jurisdictions in which it provides interconnected VoIP service. (See Exhibit R.) Notably, the Form 499 lists AM Communication Labs Inc. as the legal entity name and reports "None" for Doing Business As names, meaning the trade name "amcomlabs" under which the company operates its telecommunications business and markets its services has never been registered with the FCC. Furthermore, despite claiming Maryland as a jurisdiction of operations, amcomlabs has not registered as a foreign corporation with the Maryland SDAT as required by Md. Code, Corps. & Ass'ns § 7-202. (See Exhibit AG.)

56. In its Robocall Mitigation Database filing (RMD0002926), amcomlabs identified itself as a "Voice Service Provider with a STIR/SHAKEN implementation obligation serving end-users." (See Exhibit S.) The filing lists the following principals: "Jason Jantz, Imed Yahmadi, Readymode.com, Inc., Loki Telecom, Inc." and declares "None" for Other DBA Names. The filing further states that amcomlabs has not been the subject of any formal investigation related to illegal robocalling. Defendant Jantz personally recertified this filing on February 25, 2026, under penalty of perjury pursuant to 47 C.F.R. § 64.6305(b)(4).

57. In its Robocall Mitigation Plan filed with the FCC, amcomlabs, through Jason Jantz, represented that it conducts Know Your Customer ("KYC") screening of all subscribers, including verification of: the customer's business name and DBAs, website, state of incorporation, intended use case, nature of the business or campaign, and DNC scrubbing practices. (See Exhibit T, Section II.) In reality, amcomlabs onboarded Mortgage Pipeline LLC as a subscriber in approximately fifty-five (55) seconds from start to electronic

signature, as evidenced by the ReadyMode/AM Communication Labs Order Form (Response ID 49529, dated May 22, 2025). (See Exhibit O.) Fifty-five seconds is manifestly insufficient to conduct any meaningful KYC review. Mortgage Pipeline LLC had been incorporated only sixty-one (61) days earlier, on March 22, 2025, had no operating history, no registered website, and was managed by a single individual (Grant Maier) — yet amcomlabs provisioned it with full access to a predictive dialer platform and STIR/SHAKEN Grade A caller-ID attestation without conducting any of the KYC screening it represented to the FCC that it performs.

58. amcomlabs' Robocall Mitigation Plan contains an Acceptable Use Policy ("AUP") that expressly prohibits subscribers from engaging in: illegal or deceptive activities, unsolicited telemarketing, violations of the Telephone Consumer Protection Act ("TCPA") and the FTC Telemarketing Sales Rule ("TSR"), creating a false identity, and failing to comply with the Truth in Caller ID Act. (See Exhibit T, Section III.) Mortgage Pipeline's conduct on the amcomlabs platform violated every one of these prohibitions: it conducted unsolicited telemarketing calls in violation of the TCPA and TSR; used fictitious trade names ("VA Mortgage Pipeline," "Veteran Financial Services," "VA Mortgage Review," "VA Home Loan Center") designed to create a false identity and falsely imply affiliation with the U.S. Department of Veterans Affairs; and transmitted spoofed caller-ID information in violation of the Truth in Caller ID Act. amcomlabs took no action to enforce its own AUP against Mortgage Pipeline despite the campaign continuing for months.

59. amcomlabs' Robocall Mitigation Plan states, regarding STIR/SHAKEN authentication, that its customers "can only use caller IDs that they have subscribed to and been assigned

by AM Comm," and that, as a result, its customers "should be incapable of a spoofing violation prohibited by 47 U.S.C. § 227(e)." (See Exhibit T, Section IV.) In practice, amcomlabs assigned ten Maryland area-code telephone numbers to Mortgage Pipeline and granted STIR/SHAKEN "A" (full) attestation to every outbound call placed by Mortgage Pipeline, as confirmed by the call detail records produced by amcomlabs. (See Exhibit M.) Grade "A" attestation is the highest level of STIR/SHAKEN authentication and represents a sworn certification by the originating voice service provider that the caller is authorized to use the calling number and that the caller's identity has been verified. By granting Grade "A" attestation to Mortgage Pipeline's calls, amcomlabs affirmatively vouched for the legitimacy of the calls to every downstream carrier in the call path, including Plaintiff's carrier (T-Mobile), thereby causing the calls to bypass spam filters and call-blocking protections that would otherwise have flagged or blocked the calls. amcomlabs thus directly facilitated the delivery of illegal robocalls to Plaintiff by lending its STIR/SHAKEN credentials to vouch for a caller that it had failed to vet.

60. amcomlabs' Robocall Mitigation Plan further represents that it actively monitors its network for patterns consistent with illegal robocalling, including: short-duration calls, answer-seizure ratios, call-failure (404) ratios, and ANI Cardinality Ratio (the ratio of unique calling numbers to unique called numbers). The Plan states that amcomlabs uses the analytics tools RRAPTOR by ZipDX and SmartShield by Veriswitch, and that if it "detects a pattern consistent with illegal robocalls," it takes "prompt action." (See Exhibit T, Section V.) The evidence in this case demonstrates that amcomlabs failed to detect or take any action against a campaign that placed at least one hundred seven (107) calls to a single residential telephone number over a period of approximately four months (July

through October 2025), using ten different Maryland numbers from the same client account, with short call durations and repeated call-rejection patterns — precisely the pattern that amcomlabs told the FCC its monitoring tools were designed to identify and stop. If amcomlabs failed to detect blatant and careless conduct as shown by MP, it likely has no real capability to properly enforce its sham Robocall Mitigation Plan.

61. Taken together, amcomlabs' FCC filings demonstrate that amcomlabs was fully aware of its legal obligations to prevent illegal robocalling, spoofing, and fraud on its platform. It made detailed, sworn representations to the FCC that it maintained KYC screening, AUP enforcement, STIR/SHAKEN authentication controls, and network monitoring specifically designed to identify and prevent the exact type of conduct Mortgage Pipeline engaged in. In reality, is did precisely the opposite by onboarding MP in under a minute with no meaningful vetting, granting it STIR/SHAKEN Grade "A" attestation that caused illegal calls to bypass consumer protections, and failing to detect or stop a months-long robocalling campaign despite having deployed the very monitoring tools it told the FCC would catch such conduct. amcomlabs' conduct was not merely negligent, its conduct of a voice service provider that made promises to the FCC it never intended to keep, it prioritized profits at the expense of lawfulness to obtain and retain the numbering authorizations and regulatory standing necessary to allow organizations like MP to use its industrial-scale telemarketing infrastructure however they wanted.

**Mortgage Pipeline's Published TCPA Policy and Willful Noncompliance**

62. Defendant Mortgage Pipeline LLC publishes a "TPCA Policy" [sic] on its website at https://www.mortgagepipeline.com/privacy-policy-1, with an effective date of June 1, 2025, and last updated June 11, 2025. (See Exhibit U.) The policy title itself contains a

typographical error — "TPCA" instead of "TCPA" — suggesting a lack of genuine familiarity with the very statute Mortgage Pipeline purports to comply with. Despite this, the policy sets forth detailed representations regarding Mortgage Pipeline's telemarketing practices, each of which is directly contradicted by the evidence in this case.

63. Mortgage Pipeline's TCPA Policy represents that it "obtains prior express written consent before sending any marketing communications" via phone calls, including auto-dialed calls. The policy further states that consent is collected through "website lead forms or other digital platforms" and that users "explicitly agree to be contacted using automated technology — even if they are on a federal or state Do Not Call list." (See Exhibit U, Section 2.) In contrary, Plaintiff never provided any form of consent, written or implied, to Mortgage Pipeline, amcomlabs, IHL, or any affiliated entity. Mortgage Pipeline nonetheless placed at least one hundred seven (107) calls to Plaintiff using an automated predictive dialer, in direct violation of the consent requirements Mortgage Pipeline claims to follow.

64. Mortgage Pipeline's TCPA Policy further represents that when it "receives leads from third-party sources," it requires all vendors to: "verify that leads were generated with TCPA-compliant consent," "provide documentation of consent upon request," and "abide by all applicable federal and state telemarketing regulations." The policy states: "We do not purchase or use leads that have not been collected in compliance with the TCPA." (See Exhibit U, Section 4.) In reality, Mortgage Pipeline called Plaintiff without any evidence of TCPA-compliant consent from any source, first-party or third-party. The calls to Plaintiff were unsolicited cold calls placed through a predictive dialer, not responses to any lead form or consent-based inquiry.

65. Mortgage Pipeline's TCPA Policy states that it "process[es] all opt-out requests promptly and maintain[s] an internal Do Not Call list in accordance with TCPA guidelines." (See Exhibit U, Section 5.) In reality, Plaintiff made repeated requests to stop calling, both orally during recorded calls and in writing through a formal Cease-and-Desist letter sent via certified mail. (See Exhibits F, I, J, H.) Despite these requests, Mortgage Pipeline continued to place approximately one hundred five (105) additional calls to Plaintiff, demonstrating that it either maintained no internal Do Not Call list, or deliberately ignored it.

66. Mortgage Pipeline's TCPA Policy represents that it "trains all team members involved in telemarketing or customer outreach on TCPA compliance" and that "[v]iolations of this policy may result in disciplinary action, up to and including termination." (See Exhibit U, Section 6.) The callers who contacted Plaintiff — including the agent who identified himself only as "Joseph" — violated every material provision of the TCPA, the TSR, and Mortgage Pipeline's own stated policy: they failed to identify the seller, used fictitious trade names, and refused to honor do-not-call requests. This pattern of conduct across multiple agents over multiple months is not the result of an isolated training failure; it is the product of a business model that treats TCPA compliance as a public relations exercise rather than an operational requirement.

67. The existence of Mortgage Pipeline's published TCPA Compliance Policy establishes that Mortgage Pipeline was aware of its obligations under the TCPA and related telemarketing statutes, understood what compliance required, and affirmatively represented to the public and to consumers that it followed those requirements. Mortgage Pipeline's systematic violation of every material provision of its own policy — while

simultaneously publishing that policy as if it were being followed — constitutes willful and knowing conduct within the meaning of 47 U.S.C. § 227(c)(5), Md. Code, Com. Law § 14-3202, and Md. Code, Com. Law § 14-4503, supporting an award of treble damages. A defendant who publishes a compliance policy that it knowingly disregards cannot claim that its violations were accidental, inadvertent, or the result of ignorance of the law.

**Mortgage Pipeline's Website Representations Reveal a Deep Culture of Public Deception**

68. Mortgage Pipeline's website at https://www.mortgagepipeline.com/about prominently displays the following representations to consumers: "25+ Years of Delivering Mortgages," "97% Net Client Retention Rate," and "1.5M Mortgages Closed to Date." (See Exhibit V.) These representations are false and misleading. Mortgage Pipeline LLC was incorporated in the State of Florida on March 22, 2025 (Document No. L25000140545), as confirmed by the Florida Division of Corporations records. (See Exhibit P.) At the time of the first call to Plaintiff on July 7, 2025, Mortgage Pipeline had been in existence for approximately one hundred seven (107) days — not twenty-five years. A company that has existed for barely three and a half months cannot have "25+ years of delivering mortgages" or have closed "1.5 million" mortgages. To put the absurdity of this claim in perspective: according to the Federal Housing Finance Agency's National Mortgage Database ("NMDB"), the total number of new residential mortgage originations in the entire United States in 2024 was approximately 4,291,000. (See Exhibit W.) Mortgage Pipeline's claim of 1.5 million mortgages closed would mean that a single company, formed on March 22, 2025, with no operating history and barely a year of existence handled approximately thirty-five percent (35%) of every residential mortgage originated in the entire nation in a single year. This claim is not merely

exaggerated; it is a fabrication so transparently false that it could only have been made with the intent to deceive consumers, and it demonstrates that Mortgage Pipeline's business was built on a foundation of deliberate misrepresentation from the moment of its formation.

69. These false website representations are not isolated; they are part of a broader pattern of deceptive conduct that permeated every aspect of Mortgage Pipeline's operations. The same entity that falsely claimed twenty-five years of experience to consumers visiting its website also used fictitious trade names ("VA Mortgage Pipeline," "Veteran Financial Services," "VA Mortgage Review," "VA Home Loan Center") during telemarketing calls to falsely imply affiliation with the U.S. Department of Veterans Affairs; instructed its agents to identify themselves only by first name to conceal their identities and just hang up and try again hours later when pressed with any response other than "yes, please, I want to refinance"; and used spoofed Maryland telephone numbers to create the false appearance of local origin. Mortgage Pipeline's business model was built on deception from its inception and unfortunately has likely made a lot of money from it.

70. Mortgage Pipeline's fabrication of a twenty-five-year track record, a 97% client retention rate, and 1.5 million closed mortgages — by a company that had been in existence for less than four months at the time it began calling Plaintiff — demonstrates a corporate culture of deliberate deception. This willingness to make demonstrably false claims to consumers provides further evidence that Mortgage Pipeline's violations of the TCPA, the Maryland Telephone Consumer Protection Act, the Maryland Telephone Solicitations Act, and the Maryland Consumer Protection Act were not inadvertent but were the product of a business that was designed and operated to deceive consumers from its very

formation. This evidence supports a finding that Mortgage Pipeline's violations were willful and knowing, warranting an award of treble damages under 47 U.S.C. § 227(c)(5), Md. Code, Com. Law § 14-3202, and Md. Code, Com. Law § 14-4503.

**Independence Home Loans' Demonstrated Knowledge of TCPA Obligations**

71. IHL's own correspondence and discovery responses establish that IHL was fully aware of its obligations under the TCPA and related telemarketing statutes. On October 13, 2025, IHL responded to Plaintiff's cease-and-desist letter, claiming it was "unable to locate any call record" referencing Plaintiff and that it partnered with "reputable third-party lead generation companies" who had "all confirmed that [Plaintiff is] on their Do Not Contact list." (See ¶ 38.) On October 20, 2025, IHL sent a letter to the Maryland Office of Financial Regulation making substantially the same representations. (See ¶ 39.) On November 6, 2025, IHL's representative Eddie Pantiliat sent a second letter to Plaintiff stating that IHL had conducted "a thorough internal investigation" and that "[e]ach vendor has confirmed compliance" and "no statutory violations occurred." (See ¶ 42.) These letters demonstrate that IHL understood the legal framework governing telemarketing calls, recognized that violations of these statutes would carry legal consequences, and affirmatively represented — to Plaintiff, to a state regulator, and later to this Court — that it and its vendors were in compliance.

72. The pattern is clear: IHL knew what the TCPA required, represented to Plaintiff, to the Maryland Office of Financial Regulation, and to this Court that it was in compliance, and continued to authorize and benefit from the very telemarketing conduct those statutes prohibit. A defendant that affirms compliance through counsel while simultaneously profiting from ongoing violations cannot claim that those violations were accidental,

inadvertent, or the result of ignorance. IHL's conduct supports a finding that its violations were willful and knowing, warranting an award of treble damages under 47 U.S.C. § 227(c)(5), Md. Code, Com. Law § 14-3202, and Md. Code, Com. Law § 14-4503.

**The Agency Chain**

73. Based on the evidence obtained through discovery, the telemarketing calls to Plaintiff were placed through the following coordinated chain:

(a) IHL, as the mortgage lender seeking new loan customers, contracted with lead-generation vendors to place telemarketing calls to Maryland consumers and transfer interested prospects to IHL's loan officers as "warm transfers." Upon analysis of a Mortgage Pipeline LLC owned number through amcomlabs and a transfer to an IHL employee, was one of those vendors.

(b) Plaintiff pleads the Mortgage Pipeline relationship on the following record. First, the call detail records amcomlabs produced under subpoena identify Client ID 30796 — an account those records name "Mortgage Pipeline" — as the client account from which one hundred three (103) of the calls to Plaintiff were placed. Second, IHL has admitted, in its Opposition to Plaintiff's Motion for Preliminary Injunction and in its answer to Interrogatory No. 5, that a warm transfer was connected to one of its loan officers on September 15, 2025; three of the four calls placed to Plaintiff on September 15, 2025 appear in those records under Client ID 30796, and the fourth is attributed to Mortgage Pipeline on the basis set out for Tier B below. Third, three days later, on September 18, 2025, an IHL representative identifying herself as "Avery with Independence Home Loans" texted Plaintiff by name to say that IHL had "started your mortgage application,"

an application Plaintiff had never made. The identity of IHL's lead-generation vendors, and the terms on which IHL engaged them, are within IHL's exclusive knowledge, and IHL has declined to identify any vendor by name to Plaintiff or to the Maryland Office of Financial Regulation.

(c) IHL has identified one such vendor under oath. In its answer to Interrogatory No. 21, IHL stated that the October 3, 2025 call "was placed by an independent vendor, Premier Marketing Firm," and that "[t]he call was then transferred to a loan officer at IHL." Plaintiff alleges that IHL engaged more than one lead-generation vendor in the same campaign, and that Mortgage Pipeline and Premier Marketing Firm were each such a vendor. IHL's engagement of Premier Marketing Firm does not displace its engagement of Mortgage Pipeline; it confirms the arrangement Plaintiff alleges — that IHL purchased warm-transferred mortgage leads from outbound telemarketing vendors and staffed a transfer destination to receive them.

(d) Mortgage Pipeline LLC, managed by Grant Maier, subscribed to the amcomlabs/ReadyMode predictive dialer platform via the May 22, 2025 Order Form and directly placed the telemarketing calls to Plaintiff using Client ID 30796. Mortgage Pipeline's agents used the fictitious trade names "VA Mortgage Pipeline," "Veteran Financial Services," "VA Mortgage Review," and "VA Home Loan Center" during the calls, and identified themselves only by first name (e.g., "Joseph") without disclosing the true seller or the commercial purpose of the call.

(e) Mortgage Pipeline, acting on IHL's behalf, utilized the amcomlabs SignalWire account and ReadyMode's predictive dialer platform to place automated outbound

calls at scale, displaying spoofed Maryland (240) 226-XXXX and (240) 800-XXXX numbers as the caller ID.

(f) Jantz, as CEO of ReadyMode and billing contact for the amcomlabs account, controlled the telecommunications infrastructure that made the calls possible — including the purchase of Maryland numbers, the configuration of the predictive dialer, and the spoofing of caller-ID information.

(g) When a consumer expressed interest, the call was "warm transferred" through the system to an IHL loan officer. Notably, IHL admitted in its Opposition to Plaintiff's Motion for Preliminary Injunction that a warm transfer occurred on September 15, 2025 and Plaintiff has presented transcripts to IHL representatives.

74. At all relevant times, Mortgage Pipeline acted as the agent of IHL in placing the telemarketing calls to Plaintiff, within the scope of the actual authority, apparent authority and ratification pleaded in the section of this Complaint titled "IHL's Responsibility for Calls Placed on Its Behalf." Plaintiff does not allege that amcomlabs was IHL's agent; amcomlabs supplied the telephone numbers, the dialer capacity and the caller-identification attestation to the entity that placed the calls, and is liable for its own conduct and as a co-conspirator. IHL is vicariously liable for the acts of Mortgage Pipeline because:

(a) IHL contracted for and received the direct economic benefit of the telemarketing calls (new mortgage leads);

(b) IHL's loan officers received and acted on the warm-transferred calls, confirming Plaintiff's prior conversations with the telemarketers and attempting to close loan transactions;

(c) IHL directed or authorized the subject matter of the calls (VA mortgage refinancing and equity products);

(d) IHL had the right to control the manner in which the calls were placed, as evidenced by its claim to have "notified" vendors to stop calling and its representation that vendors "confirmed compliance"; and

(e) IHL affirmatively represented to Plaintiff and to the Maryland Office of Financial Regulation that it had investigated the calls and determined "no statutory violations occurred" , accepting responsibility for the conduct of its vendors.

75. Alternatively, even if the vendor Defendants are deemed independent contractors rather than agents, IHL is liable for their conduct because IHL ratified and accepted the benefit of the unlawful telemarketing by continuing to receive warm-transferred leads, paying its vendors for those leads, and representing to regulators that it had investigated and found no violations, rather than terminating the vendors or reporting the unlawful conduct.

**The Coercive Design of the Campaign**

76. The evidence set forth in this Complaint, taken as a whole, reveals that the telemarketing campaign conducted on IHL's behalf was not merely aggressive or noncompliant, it was architecturally designed to function as a system of psychological coercion. Every technical feature of the campaign served a single strategic purpose: to eliminate the consumer's ability to avoid, block, screen, or stop the calls, thereby creating an environment of inescapable contact in which the only apparent path to relief was to capitulate and agree to engage with the mortgage refinancing pitch. The campaign was, by design, a siege, engineered to wear consumers down through relentless, unavoidable

pressure until they concluded that the fastest way to make the calls stop was to say "yes" to the refinance.

77. The coercive architecture of the campaign is demonstrated by the interlocking design of its technical components, each of which eliminated a different avenue of consumer self-defense:

(a) **Blocking was impossible. The Calling Defendants rotated among at least fifteen (15) telephone numbers, ensuring that even if Plaintiff blocked one number, the next call would arrive from a different number he had never seen before. This is not an incidental feature of the campaign; it is a countermeasure specifically designed to defeat the consumer's primary technological defense against unwanted calls.**

(b) **Screening was impossible.** Every call displayed a spoofed Maryland area code with "Oakland, MD" as the origin, making each call appear to be a legitimate local call rather than an out-of-state commercial solicitation. Because the calls appeared local, Plaintiff had no basis to screen them without also screening calls from neighbors, local businesses, medical providers, and government offices, an unacceptable tradeoff that Defendants deliberately exploited.

(c) **Spam detection was impossible. amcomlabs assigned every call a STIR/SHAKEN Grade "A" attestation (the highest authentication level available) affirmatively certifying to Plaintiff's carrier (T-Mobile) that the calls were legitimate and that the caller was authorized to use the number displayed. This false attestation caused the calls to bypass T-Mobile's spam-detection algorithms and call-blocking protections entirely. Not a single one**

**of the 107 calls was flagged as "Spam Likely." The Calling Defendants thus co-opted the very infrastructure designed to protect consumers and turned it into a weapon against them.**

(d) **Identification was impossible.** Every calling number was configured to reject inbound calls, so Plaintiff could not call back to determine who was calling, reach a supervisor, or request removal from a call list. The callers identified themselves only by first name and used fictitious trade names that did not correspond to any registered business. When Plaintiff pressed for identifying information, a company name, NMLS number, or website, the callers were trained to immediately disconnect the call rather than provide it. The consumer was left unable to determine who was calling, who they represented, or how to make the calls stop.

(e) **Opting out was impossible.** Plaintiff made at least forty-three (43) verbal do-not-call requests during answered calls. Every request was ignored. Plaintiff sent a formal cease-and-desist letter via certified mail. The calls continued. Plaintiff filed a regulatory complaint with the Maryland Office of Financial Regulation. The calls continued. Plaintiff filed this lawsuit. The calls continued (including a call on December 9, 2025) nearly two months after the lawsuit was filed, and another on February 18, 2026. Every available mechanism for opting out, verbal, written, regulatory, and judicial, was exhausted and disregarded. The consumer was given no exit.

(f) **Escalation was deliberate.** The call frequency intensified over time, rising from sporadic contact in late July and August to multiple calls per day in September

and October 2025. On some days, Plaintiff received as many as seven calls. This escalation pattern is consistent with a system designed to increase psychological pressure as the consumer continues to resist, on the theory that sustained and intensifying contact will eventually break down resistance and produce a "warm transfer" to a loan officer.

78. The deceptive use of VA-affiliated trade names was a critical component of the coercive design. By naming themselves "VA Mortgage Pipeline," "Veteran Financial Services," "VA Mortgage Review," and "VA Home Loan Center," Mortgage Pipeline's agents deliberately targeted the trust that disabled veterans place in the institution that administers their benefits. The false implication of VA affiliation served a dual coercive purpose: it induced veterans to answer calls they would otherwise have rejected, and it created a false sense of obligation or urgency by suggesting that the call concerned their existing VA benefits rather than a commercial sales pitch. This tactic is predatory by design, it exploits the specific vulnerabilities of a population that has earned government benefits through military service and is conditioned to treat VA-affiliated communications as important and trustworthy.

79. The logical endpoint of this architecture is clear: when a consumer cannot block the calls, cannot screen them, cannot identify the caller, cannot opt out through any available channel, and receives calls that escalate in frequency over time, the consumer is placed in a position where the only apparent way to stop the calls is to comply with the caller's demand: in this case, to agree to a mortgage refinance or equity product. The campaign was not designed to inform, educate, or even persuade; it was designed to exhaust. It operated as a system of psychological attrition in which the cost of continued resistance

(enduring ever-more-frequent, inescapable, unblockable calls from unknown callers impersonating VA programs) was engineered to exceed the cost of capitulation (agreeing to speak with a loan officer). This is not aggressive marketing; it is coercion by design, and it is precisely the type of consumer abuse that the federal and Maryland telemarketing statutes were enacted to prevent.

80. The coercive mechanism underlying this campaign is not novel; it is the same psychological dynamic that produces false confessions in custodial interrogation settings. Decades of social science research have established that when a suspect is subjected to prolonged, high-pressure interrogation from which there is no escape, the suspect will eventually confess, not because the confession is true, but because the psychological cost of continued resistance exceeds the perceived cost of compliance. The subject reaches a breaking point at which saying "yes" becomes the only available mechanism for ending the pressure, regardless of whether "yes" reflects the subject's actual intent. Courts throughout the United States have recognized this phenomenon and have suppressed confessions obtained through such coercive techniques precisely because compliance produced by exhaustion is not voluntary consent. See, e.g., Ashcraft v. Tennessee, 322 U.S. 143, 154 (1944) (holding that thirty-six hours of continuous interrogation was "so inherently coercive that its very existence is irreconcilable with the possession of mental freedom"); see also Kassin & Gudjonsson, The Psychology of Confessions: A Review of the Literature and Issues, 5 Psychol. Sci. Pub. Int. 33 (2004) (documenting the established science that sustained psychological pressure produces "compliant false confessions" in which the subject capitulates to end the interrogation despite having no genuine intent to confess).

81. The campaign replicates this coercive dynamic in the consumer context with precision. In the interrogation room, the suspect cannot leave, cannot end the questioning, and cannot reach anyone who will stop the process; the only exit is to confess. In this campaign, the consumer cannot block the calls, cannot screen them, cannot identify the caller, cannot opt out through any available channel, and receives calls that escalate in frequency over time; the only exit is to agree to the warm transfer. The "warm transfer" that IHL receives at the end of this process is the consumer equivalent of a coerced confession, it does not represent genuine consumer interest in a mortgage refinance any more than a coerced confession represents a genuine admission of guilt. It represents the moment at which the consumer's psychological resistance was finally broken by a system designed to break it. IHL's reliance on the existence of warm transfers as evidence that the campaign served willing consumers is therefore fundamentally misleading: the warm transfers are not evidence that the system worked for consumers; they are evidence that the system worked on consumers. Every warm transfer IHL received was the product of a machine that converted consumer exhaustion into a sales lead.

82. This parallel is not merely illustrative; it is legally significant. Just as the law does not permit the government to obtain convictions through confessions extracted by coercive interrogation, consumer protection statutes do not permit sellers to obtain customers through consent manufactured by coercive telemarketing. The federal and Maryland statutes at issue in this case (the TCPA, the TSR, the Maryland Telephone Consumer Protection Act, the Maryland Telephone Solicitations Act, and the Maryland Consumer Protection Act) exist precisely to prevent the kind of sustained, unavoidable, high-pressure commercial contact that the Calling Defendants designed this campaign to

deliver. The campaign did not merely violate the technical requirements of these statutes; it violated the core principle underlying all of them: that a consumer's engagement with a commercial solicitation must be voluntary, informed, and freely given — not extracted through a system of psychological siege.

83. Plaintiff did not capitulate. Instead, he chose to investigate, document, and litigate. But the fact that this particular consumer resisted does not diminish the coercive nature of the system. The campaign was designed to work on the majority of consumers who lack the resources, knowledge, or tenacity to fight back, consumers who, after the twentieth or fiftieth or hundredth call from a number they cannot block, from a caller they cannot identify, about a VA program they are conditioned to take seriously, will eventually say "fine, put me through to your loan officer" simply to make it stop. That is what the Calling Defendants built, and upon information and belief, that is what each of the three Defendants profited from on a massive scale. The campaign model depends on the mathematical certainty that a sufficient volume of inescapable calls to a large enough pool of veterans will produce a predictable conversion rate: not because the product is attractive, but because the calls are unbearable.

**Impact on Plaintiff's Daily Life and Emotional Well-Being**

84. As a direct and proximate result of Defendants' relentless telemarketing campaign, Plaintiff suffered severe and ongoing emotional distress that materially altered his daily life, his sense of security in his own home, and his relationship with his family. The following specific harms are illustrative rather than exhaustive:

(a) **Dread and hypervigilance toward his own telephone.** Plaintiff, a 100% disabled veteran, began to experience anxiety and dread each time his phone rang.

Because Defendants' spoofed caller-ID made every call appear to be a legitimate local call, Plaintiff could not distinguish Defendants' telemarketing calls from calls by his doctor, the VA, his children's school, or other important contacts. The result was a persistent state of apprehension in which every incoming call became a source of stress rather than a normal part of daily life.

(b) **Avoidance of legitimate calls and resulting missed communications.** To protect himself from the relentless calls, Plaintiff began declining calls from unknown numbers. Because Defendants' spoofed numbers were indistinguishable from real local callers, this defensive measure caused Plaintiff to miss legitimate and important calls, including calls from medical providers, the VA, and other contacts that a disabled veteran cannot afford to ignore. Defendants' campaign thus forced Plaintiff into an impossible choice: answer every call and endure the telemarketing harassment, or screen calls and risk missing critical communications related to his health, benefits, and family obligations.

(c) **Sleep disruption.** The volume and persistence of the calling campaign, including calls placed in the evening hours and a call placed at 8:01 p.m. in violation of § 14-4502(c)(1), caused disruption to Plaintiff's sleep and rest. The stress and anxiety produced by the campaign did not end when the calls stopped for the day; Plaintiff experienced difficulty sleeping and a general state of agitation attributable to the knowledge that the calls would resume the following day and that he had no means to prevent them.

(d) **Aggravation of service-connected disability.** Plaintiff holds a 100% disability rating from the U.S. Department of Veterans Affairs. The sustained stress,

anxiety, and frustration caused by Defendants' campaign aggravated the conditions underlying Plaintiff's service-connected disability. The calls were a source of persistent psychological pressure that compounded the challenges Plaintiff already faces as a result of his military service.

(e) **Erosion of trust in legitimate VA communications.** The Calling Defendants' use of fictitious trade names containing "VA" ("VA Mortgage Pipeline," "VA Mortgage Review," "VA Home Loan Center") had a particularly insidious effect on Plaintiff. As a disabled veteran who depends on the VA for ongoing medical care, disability benefits, and housing assistance, Plaintiff had been conditioned through years of military service and post-service interactions to treat VA-affiliated communications as important and trustworthy. The Calling Defendants deliberately exploited this trust. After months of receiving deceptive calls falsely implying VA affiliation, Plaintiff became suspicious of legitimate VA outreach and communications, creating anxiety about whether he might miss or disregard an actual VA communication because the campaign had corrupted his ability to distinguish real VA contacts from predatory imitations.

(f) **Feeling that his veteran status was being weaponized against him.** The deceptive use of VA-affiliated names caused Plaintiff to feel that the service and sacrifice he had given to his country was being turned into a tool for commercial exploitation. Plaintiff earned his VA benefits through nine years of honorable military service. Defendants treated those benefits not as something Plaintiff had earned, but as a data point to be harvested and monetized, a vulnerability to be

exploited rather than a service to be honored. This realization caused Plaintiff significant anger, frustration, and emotional pain.

(g) **Strain on Plaintiff's marriage and home life.** The constant ringing of Plaintiff's phone, the visible frustration and stress it caused him, and the significant time he was forced to spend investigating, documenting, and ultimately litigating Defendants' campaign placed substantial strain on Plaintiff's relationship with his wife and children disrupted the peace and routine of the family household. Plaintiff's wife witnessed firsthand the toll the campaign took on Plaintiff's emotional state and daily functioning. The calls intruded not only on Plaintiff individually but on the shared domestic life of the household.

(h) **Diversion of substantial personal time and energy.** Because the callers refused to identify themselves, honor opt-out requests, or cease their campaign through any available channel, Plaintiff was forced to devote hundreds of hours of personal time to investigating the source of the calls, documenting each call, researching the telecommunications infrastructure, filing regulatory complaints, sending cease-and-desist letters, and ultimately preparing and prosecuting this lawsuit. This time was taken from Plaintiff's family, personal life, and the activities that contribute to his well-being as a disabled veteran. The burden of accountability fell entirely on Plaintiff because the campaign was designed to be untraceable, and every entity in the chain, IHL, amcomlabs, and Mortgage Pipeline, denied responsibility when confronted.

85. Plaintiff's wife is prepared to testify as a corroborating witness to the emotional distress, behavioral changes, sleep disruption, marital strain, and disruption to daily life described

above. She observed Plaintiff's visible frustration and anxiety each time his phone rang, witnessed the volume and frequency of the calls in the household, and can attest to the significant impact the campaign had on Plaintiff's emotional well-being and the family's home environment throughout the period of the calling campaign and continuing to the present.

86. BASIS OF ATTRIBUTION

87. Three entities performed distinct roles in the campaign described in this Complaint, and this Complaint attributes conduct to each of them separately. Where an allegation is made against more than one Defendant, the allegation states what each of them did.

88. Mortgage Pipeline LLC ("Mortgage Pipeline") is the placing party. It selected the contact list, employed or engaged the agents who spoke to Plaintiff, supplied the scripts and the trade names those agents used, and initiated the calls. It appears in the call detail records produced by AM Communication Labs Inc. as Client ID 30796.

89. AM Communication Labs Inc. ("amcomlabs") is the transmitting party. It owns and operates the SignalWire account on which the telephone numbers used to call Plaintiff are held, purchased and configured those numbers, granted the calls STIR/SHAKEN attestation, and routed the calls through the ReadyMode predictive dialer platform. References to amcomlabs include ReadyMode.com, Inc. where the two operate as a single integrated platform, as pleaded above.

90. Independence Home Loans, LLC ("IHL") is the seller. The calls were placed to generate mortgage leads for IHL, consumers who engaged were transferred to IHL's loan officers, and IHL is the entity on whose behalf the calls were made within the meaning of 16 C.F.R. § 310.4(b), 47 U.S.C. § 227(c)(5), and 47 C.F.R. § 64.1200(d)(3).

91. The term "Calling Defendants" means Mortgage Pipeline and amcomlabs together, and is used only in allegations where both of them performed the act alleged. Except in the caption, the prayer for relief, and paragraphs describing the cumulative effect of the campaign on Plaintiff, this Complaint does not use the term "Defendants" to refer to the three Defendants collectively.

92. This section identifies which of the one hundred seven (107) calls is attributed to which Defendant, and on what record. Each Count below cites the tiers on which it rests. The tiers are set out call by call in Exhibit B-1, which is the operative call-by-call record of the calls at issue. Exhibit B, the call log filed with the Second Amended Complaint, records only the calls placed through October 1, 2025, and is superseded by Exhibit B-1.

93. Tier A — ninety-six (96) calls. These calls were placed from the ten (240) 226-XXXX telephone numbers held on the amcomlabs SignalWire account and appear in the call detail records amcomlabs produced under subpoena, associated with Client ID 30796, which those records identify as Mortgage Pipeline. Tier A calls are attributed to Mortgage Pipeline as the placing party and to amcomlabs as the transmitting party, on documentary evidence produced by amcomlabs itself. Among the Tier A calls are three placed on September 15, 2025, at 10:36 a.m., 5:26 p.m. and 5:32 p.m.; a fourth call to Plaintiff that day, at 2:10 p.m., is a Tier B call. IHL has identified September 15, 2025, in its Opposition to Plaintiff's Motion for Preliminary Injunction and in its answer to Interrogatory No. 5, as a date on which a warm transfer was connected to one of its loan officers. Three of those four calls appear in the call detail records under Client ID 30796, and the fourth is attributed to Mortgage Pipeline on the basis set out for Tier B below. IHL has therefore admitted receiving a lead generated by a call Mortgage Pipeline placed.

94. Tier A-2 — two (2) calls. These calls were placed from the same ten telephone numbers held on the amcomlabs SignalWire account and appear in Plaintiff's carrier records. They are attributed to Mortgage Pipeline as the placing party and to amcomlabs as the transmitting party, on the registration of the calling numbers to the amcomlabs account.

95. Tier B — five (5) calls. These calls were placed from (240) 800-9702. Plaintiff pleads these calls on his carrier records, which show that this number presented a Maryland caller ID and was configured to reject return calls in the same manner as the ten numbers held on the amcomlabs SignalWire account, and, upon information and belief, that (240) 800-9702 is likewise held on that account. Plaintiff attributes these calls to Mortgage Pipeline as the placing party and to amcomlabs as the transmitting party.

96. Tier C — two (2) calls, on October 2 and October 3, 2025, from (240) 433-5517 and (240) 443-3768. IHL has acknowledged both calls. As to the October 3, 2025 call, IHL has stated under oath, in its answer to Interrogatory No. 21, that the call was placed by an independent vendor, Premier Marketing Firm, and was then transferred to a loan officer at IHL; the recording and transcript at Exhibit J show that the loan officer who took it was Matthew Huss, IHL's Executive Loan Officer, who identified the business he represented as "Veteran Services." That call is attributed to IHL on its own admission and on Exhibit J. As to the October 2, 2025 call, the vendor that placed it has not yet been identified; Plaintiff attributes that call to IHL as the seller on whose behalf it was placed, on the grounds set out in the section titled "IHL's Responsibility for Calls Placed on Its Behalf."

97. Tier D — one (1) call, on December 9, 2025, from (240) 502-9284. This call was placed five days after IHL was served with process in this action and was answered by Plaintiff.

Plaintiff pleads this call on his carrier records and on his own testimony as the person who answered it.

98. Tier E — one (1) call, on February 18, 2026, from (240) 901-3983. This call was placed fourteen days after this Court denied IHL's motion to dismiss. Twilio has identified amcomlabs as the entity to which the originating number is assigned.

99. The six tiers total one hundred seven (107) calls: 96 + 2 + 5 + 2 + 1 + 1. Where a Count is pleaded against fewer than all Defendants, the omission reflects Plaintiff's attribution and not any abandonment of any other claim.

100. IHL'S RESPONSIBILITY FOR CALLS PLACED ON ITS BEHALF

101. IHL's liability in this Complaint rests on five independent grounds. The first is regulatory: several of the provisions at issue impose duties on the seller by their own terms, without regard to agency. The second, third and fourth are the common law of agency — actual authority, apparent authority, and IHL's ratification of the campaign after it learned of it. The fifth is the conduct of IHL's own employees, for which IHL answers without regard to any vendor's status. Plaintiff pleads each of them, and no Count that identifies an independent ground depends on the agency grounds.

102. First ground, regulatory. 16 C.F.R. § 310.4(a) provides that "[i]t is an abusive telemarketing act or practice and a violation of this part for any seller or telemarketer to engage in" the conduct that subsection describes. 16 C.F.R. § 310.4(b) provides that it is such a violation "for a telemarketer to engage in, or for a seller to cause a telemarketer to engage in," the conduct that subsection describes. 47 U.S.C. § 227(c)(5) creates a private action for a person who has received more than one call within any twelve-month period "by or on behalf of the same entity" in violation of the regulations prescribed under that

subsection. And 47 C.F.R. § 64.1200(d)(3) provides that "[i]f such requests are recorded or maintained by a party other than the person or entity on whose behalf the call is made, the person or entity on whose behalf the call is made will be liable for any failures to honor the do-not-call request." Each of these provisions reaches IHL directly.

103. Second ground, actual authority. The agency chain is pleaded above and is incorporated here. Under Maryland law an agency relationship turns on the intent of the parties as shown by their agreements and conduct, and on the principal's right to control the agent with respect to the objectives of the agency; the principal need not control every detail of the agent's performance. Green v. H & R Block, Inc., 355 Md. 488, 735 A.2d 1039 (1999). IHL defined the object of the work — VA-eligible refinance and equity leads in the states in which it is licensed to lend, including Maryland — received the warm transfers those calls produced, took Plaintiff's personal and financial information through them, and opened a mortgage file in Plaintiff's name that Plaintiff never requested.

104. IHL has itself asserted the control that establishes the relationship. IHL represented to Plaintiff, to the Maryland Office of Financial Regulation, and to this Court that upon receiving Plaintiff's complaint it notified its vendors to cease calling him and that the vendors "all confirmed" his removal. A party with no right to direct the manner of another's telemarketing cannot instruct it to stop and obtain its confirmation. As the Fourth Circuit put it in a materially identical posture, "[i]f the parties want the benefits of an independent contractor relationship, they have to actually have one." Krakauer v. Dish Network, L.L.C., 925 F.3d 643, 660 (4th Cir. 2019).

105. In the telemarketing context, the control that establishes agency is control over the manner and means of the calling campaign. Bradley v. DentalPlans.com, 2022 WL 2973979, at *8 (D. Md. 2022); see Green v. H & R Block, Inc., 355 Md. 488, 503, 735 A.2d 1039 (1999) (the principal's right to control the agent is among the three characteristics of the relationship).

106. Upon information and belief, IHL's engagement of Mortgage Pipeline fixed the manner and means of the calling campaign in the following respects. IHL specified the lead it would buy: a consumer holding a VA-backed mortgage, residing in a State in which IHL is licensed to lend, and meeting IHL's loan-balance, equity and credit criteria. IHL paid on a per-lead or per-transfer basis, so that IHL's own compensation structure set the vendor's incentive to place calls. IHL supplied and staffed the destination to which qualified consumers were to be transferred, and the hours during which it would accept transfers, so that the campaign could be conducted only when IHL's loan officers were available to receive it. IHL retained the right to reject leads that did not meet its criteria. And IHL retained the right to suspend or terminate the vendor — a right IHL says it exercised when it "notified" its vendors to stop calling Plaintiff. The documents recording that engagement are in IHL's possession and have not been produced.

107. Third ground, apparent authority. A principal is liable to a third party who reasonably believes, on the strength of the principal's own manifestations, that another is acting on the principal's behalf. Maryland's test has three elements: the apparent principal created or accepted the appearance of an agency relationship; the plaintiff believed in that relationship and relied on that belief; and the belief and the reliance were reasonable. Williams v. Dimensions Health Corp., 479 Md. 60 (2022); Homa v. Friendly

Mobile Manor, Inc., 93 Md. App. 337, 349, 612 A.2d 322 (1992). Apparent authority is an independent route to a seller's liability for a telemarketer's conduct, alongside actual authority and ratification. Hodgin v. UTC Fire & Security Americas Corp., 885 F.3d 243, 252 (4th Cir. 2018).

108. The appearance was IHL's own. IHL maintained a destination for warm-transferred telemarketing leads and staffed it with its own loan officers, who took the transfers. IHL has admitted taking such transfers on September 15, October 2 and October 3, 2025. A seller that maintains and answers a warm-transfer destination holds out the callers who fill it as authorized to call on its behalf. IHL then went further. On September 18, 2025, three days after the September 15 transfer, an IHL representative identifying herself as "Avery with Independence Home Loans" texted Plaintiff by name to say that IHL had "started your mortgage application." On October 2, 2025, an IHL loan officer conducted a sixteen-minute discussion of proposed mortgage interest rates with Plaintiff, during which IHL's licensed loan originator Owen James Dixon texted Plaintiff IHL's website and his own NMLS identifier. And on October 3, 2025, IHL's own Executive Loan Officer answered a transferred call with the greeting "Veteran Services" — one of the same fictitious trade names Mortgage Pipeline's callers had been using since July.

109. Plaintiff believed and relied. Plaintiff gave and confirmed personal and financial information on the strength of the transfer and of the identifications that followed it, remained on the October 2, 2025 call for sixteen minutes discussing proposed interest rates, and dealt with IHL as the entity standing behind the calls.

110. The belief was reasonable. Nothing IHL did distinguished its own conduct from its vendors'. IHL's own employee used the same fictitious trade name the vendors' callers used. IHL opened a mortgage file in Plaintiff's name on information the vendors' callers had taken from him. IHL solicited Plaintiff under its own name from telephone numbers it controlled, referring to the same application. A consumer in Plaintiff's position had no means of drawing a line between IHL and the callers, because IHL's own conduct had erased it.

111. Fourth ground, ratification. IHL's knowledge of the campaign and its representations about it are pleaded above and are incorporated here. Whatever the vendors' status when the campaign began, IHL adopted the campaign once it knew of it. A call was placed to Plaintiff and answered on December 9, 2025, after IHL had been served with process in this action, and a further call followed on February 18, 2026, after this Court denied IHL's motion to dismiss.

112. A principal that learns of an agent's unlawful conduct, tells a regulator the conduct has stopped, and permits it to continue has ratified it and made it its own. Restatement (Third) of Agency § 4.01. The willfulness of the conduct is likewise inherited: an act ratified is treated as authorized from the outset, together with the state of mind with which it was done. Restatement (Third) of Agency § 7.04; Krakauer, 925 F.3d at 659–60.

113. Ratification is not effective without knowledge of the material facts. Restatement (Third) of Agency § 4.06. IHL had that knowledge, on dates of its own making. By October 8, 2025 — the date IHL told the Maryland Office of Financial Regulation it received Plaintiff's cease-and-desist letter — IHL knew that Plaintiff had been called

repeatedly, that he had demanded that the calls stop, and that he attributed the calls to vendors calling on IHL's behalf. By October 20, 2025, IHL had described those vendors to a State regulator and represented that it had contacted them. On December 4, 2025, IHL was served with process in this action, which set the campaign out in detail. On February 4, 2026, this Court denied IHL's motion to dismiss.

114. IHL affirmed the campaign by retaining its benefits. IHL kept the leads the campaign produced. It kept the mortgage file it had opened in Plaintiff's name on information taken from him during the calls. It kept Plaintiff's telephone number in its marketing systems and continued to solicit him through "Avery" after learning of his objection. It did not terminate the vendor, did not identify the vendor to the regulator, and did not repudiate the calls. Under Maryland law, both an intention to affirm and knowledge of the essential facts may be inferred from the receipt and retention of the benefit of an unauthorized act coupled with a failure to disavow it within a reasonable time. Progressive Casualty Insurance Co. v. Ehrhardt, 69 Md. App. 431, 448–49, 518 A.2d 151 (1986).

115. Fifth ground, IHL's own employees. On the Tier C call of October 3, 2025, the consumer was transferred to Matthew Huss, an Executive Loan Officer employed by IHL, who conducted the sales conversation and identified the business he represented as "Veteran Services." On that portion of the call no vendor spoke; IHL did. IHL is liable for the conduct of its own employee acting within the scope of his employment without regard to any vendor's status.

116. Plaintiff pleads these grounds in the alternative and cumulatively. Where a Count below states that IHL's liability does not depend on a finding that Mortgage Pipeline

acted as IHL's agent, that statement rests on the regulatory ground, on the statutory text of the provision charged in that Count, on ratification, on IHL's own employees' conduct, or on some combination of them, as that Count specifies.

## CLAIMS FOR RELIEF

### Count I — Maryland Telephone Consumer Protection Act: Failure to Honor Do-Not-Call Requests (Against Mortgage Pipeline LLC and Independence Home Loans, LLC) (Md. Code, Com. Law §§ 14-3201, 14-3202; 16 C.F.R. § 310.4(b)(1)(ii))

117. Plaintiff realleges and incorporates all preceding paragraphs.

118. Conduct alleged. Mortgage Pipeline placed the calls identified in Exhibit B-1 as Tiers A, A-2 and B. Plaintiff answered forty-three (43) of those calls. On each answered call Plaintiff stated, clearly and without qualification, that he did not consent to the calls, that he wanted no further calls, and that his number should be removed from every list on which it appeared. Mortgage Pipeline's agents took each of those requests. Mortgage Pipeline recorded none of them, processed none of them, and honored none of them, and continued placing calls to the same number for another five months.

119. Conduct alleged. Mortgage Pipeline is a "telemarketer" within the meaning of 16 C.F.R. § 310.2(hh). It appears in the call detail records produced by amcomlabs as Client ID 30796, and the calls in Tiers A, A-2 and B originated from that client account.

120. IHL as principal. IHL is a "seller" within the meaning of 16 C.F.R. § 310.2(ee). The calls were placed to generate mortgage leads for IHL, and consumers who engaged were transferred to IHL's loan officers. IHL is liable for the same forty-three (43) calls as the seller on whose behalf they were placed, on the agency and ratification facts pleaded

in the section of this Complaint titled "IHL's Responsibility for Calls Placed on Its Behalf."

121. IHL's independent liability. IHL is separately liable on this Count without regard to agency. Plaintiff's do-not-call demand reached IHL directly and in writing: by certified cease-and-desist letter sent to IHL's principal office and resident agent on October 6, 2025, and by the complaint Plaintiff filed with the Maryland Office of Financial Regulation the same day. IHL answered on October 13, 2025 that it had no record of the calls; told the Office of Financial Regulation on October 20, 2025 that its vendors had "all confirmed" Plaintiff's removal; and wrote through its General Counsel on November 6, 2025 that "each vendor confirmed compliance." Calls continued through December 9, 2025 and again on February 18, 2026. A seller that receives a do-not-call demand, tells a state regulator it has been honored, and permits the calls to continue has failed to honor that demand through its own conduct. IHL's liability under this Count does not depend on any finding that Mortgage Pipeline acted as IHL's agent.

122. Under Md. Code, Com. Law § 14-3201(1), a person may not violate the Telemarketing and Consumer Fraud and Abuse Prevention Act (15 U.S.C. §§ 6101–6108) or its implementing rule, the Telemarketing Sales Rule (16 C.F.R. Part 310).

123. Statutory standard. 16 C.F.R. § 310.4(b)(1)(ii) makes it an abusive telemarketing act or practice to deny or interfere with a person's right to be placed on a list of persons who do not wish to receive further calls from or on behalf of the seller. The obligation attaches to an entity-specific request and applies whether or not the called party is listed on the National Do Not Call Registry.

124. Pursuant to Md. Code, Com. Law § 14-3202(b), an individual affected by a violation of this subtitle may recover the greater of $500 for each violation or actual damages, together with reasonable attorney's fees. Under § 14-3202(c), each prohibited solicitation and each prohibited practice during a solicitation constitutes a separate violation.

125. Damages. Forty-three (43) separate violations at $500 each. Mortgage Pipeline and IHL are jointly and severally liable to Plaintiff in the amount of $21,500, together with reasonable attorney's fees, costs, and such other relief as the Court deems just and proper.

**Count II — Maryland Telephone Consumer Protection Act: Calls Placed After Revocation of Consent (Against Mortgage Pipeline LLC and Independence Home Loans, LLC) (Md. Code, Com. Law §§ 14-3201, 14-3202; 16 C.F.R. § 310.4(b)(1)(iii)(A))**

126. Plaintiff realleges and incorporates all preceding paragraphs.

127. Conduct alleged. Plaintiff revoked any consent that may have existed on July 7, 2025, during the first call he answered. One hundred five (105) further calls were placed to Plaintiff's personal cellular number after that revocation, running from July 23, 2025 through February 18, 2026. Mortgage Pipeline placed one hundred one (101) of them, comprising the calls identified in Exhibit B-1 as Tiers A, A-2 and B other than the two calls of July 7, 2025. The remaining four were the two Tier C calls of October 2 and October 3, 2025, one of which IHL has admitted was placed by its vendor Premier Marketing Firm and transferred to IHL's own Executive Loan Officer; the Tier D call of December 9, 2025, placed five days after IHL was served with process; and the Tier E

call of February 18, 2026, placed fourteen days after this Court denied IHL's motion to dismiss.

128. Conduct alleged. 16 C.F.R. § 310.4(b)(1)(iii)(A) contains no grace period. It prohibits initiating an outbound telephone call to a person who "previously has stated that he or she does not wish to receive an outbound telephone call made by or on behalf of the seller." Every one of the one hundred five (105) calls was placed after Plaintiff had so stated.

129. IHL as principal. The prohibition in 16 C.F.R. § 310.4(b) runs against "a telemarketer" and against "a seller" who causes a telemarketer to engage in the prohibited conduct. IHL is liable for the same one hundred five (105) calls as the seller on whose behalf they were placed, on the facts pleaded in the section titled "IHL's Responsibility for Calls Placed on Its Behalf."

130. IHL's independent liability. Two of the calls in this Count did not merely continue after Plaintiff's revocation; they continued after IHL was a defendant in this action. A call was placed and answered on December 9, 2025, after IHL had been served with process. A further call followed on February 18, 2026, after this Court denied IHL's motion to dismiss. Calls placed after a seller has been sued over the calls, and after that seller has told a regulator the calls have stopped, are the seller's own conduct. IHL's liability under this Count does not depend on any finding that Mortgage Pipeline acted as IHL's agent.

131. Under Md. Code, Com. Law § 14-3201(1), a person may not violate the Telemarketing and Consumer Fraud and Abuse Prevention Act (15 U.S.C. §§ 6101–6108) or its implementing rule, the Telemarketing Sales Rule (16 C.F.R. Part 310).

132. Pursuant to Md. Code, Com. Law § 14-3202(b), an individual affected by a violation of this subtitle may recover the greater of $500 for each violation or actual damages, together with reasonable attorney's fees. Under § 14-3202(c), each prohibited solicitation and each prohibited practice during a solicitation constitutes a separate violation.

133. Damages. One hundred five (105) separate violations at $500 each. Mortgage Pipeline and IHL are jointly and severally liable to Plaintiff in the amount of $52,500, together with reasonable attorney's fees, costs, and such other relief as the Court deems just and proper.

**Count III — Maryland Telephone Consumer Protection Act: Failure to Transmit the True Name and Telephone Number (Against AM Communication Labs Inc., Mortgage Pipeline LLC, and Independence Home Loans, LLC) (Md. Code, Com. Law §§ 14-3201, 14-3202; 16 C.F.R. § 310.4(a)(8))**

134. Plaintiff realleges and incorporates all preceding paragraphs.

135. Conduct alleged. amcomlabs purchased and holds ten (10) of the telephone numbers used as caller-ID presentation numbers on the calls to Plaintiff, on a SignalWire account amcomlabs operates, and upon information and belief holds an eleventh, (240) 800-9702, on that same account. All ten documented numbers were acquired within a single four-minute window on May 26, 2025, forty-two days before the first call to Plaintiff. amcomlabs configured each number so that inbound calls to it were rejected.

136. Conduct alleged. Mortgage Pipeline selected those numbers as the caller-ID presented on the calls it placed under Client ID 30796. Four further numbers — (240) 433-5517, (240) 443-3768, (240) 502-9284 and (240) 901-3983 — were used on the calls

in Tiers C, D and E. None of the fifteen (15) numbers was the telephone number of the seller, and none was answered by any customer-service line of the seller during regular business hours or at any other time.

137. Statutory standard. 16 C.F.R. § 310.4(a) provides that "[i]t is an abusive telemarketing act or practice and a violation of this part for any seller or telemarketer to engage in" the conduct it describes, which at subsection (a)(8) is "[f]ailing to transmit or cause to be transmitted the telephone number, and, when made available by the telemarketer's carrier, the name of the telemarketer, to any caller identification service in use by a recipient of a telemarketing call." The safe harbor within that subsection permits substitution only of "the name of the seller" and "the seller's . . . customer or donor service telephone number, which is answered during regular business hours." Neither substitution was made here.

138. IHL's independent liability. Because § 310.4(a) binds "any seller or telemarketer" by its own terms, IHL is directly liable on this Count as the seller, and not derivatively. IHL's mortgage products were the goods being sold on every call, IHL's loan officers received the transfers, and no call transmitted IHL's name or a working IHL service number. IHL's liability under this Count does not depend on any finding that Mortgage Pipeline acted as IHL's agent.

139. Under Md. Code, Com. Law § 14-3201(1), a person may not violate the Telemarketing and Consumer Fraud and Abuse Prevention Act (15 U.S.C. §§ 6101–6108) or its implementing rule, the Telemarketing Sales Rule (16 C.F.R. Part 310).

140. Pursuant to Md. Code, Com. Law § 14-3202(b), an individual affected by a violation of this subtitle may recover the greater of $500 for each violation or actual

damages, together with reasonable attorney's fees. Under § 14-3202(c), each prohibited solicitation and each prohibited practice during a solicitation constitutes a separate violation.

Damages. One hundred seven (107) separate violations at $500 each. amcomlabs, Mortgage Pipeline and IHL are jointly and severally liable to Plaintiff in the amount of $53,500, together with reasonable attorney's fees, costs, and such other relief as the Court deems just and proper.

Count IV — Maryland Telephone Solicitations Act: Failure to Transmit Caller Name and Number (Against AM Communication Labs Inc., Mortgage Pipeline LLC, and Independence Home Loans, LLC) (Md. Code, Com. Law §§ 14-4502(b)(1)(i), 14-4503; Title 13)

141. Plaintiff realleges and incorporates all preceding paragraphs.

142. Conduct alleged. On each of the one hundred seven (107) solicitations, the number and name delivered to Plaintiff's caller-identification service were not the originating number and not the name of any party to the call. amcomlabs owned and provisioned the presentation numbers; Mortgage Pipeline selected them and placed the calls.

143. IHL's liability under the statutory text. Md. Code, Com. Law § 14-4502(b)(1)(i) binds "[a] person who makes or causes to be made a telephone solicitation," and § 14-4501(f) defines "telephone solicitation" by reference to Md. Code, Public Utilities § 8-205(a)(1) as an organized activity, program, or campaign to communicate by telephone with residents of Maryland in order to sell, lease, or rent goods or services. Section 8-205(a)(2) further provides that the term includes "the act of managing, directing, or supervising an individual engaged in telephone solicitation." The campaign was

organized to sell IHL's mortgage products, and IHL is liable as the person on whose behalf the solicitations were made. IHL caused those solicitations to be made, and its liability on this Count therefore rests on the statutory text. IHL is separately liable as principal on the facts pleaded in the section titled "IHL's Responsibility for Calls Placed on Its Behalf." IHL's liability under this Count does not depend on any finding that Mortgage Pipeline acted as IHL's agent.

144. Under Md. Code, Com. Law § 14-4503, a violation of § 14-4502 is an unfair or deceptive trade practice within the meaning of Title 13, enforceable through the private right of action provided in § 13-408. Under § 14-4503(a)(2), a called party aggrieved by a violation may recover up to $500 per violation or actual damages, whichever is greater, and if the court finds the violation willful or knowing it may award up to three times that amount.

145. The violations charged in this Count were willful and knowing. Mortgage Pipeline published a TCPA compliance policy representing that it obtained consent, maintained records, verified its lead sources, and honored opt-out requests, and violated every material provision of its own policy. IHL represented to Plaintiff, to the Maryland Office of Financial Regulation, and to this Court that it had investigated the calls and that "no statutory violations occurred," and the calls continued afterward. Each Defendant thus acted with actual knowledge of the requirements it was violating. Md. Code, Com. Law § 14-4503(a)(2)(ii). Because the calls displayed Maryland area codes, the presumption of § 14-4503(b) also applies.

146. Damages. One hundred seven (107) separate violations. Plaintiff seeks treble statutory damages of $1,500 per violation, totaling $160,500, for which amcomlabs,

Mortgage Pipeline and IHL are jointly and severally liable, together with reasonable attorney's fees, costs, and such other relief as the Court deems just and proper.

147. Count V — Maryland Telephone Solicitations Act: Intentional Prevention of Caller-ID Transmission (Against AM Communication Labs Inc., Mortgage Pipeline LLC, and Independence Home Loans, LLC) (Md. Code, Com. Law §§ 14-4502(b)(1)(ii), 14-4503; Title 13)

148. Plaintiff realleges and incorporates all preceding paragraphs.

149. Conduct alleged. amcomlabs configured each of the ten (10) Subject Numbers held on its SignalWire account to reject inbound calls. The only inbound records on those numbers in amcomlabs' SignalWire account are Plaintiff's own attempted return calls, each disconnected on arrival. The configuration performed exactly as it was built to perform: it made the caller unreachable and unidentifiable.

150. Conduct alleged. The platform amcomlabs operates is capable of transmitting accurate caller identification. amcomlabs is registered with the Federal Communications Commission as an interconnected VoIP provider (Filer ID 834408) and assigned STIR/SHAKEN Grade "A" attestation to the outbound calls, which is a representation that the caller's identity had been verified. The failure to transmit true identifying information was therefore not a limitation of the technology but a configuration choice.

151. Conduct alleged. Mortgage Pipeline placed every call in Tiers A, A-2 and B using those numbers as its presented caller ID, with knowledge that the return path was closed, and instructed its agents to give only a first name and to end the call when asked for identifying information.

152. IHL's liability under the statutory text. Md. Code, Com. Law § 14-4502(b)(1)(ii) binds "[a] person who makes or causes to be made a telephone solicitation," and § 14-4501(f) incorporates Md. Code, Public Utilities § 8-205(a)(2), which extends the term to "the act of managing, directing, or supervising an individual engaged in telephone solicitation." The campaign was organized to sell IHL's mortgage products, IHL caused the solicitations to be made, and IHL is liable on this Count on the statutory text. Plaintiff does not allege that IHL itself configured the Subject Numbers; Plaintiff alleges that IHL caused to be made the solicitations those numbers carried. IHL is separately liable as principal on the facts pleaded in the section titled "IHL's Responsibility for Calls Placed on Its Behalf." IHL's liability under this Count does not depend on any finding that Mortgage Pipeline acted as IHL's agent.

153. Under Md. Code, Com. Law § 14-4503, a violation of § 14-4502 is an unfair or deceptive trade practice within the meaning of Title 13, enforceable through the private right of action provided in § 13-408. Under § 14-4503(a)(2), a called party aggrieved by a violation may recover up to $500 per violation or actual damages, whichever is greater, and if the court finds the violation willful or knowing it may award up to three times that amount.

154. The violations charged in this Count were willful and knowing. Mortgage Pipeline published a TCPA compliance policy representing that it obtained consent, maintained records, verified its lead sources, and honored opt-out requests, and violated every material provision of its own policy. IHL represented to Plaintiff, to the Maryland Office of Financial Regulation, and to this Court that it had investigated the calls and that "no statutory violations occurred," and the calls continued afterward. Each Defendant

thus acted with actual knowledge of the requirements it was violating. Md. Code, Com. Law § 14-4503(a)(2)(ii). Because the calls displayed Maryland area codes, the presumption of § 14-4503(b) also applies.

155. Damages. One hundred seven (107) separate violations. Plaintiff seeks treble statutory damages of $1,500 per violation, totaling $160,500, for which amcomlabs, Mortgage Pipeline and IHL are jointly and severally liable, together with reasonable attorney's fees, costs, and such other relief as the Court deems just and proper.

**Count VI — Maryland Telephone Solicitations Act: Use of Technology to Conceal True Identity (Caller-ID Spoofing) (Against AM Communication Labs Inc., Mortgage Pipeline LLC, and Independence Home Loans, LLC) (Md. Code, Com. Law §§ 14-4502(b)(1)(iii), 14-4503; Title 13)**

156. Plaintiff realleges and incorporates all preceding paragraphs.

157. Conduct alleged. The numbers displayed to Plaintiff were presentation numbers, not originating trunk lines. SignalWire records confirm that the calls were routed through the ReadyMode predictive dialer over SIP trunking and that the (240) 226-XXXX and (240) 800-XXXX numbers were used solely as displayed caller ID. amcomlabs provisioned and configured that arrangement.

158. Conduct alleged. The displayed numbers carried Maryland area codes and rate centers, including "Oakland, MD," "Bethesda" and "Silver Spring," which caused Plaintiff to believe the calls originated locally. Mortgage Pipeline placed the calls behind that display and rotated among the numbers as Plaintiff blocked them.

159. IHL's liability under the statutory text. Md. Code, Com. Law § 14-4502(b)(1)(iii) binds "[a] person who makes or causes to be made a telephone solicitation," and § 14-

4501(f) incorporates Md. Code, Public Utilities § 8-205(a)(2), which extends the term to the act of managing, directing, or supervising an individual engaged in telephone solicitation. IHL caused the solicitations to be made and is liable on this Count on the statutory text. IHL is separately liable as principal on the facts pleaded in the section titled "IHL's Responsibility for Calls Placed on Its Behalf." IHL's liability under this Count does not depend on any finding that Mortgage Pipeline acted as IHL's agent.

160. Under Md. Code, Com. Law § 14-4503, a violation of § 14-4502 is an unfair or deceptive trade practice within the meaning of Title 13, enforceable through the private right of action provided in § 13-408. Under § 14-4503(a)(2), a called party aggrieved by a violation may recover up to $500 per violation or actual damages, whichever is greater, and if the court finds the violation willful or knowing it may award up to three times that amount.

161. The violations charged in this Count were willful and knowing. Mortgage Pipeline published a TCPA compliance policy representing that it obtained consent, maintained records, verified its lead sources, and honored opt-out requests, and violated every material provision of its own policy. IHL represented to Plaintiff, to the Maryland Office of Financial Regulation, and to this Court that it had investigated the calls and that "no statutory violations occurred," and the calls continued afterward. Each Defendant thus acted with actual knowledge of the requirements it was violating. Md. Code, Com. Law § 14-4503(a)(2)(ii). Because the calls displayed Maryland area codes, the presumption of § 14-4503(b) also applies.

162. Damages. One hundred seven (107) separate violations. Plaintiff seeks treble statutory damages of $1,500 per violation, totaling $160,500, for which amcomlabs,

Mortgage Pipeline and IHL are jointly and severally liable, together with reasonable attorney's fees, costs, and such other relief as the Court deems just and proper.

**Count VII — Maryland Consumer Protection Act: Use of False or Misleading Trade Names During Telephone Solicitations (Against Mortgage Pipeline LLC and Independence Home Loans, LLC) (Md. Code, Com. Law §§ 13-301(10)(i), 13-408)**

163. Plaintiff realleges and incorporates all preceding paragraphs.

164. Conduct alleged. On the forty-three (43) answered calls, Mortgage Pipeline's agents identified the business they represented as "VA Mortgage Pipeline," "Veteran Financial Services," "VA Mortgage Review," "VA Home Loan Center," or "Veteran Services." Mortgage Pipeline is registered in Florida under no such name and is registered in Maryland under no name at all. A search of the Maryland State Department of Assessments and Taxation Express Business Entity Search returns no active or registered Maryland entity under any of them. (See Exhibit F.)

(a) Conduct alleged. Each of those names was chosen to imply an affiliation with the United States Department of Veterans Affairs that did not exist, and was directed at a consumer the callers knew to be a veteran with a VA-backed mortgage.

(b) IHL's independent liability. The same naming convention was used inside IHL. On October 3, 2025, a call was warm transferred to Matthew Huss, IHL's own Executive Loan Officer, who answered it with the greeting "Veteran Services." (See Exhibit J.) That call is identified in Exhibit B-1 as a Tier C call, and IHL has admitted it. Huss is not a vendor, a lead generator, or a contractor; he is IHL's employee, and the words he used were IHL's own representation of the business he represented. IHL has offered no explanation of how its employee

independently arrived at the same fictitious trade name its upstream callers were using. IHL's liability under this Count does not depend on any finding that Mortgage Pipeline acted as IHL's agent.

(c) Statutory standard. Md. Code, Com. Law § 13-301(10)(i) makes it an unfair, abusive, or deceptive trade practice for a person making a telephone solicitation to fail to state clearly, affirmatively, and expressly the trade name of the person represented. Under § 13-408, a person may bring an action to recover for injury or loss sustained as the result of such a practice.

(d) Damages. Forty-three (43) separate violations at $500 each. Mortgage Pipeline and IHL are jointly and severally liable to Plaintiff in the amount of $21,500, together with reasonable attorney's fees, costs, and such other relief as the Court deems just and proper.

**Count VIII — Maryland Telephone Consumer Protection Act: Failure to Disclose the Identity of the Seller (Against Mortgage Pipeline LLC and Independence Home Loans, LLC) (Md. Code, Com. Law §§ 14-3201, 14-3202; 16 C.F.R. § 310.4(d)(1))**

165. Plaintiff realleges and incorporates all preceding paragraphs.

166. Conduct alleged. On each of the forty-three (43) answered calls, Mortgage Pipeline's agents failed to disclose the identity of the seller. They gave a first name and a fictitious trade name and, when asked who they worked for or who was licensed to make the loan, ended the call. Plaintiff learned the seller's identity only through subpoena practice after this suit was filed.

167. IHL as principal. 16 C.F.R. § 310.4(d) binds "a telemarketer in an outbound telephone call." IHL is liable on this Count as the seller on whose behalf Mortgage

Pipeline made the calls, on the facts pleaded in the section titled "IHL's Responsibility for Calls Placed on Its Behalf."

168. IHL's independent liability as to the Tier C calls. On the two calls identified in Exhibit B-1 as Tier C, the consumer was transferred to IHL's own Executive Loan Officer, who then conducted the sales conversation. On those calls IHL was itself the telemarketer within the meaning of 16 C.F.R. § 310.2(hh), and it identified the business it represented as "Veteran Services" rather than as Independence Home Loans, LLC. As to those two calls, IHL's liability does not depend on any finding that Mortgage Pipeline acted as its agent.

169. Under Md. Code, Com. Law § 14-3201(1), a person may not violate the Telemarketing and Consumer Fraud and Abuse Prevention Act (15 U.S.C. §§ 6101–6108) or its implementing rule, the Telemarketing Sales Rule (16 C.F.R. Part 310).

170. Pursuant to Md. Code, Com. Law § 14-3202(b), an individual affected by a violation of this subtitle may recover the greater of $500 for each violation or actual damages, together with reasonable attorney's fees. Under § 14-3202(c), each prohibited solicitation and each prohibited practice during a solicitation constitutes a separate violation.

171. Damages. Forty-three (43) separate violations at $500 each. Mortgage Pipeline and IHL are jointly and severally liable to Plaintiff in the amount of $21,500, together with reasonable attorney's fees, costs, and such other relief as the Court deems just and proper.

**Count IX — Maryland Consumer Protection Act: Misrepresentation of the Purpose of the Solicitation (Against Mortgage Pipeline LLC and Independence Home Loans, LLC) (Md. Code, Com. Law §§ 13-301(1), (3), (9), (10)(ii), 13-408)**

172. Plaintiff realleges and incorporates all preceding paragraphs.

173. Conduct alleged. On each of the forty-three (43) answered calls, Mortgage Pipeline's agents described the purpose of the call as informational or educational — to "help veterans understand their VA home-loan benefits," to "explain how equity works," or to "review eligibility for VA programs." The actual purpose of every call was to generate a mortgage refinance lead for IHL and to transfer Plaintiff to an IHL loan officer.

174. IHL as principal. IHL is liable as the seller on whose behalf the calls were made and as the recipient of the transfers the misrepresentation was designed to produce, on the facts pleaded in the section titled "IHL's Responsibility for Calls Placed on Its Behalf."

175. IHL's independent liability as to the Tier C calls. On the two calls identified in Exhibit B-1 as Tier C, the consumer was transferred to IHL's own Executive Loan Officer, who then conducted the sales conversation. On those calls IHL was itself the person making the telephone solicitation within the meaning of Md. Code, Com. Law § 13-301(10), and no vendor spoke. As to those two calls, IHL's liability does not depend on any finding that Mortgage Pipeline acted as its agent.

176. Statutory standard. Md. Code, Com. Law § 13-301(10)(ii) requires a person making a telephone solicitation to state clearly, affirmatively, and expressly the purpose of the telephone conversation. A description of a sales call as an educational or benefits review is a false or misleading representation under § 13-301(1), a failure to state a

material fact that tends to deceive under § 13-301(3), and a concealment of a material fact under § 13-301(9). Under § 13-408, Plaintiff may recover for the injury and loss he sustained as a result.

177. Damages. Forty-three (43) separate violations. Mortgage Pipeline and IHL are jointly and severally liable to Plaintiff in the amount of $21,500, together with actual damages, reasonable attorney's fees, costs, and such other relief as the Court deems just and proper.

**Count X — Maryland Consumer Protection Act: Failure to Disclose the Kind of Service Solicited (Against Mortgage Pipeline LLC and Independence Home Loans, LLC) (Md. Code, Com. Law §§ 13-301(1), (3), (9), (10)(iii), 13-408)**

178. Plaintiff realleges and incorporates all preceding paragraphs.

179. Conduct alleged. On each of the forty-three (43) answered calls, Mortgage Pipeline's agents sought to induce Plaintiff to enter a mortgage transaction — a refinance, a cash-out equity loan, or a similar fee-bearing product — without ever identifying the kind of service being solicited. They described the call as a "VA benefits review," an "equity evaluation," or a "veteran program update."

180. IHL as principal. IHL is liable as the seller of the services actually being solicited, on the facts pleaded in the section titled "IHL's Responsibility for Calls Placed on Its Behalf."

181. IHL's independent liability as to the Tier C calls. On the two calls identified in Exhibit B-1 as Tier C, the consumer was transferred to IHL's own Executive Loan Officer, who then conducted the sales conversation. On those calls IHL was itself the person making the telephone solicitation within the meaning of Md. Code, Com. Law §

13-301(10), and no vendor spoke. As to those two calls, IHL's liability does not depend on any finding that Mortgage Pipeline acted as its agent.

182. Statutory standard. Md. Code, Com. Law § 13-301(10)(iii) requires a person making a telephone solicitation to state clearly, affirmatively, and expressly the kind of goods or services being solicited. The omission was material and had the capacity and tendency to deceive. § 13-301(1), (3), (9). Under § 13-408, Plaintiff may recover for the injury and loss he sustained as a result.

183. Damages. Forty-three (43) separate violations. Mortgage Pipeline and IHL are jointly and severally liable to Plaintiff in the amount of $21,500, together with actual damages, reasonable attorney's fees, costs, and such other relief as the Court deems just and proper.

**Count XI — Maryland Telephone Consumer Protection Act: Failure to Disclose That the Purpose of the Call Was to Sell (Against Mortgage Pipeline LLC and Independence Home Loans, LLC) (Md. Code, Com. Law §§ 14-3201, 14-3202; 16 C.F.R. § 310.4(d)(2))**

184. Plaintiff realleges and incorporates all preceding paragraphs.

185. Conduct alleged. On each of the forty-three (43) answered calls, Mortgage Pipeline's agents failed to disclose truthfully, promptly, and in a clear and conspicuous manner that the purpose of the call was to sell goods or services, as 16 C.F.R. § 310.4(d)(2) requires.

186. IHL as principal. IHL is liable as the seller on whose behalf the calls were made, on the facts pleaded in the section titled "IHL's Responsibility for Calls Placed on Its Behalf."

187. IHL's independent liability as to the Tier C calls. On the two calls identified in Exhibit B-1 as Tier C, the consumer was transferred to IHL's own Executive Loan Officer, who then conducted the sales conversation. On those calls IHL was itself the telemarketer within the meaning of 16 C.F.R. § 310.2, and the disclosure 16 C.F.R. § 310.4(d) requires was not made. As to those two calls, IHL's liability does not depend on any finding that Mortgage Pipeline acted as its agent.

188. Under Md. Code, Com. Law § 14-3201(1), a person may not violate the Telemarketing and Consumer Fraud and Abuse Prevention Act (15 U.S.C. §§ 6101–6108) or its implementing rule, the Telemarketing Sales Rule (16 C.F.R. Part 310).

189. Pursuant to Md. Code, Com. Law § 14-3202(b), an individual affected by a violation of this subtitle may recover the greater of $500 for each violation or actual damages, together with reasonable attorney's fees. Under § 14-3202(c), each prohibited solicitation and each prohibited practice during a solicitation constitutes a separate violation.

190. Damages. Forty-three (43) separate violations at $500 each. Mortgage Pipeline and IHL are jointly and severally liable to Plaintiff in the amount of $21,500, together with reasonable attorney's fees, costs, and such other relief as the Court deems just and proper.

**Count XII — Maryland Telephone Consumer Protection Act: Failure to Disclose the Nature of the Goods or Services Offered (Against Mortgage Pipeline LLC and Independence Home Loans, LLC) (Md. Code, Com. Law §§ 14-3201, 14-3202; 16 C.F.R. § 310.4(d)(3))**

191. Plaintiff realleges and incorporates all preceding paragraphs.

192. Conduct alleged. On each of the forty-three (43) answered calls, Mortgage Pipeline's agents failed to disclose the nature of the goods or services offered, as 16 C.F.R. § 310.4(d)(3) requires. At no point did any caller state that the product being offered was a mortgage refinance, a cash-out equity loan, or any other lending product.

193. IHL as principal. IHL is liable as the seller of those products and as the party on whose behalf the calls were made, on the facts pleaded in the section titled "IHL's Responsibility for Calls Placed on Its Behalf."

194. IHL's independent liability as to the Tier C calls. On the two calls identified in Exhibit B-1 as Tier C, the consumer was transferred to IHL's own Executive Loan Officer, who then conducted the sales conversation. On those calls IHL was itself the telemarketer within the meaning of 16 C.F.R. § 310.2, and the disclosure 16 C.F.R. § 310.4(d) requires was not made. As to those two calls, IHL's liability does not depend on any finding that Mortgage Pipeline acted as its agent.

195. Under Md. Code, Com. Law § 14-3201(1), a person may not violate the Telemarketing and Consumer Fraud and Abuse Prevention Act (15 U.S.C. §§ 6101–6108) or its implementing rule, the Telemarketing Sales Rule (16 C.F.R. Part 310).

196. Pursuant to Md. Code, Com. Law § 14-3202(b), an individual affected by a violation of this subtitle may recover the greater of $500 for each violation or actual damages, together with reasonable attorney's fees. Under § 14-3202(c), each prohibited solicitation and each prohibited practice during a solicitation constitutes a separate violation.

197. Damages. Forty-three (43) separate violations at $500 each. Mortgage Pipeline and IHL are jointly and severally liable to Plaintiff in the amount of $21,500, together

with reasonable attorney's fees, costs, and such other relief as the Court deems just and proper.

**Count XIII — Maryland Telephone Solicitations Act: Solicitation Placed Outside Permissible Hours (Against Mortgage Pipeline LLC and Independence Home Loans, LLC) (Md. Code, Com. Law §§ 14-4502(c)(1), 14-4503, 13-408)**

198. Plaintiff realleges and incorporates all preceding paragraphs.

199. Conduct alleged. On July 25, 2025, at 8:01 p.m. Eastern Time, Mortgage Pipeline placed a telemarketing call to Plaintiff's personal cellular number from (240) 226-6572, a Tier A number. Plaintiff was in Maryland when the call was received.

200. Statutory standard. Md. Code, Com. Law § 14-4502(c)(1) prohibits making or causing to be made a telephone solicitation during the hours between 8 p.m. and 8 a.m. in the called party's time zone. The Maryland window is narrower than the federal window in 16 C.F.R. § 310.4(c), and it is the Maryland window that governs a call to a Maryland consumer.

201. IHL's liability under the statutory text. Md. Code, Com. Law § 14-4502(c)(1) prohibits a person from making "or caus[ing] to be made" a telephone solicitation during the prohibited hours, and § 14-4501(f) incorporates Md. Code, Public Utilities § 8-205(a)(2). IHL caused the July 25, 2025 solicitation to be made and is liable on this Count on the statutory text. IHL is separately liable as principal on the facts pleaded in the section titled "IHL's Responsibility for Calls Placed on Its Behalf."

202. Under Md. Code, Com. Law § 14-4503, a violation of § 14-4502 is an unfair or deceptive trade practice within the meaning of Title 13, enforceable through the private right of action provided in § 13-408. Under § 14-4503(a)(2), a called party aggrieved by a

violation may recover up to $500 per violation or actual damages, whichever is greater, and if the court finds the violation willful or knowing it may award up to three times that amount.

203. The violation was willful and knowing. The call was placed by a predictive dialer capable of enforcing time-of-day restrictions, operated by a party that published a compliance policy representing that it observed them. Md. Code, Com. Law § 14-4503(a)(2)(ii); see also § 14-4503(b).

204. Damages. One violation. Plaintiff seeks treble statutory damages of $1,500 for the July 25, 2025 call, for which Mortgage Pipeline and IHL are jointly and severally liable, together with reasonable attorney's fees, costs, and such other relief as the Court deems just and proper.

**Count XIV — Maryland Telephone Solicitations Act: More Than Three Solicitations on the Same Subject Within Twenty-Four Hours (Against Mortgage Pipeline LLC and Independence Home Loans, LLC) (Md. Code, Com. Law §§ 14-4502(c)(2), 14-4503, 13-408)**

205. Plaintiff realleges and incorporates all preceding paragraphs.

206. Statutory standard. Md. Code, Com. Law § 14-4502(c)(2) makes it unlawful to make or cause to be made more than three telephone solicitations to the same called party during a twenty-four-hour period on the same subject matter or issue, regardless of the telephone numbers used to make the call.

207. Conduct alleged. Every call Mortgage Pipeline placed concerned the same subject matter: the sale of mortgage refinancing and VA-related loan products. Mortgage Pipeline rotated among the (240) 226-XXXX and (240) 800-XXXX numbers, which is why the statute counts calls without regard to the number used.

208. Conduct alleged. Thirty-one (31) of the calls Mortgage Pipeline placed were the fourth or a later solicitation within a rolling twenty-four-hour period. Those thirty-one calls are identified individually in the paragraph that follows and are marked as such in Exhibit B-1.

| # | Date | Time | Phone Number |
|---|---|---|---|
| 1 | 8/21/2025 | 11:08 AM | (240) 226-6649 |
| 2 | 8/21/2025 | 3:00 PM | (240) 226-7226 |
| 3 | 8/21/2025 | 7:00 PM | (240) 226-7347 |
| 4 | 8/28/2025 | 10:05 AM | (240) 226-7226 |
| 5 | 8/28/2025 | 1:37 PM | (240) 226-7127 |
| 6 | 9/5/2025 | 7:46 PM | (240) 226-7375 |
| 7 | 9/5/2025 | 7:47 PM | (240) 226-7350 |
| 8 | 9/5/2025 | 7:47 PM | (240) 226-6724 |
| 9 | 9/10/2025 | 3:48 PM | (240) 226-7350 |
| 10 | 9/10/2025 | 7:49 PM | (240) 226-7127 |
| 11 | 9/11/2025 | 11:07 AM | (240) 226-7375 |
| 12 | 9/11/2025 | 3:07 PM | (240) 226-7226 |
| 13 | 9/11/2025 | 3:08 PM | (240) 226-7347 |
| 14 | 9/12/2025 | 6:26 PM | (240) 226-6649 |
| 15 | 9/15/2025 | 5:32 PM | (240) 226-6572 |
| 16 | 9/16/2025 | 11:33 AM | (240) 226-6649 |

| | | | |
|---|---|---|---|
| **17** | 9/16/2025 | 2:13 PM | (240) 226-7350 |
| **18** | 9/16/2025 | 5:07 PM | (240) 226-6712 |
| **19** | 9/17/2025 | 10:57 AM | (240) 226-6649 |
| **20** | 9/17/2025 | 11:59 AM | (240) 226-6649 |
| **21** | 9/17/2025 | 4:56 PM | (240) 226-6572 |
| **22** | 9/18/2025 | 10:49 AM | (240) 226-7375 |
| **23** | 9/23/2025 | 11:16 AM | (240) 226-7127 |
| **24** | 9/23/2025 | 6:59 PM | (240) 226-7226 |
| **25** | 9/24/2025 | 2:30 PM | (240) 226-7226 |
| **26** | 9/24/2025 | 6:30 PM | (240) 226-7135 |
| **27** | 9/25/2025 | 11:17 AM | (240) 226-6712 |
| **28** | 9/25/2025 | 1:43 PM | (240) 226-6572 |
| **29** | 9/25/2025 | 4:42 PM | (240) 226-7127 |
| **30** | 9/26/2025 | 10:50 AM | (240) 226-7347 |
| **31** | 9/26/2025 | 12:06 PM | (240) 800-9702 |

Call #27: 08/21/2025 at 11:08 AM from (240) 226-6649 (Missed); Call #28: 08/21/2025 at 3:00 PM from (240) 226-7226 (Answered); Call #29: 08/21/2025 at 7:00 PM from (240) 226-7347 (Answered); Call #40: 08/28/2025 at 10:05 AM from (240) 226-7226 (Missed); Call #41: 08/28/2025 at 1:37 PM from (240) 226-7127 (Missed); Call #51: 09/05/2025 at 7:46 PM from (240) 226-7375 (Answered); Call #52: 09/05/2025 at 7:47 PM from (240) 226-7350 (Answered); Call #53: 09/05/2025 at 7:47 PM from (240) 226-6724 (Answered); Call #61: 09/10/2025 at 3:48 PM from (240) 226-7350 (Missed); Call #62: 09/10/2025 at 7:49 PM from (240) 226-7127

(Missed); Call #63: 09/11/2025 at 11:07 AM from (240) 226-7375 (Missed); Call #64: 09/11/2025 at 3:07 PM from (240) 226-7226 (Missed); Call #65: 09/11/2025 at 3:08 PM from (240) 226-7347 (Missed); Call #69: 09/12/2025 at 6:26 PM from (240) 226-6649 (Answered); Call #73: 09/15/2025 at 5:32 PM from (240) 226-6572 (Missed); Call #74: 09/16/2025 at 11:33 AM from (240) 226-6649 (Missed); Call #75: 09/16/2025 at 2:13 PM from (240) 226-7350 (Missed); Call #76: 09/16/2025 at 5:07 PM from (240) 226-6712 (Missed); Call #77: 09/17/2025 at 10:57 AM from (240) 226-6649 (Missed); Call #78: 09/17/2025 at 11:59 AM from (240) 226-6649 (Answered); Call #79: 09/17/2025 at 4:56 PM from (240) 226-6572 (Missed); Call #80: 09/18/2025 at 10:49 AM from (240) 226-7375 (Answered); Call #88: 09/23/2025 at 11:16 AM from (240) 226-7127 (Missed); Call #90: 09/23/2025 at 6:59 PM from (240) 226-7226 (Answered); Call #92: 09/24/2025 at 2:30 PM from (240) 226-7226 (Answered); Call #93: 09/24/2025 at 6:30 PM from (240) 226-7135 (Answered); Call #94: 09/25/2025 at 11:17 AM from (240) 226-6712 (Missed); Call #95: 09/25/2025 at 1:43 PM from (240) 226-6572 (Answered); Call #96: 09/25/2025 at 4:42 PM from (240) 226-7127 (Missed); Call #97: 09/26/2025 at 10:50 AM from (240) 226-7347 (Missed); Call #98: 09/26/2025 at 12:06 PM from (240) 800-9702 (Answered).

209. IHL's liability under the statutory text. Md. Code, Com. Law § 14-4502(c)(2) prohibits a person from making "or caus[ing] to be made" more than three telephone solicitations to the same called party within a twenty-four-hour period on the same subject matter, and § 14-4501(f) incorporates Md. Code, Public Utilities § 8-205(a)(2). IHL caused those solicitations to be made and is liable on this Count on the statutory text. IHL is separately liable as principal on the facts pleaded in the section titled "IHL's Responsibility for Calls Placed on Its Behalf."

210. Under Md. Code, Com. Law § 14-4503, a violation of § 14-4502 is an unfair or deceptive trade practice within the meaning of Title 13, enforceable through the private right of action provided in § 13-408. Under § 14-4503(a)(2), a called party aggrieved by a violation may recover up to $500 per violation or actual damages, whichever is greater, and if the court finds the violation willful or knowing it may award up to three times that amount.

211. The violations were willful and knowing. The calls were placed through a predictive dialer that tracks call frequency per contact, by a party whose published policy represented that it observed frequency limits, and the pattern continued after Plaintiff's repeated demands that the calls stop. Md. Code, Com. Law § 14-4503(a)(2)(ii); see also § 14-4503(b).

212. Damages. Thirty-one (31) separate violations. Plaintiff seeks treble statutory damages of $1,500 per violation, totaling $46,500, for which Mortgage Pipeline and IHL are jointly and severally liable, together with reasonable attorney's fees, costs, and such other relief as the Court deems just and proper.

**Count XV — Maryland Telephone Consumer Protection Act: Pattern of Harassing and Abusive Telemarketing (Against AM Communication Labs Inc., Mortgage Pipeline LLC, and Independence Home Loans, LLC) (Md. Code, Com. Law §§ 14-3201, 14-3202; 15 U.S.C. §§ 6101–6108; 16 C.F.R. § 310.4(b)(1)(i))**

213. Plaintiff realleges and incorporates all preceding paragraphs.

214. Statutory standard. 16 C.F.R. § 310.4(b)(1)(i) makes it an abusive telemarketing act or practice "to cause any telephone to ring, or to engage any person in telephone conversation, repeatedly or continuously with intent to annoy, abuse, or harass any

person at the called number." That standard is incorporated into Maryland law by Md. Code, Com. Law § 14-3201(1).

215. Conduct alleged. Mortgage Pipeline placed one hundred seven (107) calls to a single cellular number over approximately seven months, as many as seven in one day, after forty-three (43) requests to stop. Volume and persistence of that character, directed at one consumer who had refused the product each time it was offered, evidences intent to annoy, abuse, and harass.

216. Conduct alleged. amcomlabs supplied the means by which the pattern was made unavoidable: rotating numbers so that blocking one accomplished nothing, spoofed local caller ID so that screening accomplished nothing, inbound rejection so that calling back accomplished nothing, and Grade "A" attestation so that carrier spam filtering accomplished nothing. amcomlabs held the call detail records and a perpetual license to every call disposition and recording on the account, and so had continuous visibility into the pattern it was carrying.

217. IHL as principal. IHL is liable as the seller on whose behalf the campaign was conducted, on the facts pleaded in the section titled "IHL's Responsibility for Calls Placed on Its Behalf."

218. IHL's independent liability. The pattern did not end when IHL learned of it. It continued through the cease-and-desist, the regulatory complaint, IHL's denial to the Office of Financial Regulation, its General Counsel's assurance that "each vendor confirmed compliance," service of this lawsuit, and the denial of IHL's motion to dismiss. A seller that is told the calls are continuing, reports to a regulator that they have stopped,

and does nothing that stops them has adopted the pattern as its own. IHL's liability under this Count does not depend on any finding that Mortgage Pipeline acted as IHL's agent.

219. Under Md. Code, Com. Law § 14-3201(1), a person may not violate the Telemarketing and Consumer Fraud and Abuse Prevention Act (15 U.S.C. §§ 6101–6108) or its implementing rule, the Telemarketing Sales Rule (16 C.F.R. Part 310).

220. Pursuant to Md. Code, Com. Law § 14-3202(b), an individual affected by a violation of this subtitle may recover the greater of $500 for each violation or actual damages, together with reasonable attorney's fees. Under § 14-3202(c), each prohibited solicitation and each prohibited practice during a solicitation constitutes a separate violation.

221. Damages. One hundred seven (107) separate violations at $500 each. amcomlabs, Mortgage Pipeline and IHL are jointly and severally liable to Plaintiff in the amount of $53,500, together with reasonable attorney's fees, costs, and such other relief as the Court deems just and proper.

Count XVI — Civil Conspiracy (Against AM Communication Labs Inc., Mortgage Pipeline LLC, and Independence Home Loans, LLC) (Hoffman v. Stamper, 385 Md. 1 (2005))

222. Plaintiff realleges and incorporates all preceding paragraphs.

223. Under Maryland law, a civil conspiracy exists where two or more persons combine, associate, agree, or act in concert to accomplish an unlawful purpose or to accomplish a lawful purpose by unlawful means, and an overt act is committed in furtherance of the agreement that causes injury to the plaintiff. Hoffman v. Stamper, 385 Md. 1, 24 (2005). Civil conspiracy is not a separate tort capable of independently sustaining an award of damages in the absence of other tortious injury to the plaintiff; this

Count therefore rests on, and is pleaded together with, the intrusion upon seclusion alleged in Count XVIII and the intentional infliction of emotional distress alleged in Count XIX. Alleco, Inc. v. Harry & Jeanette Weinberg Found., Inc., 340 Md. 176, 189–91, 665 A.2d 1038, 1044–45 (1995).

224. Defendants IHL, amcomlabs, and Mortgage Pipeline LLC entered into an agreement, express or implied, to conduct an unlawful telemarketing campaign targeting Maryland consumers, including Plaintiff. The existence of this agreement is established by the coordinated and interdependent conduct of the Defendants:

(a) IHL, as the seller, contracted with lead-generation vendors to generate mortgage leads from Maryland consumers, including veterans eligible for VA Home Loan products;

(b) Mortgage Pipeline LLC, acting as IHL's lead-generation vendors, initiated telemarketing calls to Plaintiff using the amcomlabs calling infrastructure and warm-transferred interested consumers directly to IHL's loan officers. Call detail records produced by amcomlabs identify Mortgage Pipeline (Client ID 30796) as the entity that directly placed the calls to Plaintiff's number;

(c) amcomlabs provided the telecommunications infrastructure for the conspiracy by purchasing at least eleven (11) Maryland area code telephone numbers, including ten in a single four-minute window on May 26, 2025 — forty-two days before the first call to Plaintiff, configured those numbers with spoofed caller-ID displaying local areas including Oakland, Bethesda, and Silver Spring Maryland as their origin, and configured the numbers to reject all inbound calls so that Plaintiff could not call back to identify the caller or request that the calls stop. The only

call records in amcomlabs' SignalWire account for the Subject Numbers are Plaintiff's own attempted return calls, which were immediately disconnected — confirming that the call-rejection configuration was functioning as designed;

(d) The conspiracy was deliberately structured through multiple nested layers of intermediaries (IHL to Mortgage Pipeline to amcomlabs to SignalWire to Onvoy) to obscure the identities of the responsible parties, prevent victims from identifying who was calling, and evade accountability under federal and Maryland consumer protection statutes. (See Exhibit K.)

225. The existence of the conspiratorial agreement is further established by the aligned financial incentive structure that bound each Defendant's revenue directly to the volume of unlawful calls placed. Under Maryland law, a conspiratorial agreement need not be express; it may be inferred from "the nature of the acts complained of, the individual and collective interest of the alleged conspirators, the situation and relation of the parties at the time of the commission of the acts, the motives which produced them, and all the surrounding circumstances preceding and attending the culmination of the common design." Hoffman v. Stamper, 385 Md. 1, 25–26, 867 A.2d 276, 291 (2005) (quoting W. Md. Dairy, Inc. v. Chenowith, 180 Md. 236, 243–44, 23 A.2d 660, 664 (1942)). Here, every Defendant's economic interest was served by maximizing call volume without regard to legal compliance:

(a) amcomlabs operates a usage-based telecommunications platform. Its revenue is directly proportional to the number of telephone numbers provisioned, the volume of calls routed through its SIP trunks, and the number of active client accounts on its ReadyMode predictive dialer. The more calls Mortgage Pipeline placed

through the amcomlabs infrastructure, the more revenue amcomlabs earned. amcomlabs therefore had a direct financial incentive to onboard clients quickly, without meaningful compliance screening, and to avoid enforcing its own Acceptable Use Policy — because terminating a high-volume client like Mortgage Pipeline would reduce amcomlabs' revenue;

(b) Mortgage Pipeline LLC is a lead-generation operation that, upon information and belief, was compensated on a per-lead or per-transfer basis for each consumer warm-transferred to IHL's loan officers. The more calls Mortgage Pipeline placed, the more leads it generated, and the more revenue it earned. Mortgage Pipeline therefore had a direct financial incentive to maximize outbound call volume, to use deceptive VA-affiliated trade names to increase consumer engagement, and to ignore do-not-call requests — because honoring those requests would reduce the pool of callable consumers and decrease revenue; and

(c) IHL is the end beneficiary of the entire calling operation. Each warm-transferred lead represented a potential mortgage loan application, and each closed loan generated origination fees and other revenue for IHL. The more calls Mortgage Pipeline placed, the more warm transfers IHL received, and the more loans IHL closed. IHL therefore had a direct financial incentive not to scrutinize how its lead-generation vendors obtained their leads, to continue accepting warm-transferred calls from vendors it knew or should have known were engaged in unlawful telemarketing, and to represent to regulators and to this Court that "no statutory violations occurred" rather than investigate or terminate the vendors whose illegal conduct was generating IHL's leads.

226. The telemarketing system operated by Defendants was not a collection of independent business relationships; it was a single integrated system in which each Defendant's contribution was necessary for the whole to function, and in which no single Defendant's conduct makes commercial sense in isolation. amcomlabs could not profit from its platform without high-volume clients like Mortgage Pipeline placing calls. Mortgage Pipeline could not generate leads without amcomlabs' telecommunications infrastructure, spoofed telephone numbers, and STIR/SHAKEN attestation. IHL could not close VA refinancing loans from cold-called veterans without Mortgage Pipeline generating and warm-transferring the leads. The proven facts and circumstances, "pieced together and considered as a whole," show that the parties were "acting together understandingly in order to accomplish" the scheme. Hoffman, 385 Md. at 25, 867 A.2d at 291. This mutual dependence — where each party's revenue stream depended on the continued illegal conduct of the others — constitutes circumstantial evidence of a tacit agreement to operate the system as designed, without regard to the legal rights of the consumers being called.

227. The concealment architecture built into the telemarketing system provides the strongest circumstantial evidence that the Defendants' agreement extended beyond lawful commercial cooperation to encompass the unlawful conduct alleged herein. Each Defendant contributed a distinct component of a coordinated concealment apparatus designed to prevent detection and accountability: amcomlabs purchased spoofed Maryland telephone numbers and configured every number to reject inbound calls, ensuring consumers could not identify or contact the caller; Mortgage Pipeline instructed its agents to use fictitious VA-affiliated trade names, to identify themselves only by first

name, and to immediately terminate calls when consumers requested identifying information or asserted their do-not-call rights; and IHL provided plausible deniability by claiming ignorance of the campaign and representing to Plaintiff, to the Maryland Office of Financial Regulation, and to this Court that "no statutory violations occurred." Legitimate businesses do not configure their telephone numbers to reject return calls from the consumers they are soliciting. Legitimate businesses do not instruct their agents to use five different fictitious trade names during a single campaign. Legitimate businesses do not claim to have conducted a "thorough internal investigation" and found no violations while the illegal calls continue. The concealment features of this system were not incidental to its operation; they were engineered into its architecture, and each Defendant contributed a necessary piece. A system this elaborate does not emerge from three parties independently deciding to break the law in perfectly complementary ways — it emerges from a common understanding and shared design.

228. amcomlabs' sham Know Your Customer ("KYC") process constitutes affirmative evidence of its knowing participation in the conspiracy, not merely negligent oversight. amcomlabs represented to the FCC under penalty of perjury that it conducts KYC screening of all subscribers, including verification of the customer's business name, website, state of incorporation, intended use case, and DNC scrubbing practices. In reality, amcomlabs onboarded Mortgage Pipeline LLC in approximately fifty-five (55) seconds. Mortgage Pipeline had been incorporated only sixty-one (61) days earlier, had no operating history, no registered website, and was managed by a single individual. The existence of the sham KYC process demonstrates that amcomlabs understood the illegality of what its platform was being used for and deliberately chose to create the

appearance of compliance rather than actual compliance — a dual-layer deception directed at the FCC to maintain regulatory standing and directed at consumers and regulators to prevent detection of the unlawful telemarketing conducted through its platform. A party that maintains a fraudulent compliance facade while knowingly enabling the illegal conduct of its subscribers is not a passive bystander; it is an active co-conspirator whose participation was essential to the operation and concealment of the conspiracy.

229. Each Defendant committed overt acts in furtherance of the conspiracy, including but not limited to: IHL's contracting with vendors and receipt of warm-transferred leads and false official declarations that its vendors comply all state and federal TCPA; the vendor's placement of telemarketing calls; Mortgage Pipeline's direct placement of calls to Plaintiff as Client ID 30796 using the amcomlabs platform; and amcomlabs' purchase and configuration of Maryland telephone numbers with spoofed caller-ID and call-rejection capabilities.

230. The unlawful purpose of the conspiracy was to conduct a telemarketing campaign in violation of the Maryland Telephone Consumer Protection Act, the Maryland Telephone Solicitations Act, the Maryland Consumer Protection Act, and the Telemarketing Sales Rule, while concealing the identities of the participants through fictitious trade names ("VA Mortgage Pipeline," "Veteran Financial Services," "VA Mortgage Review," and "VA Home Loan Center"), spoofed telephone numbers, call-rejection configurations that prevented return calls, and layered intermediaries designed to obscure the chain of responsibility.

231. amcomlabs' role in the conspiracy was not that of a passive or neutral telecommunications platform. amcomlabs actively configured its infrastructure to facilitate and conceal the unlawful campaign by:

(a) purchasing Maryland area code numbers in bulk to create the false appearance of local origin;

(b) configuring spoofed caller-ID to display local areas including Oakland, Bethesda, and Silver Spring Maryland;

(c) configuring all eleven (11) numbers to reject inbound calls, thereby preventing Plaintiff and other victims from calling back to identify the caller, request cessation, or exercise their rights under the do-not-call statutes;

(d) routing calls through multiple carriers (SignalWire, Onvoy/ThinQ Technologies) to further obscure the origin; and

(e) granting STIR/SHAKEN Grade "A" attestation to every outbound call to cause Plaintiff's carrier to deliver the calls without spam warnings. amcomlabs' sham KYC onboarding, its failure to enforce its own Acceptable Use Policy, and its financial dependence on the call volume generated by clients like Mortgage Pipeline collectively demonstrate that amcomlabs was an integral and knowing participant in the conspiracy, not a bystander.

232. As a proximate result of the conspiracy and the overt acts committed in furtherance thereof, Plaintiff suffered damages as set forth in Counts I through XXII of this Complaint.

233. Pursuant to Maryland law governing civil conspiracy, each Defendant is jointly and severally liable for the full amount of damages caused by the conspiracy, regardless

of the specific role each Defendant played. The acts of each co-conspirator committed in furtherance of the conspiracy are attributable to all. Accordingly, Defendants are jointly and severally liable to Plaintiff for all statutory damages, actual damages, treble damages where applicable, reasonable attorney's fees, costs, and such further relief as the Court deems just and proper.

**Count XVII — Federal Telephone Consumer Protection Act: Violation of Do-Not-Call Regulations (Against Mortgage Pipeline LLC and Independence Home Loans, LLC) (47 U.S.C. § 227(c)(5); 47 C.F.R. § 64.1200(d))**

234. Plaintiff realleges and incorporates all preceding paragraphs.

235. Statutory standard. Under 47 U.S.C. § 227(c), the Federal Communications Commission has prescribed 47 C.F.R. § 64.1200(d), which requires a person or entity making calls for telemarketing purposes to institute procedures for maintaining a list of persons who ask not to be called. The minimum standards include a written policy for maintaining the list (§ 64.1200(d)(1)); training of personnel engaged in telemarketing in its existence and use (§ 64.1200(d)(2)); recording each request and honoring it (§ 64.1200(d)(3)); identification of the caller at the outset of each call, including the name of the individual caller and of the business on whose behalf the call is made (§ 64.1200(d)(4)); and, where a service bureau is used, use of the seller's own name or its registered fictitious name (§ 64.1200(d)(6)).

236. Statutory standard. Section 64.1200(d)(3) requires that a do-not-call request be honored "within a reasonable time from the date such request is made," and provides that

"[t]his period may not exceed ten (10) business days from the receipt of such request." The thirty-day period that appears elsewhere in Part 64 governs facsimile opt-out requests under § 64.1200(a)(4)(v) and has no application to a telemarketing do-not-call request.

237. Plaintiff made his first do-not-call request on July 7, 2025, during the first call he answered. One hundred five (105) of the one hundred seven (107) calls were placed after the ten business days that § 64.1200(d)(3) allows had run. Plaintiff repeated the request on each of the forty-two (42) further calls he answered. Each request was a company-specific do-not-call demand within the meaning of § 64.1200(d).

238. Conduct alleged. Mortgage Pipeline received all forty-three (43) requests through its agents and maintained no company-specific do-not-call list on which to record them. It had no written policy, gave its personnel no training in the existence or use of such a list, identified neither the individual caller by full name nor the business on whose behalf the call was made, and used fictitious names registered nowhere rather than the seller's name or a registered fictitious name of the seller.

239. IHL's independent liability. IHL is liable on this Count by the terms of the regulation itself and without regard to agency. Section 64.1200(d)(3) provides: "If such requests are recorded or maintained by a party other than the person or entity on whose behalf the call is made, the person or entity on whose behalf the call is made will be liable for any failures to honor the do-not-call request." The calls were made on behalf of IHL. Whatever Mortgage Pipeline did or failed to do with Plaintiff's requests, the regulation assigns the resulting failure to IHL. Section 227(c)(5) reaches the same result from the statutory side, creating the action for calls received "by or on behalf of the same

entity." IHL's liability under this Count does not depend on any finding that Mortgage Pipeline acted as IHL's agent.

240. IHL's independent liability. IHL is separately liable because it received Plaintiff's do-not-call demand directly, in writing, on October 6, 2025, and did not honor it. Ten business days from that date expired on October 20, 2025, the same day IHL told the Maryland Office of Financial Regulation that its vendors had "all confirmed" Plaintiff's removal. Calls continued for another four months.

241. Remedy. Under 47 U.S.C. § 227(c)(5), a person who has received more than one telephone call within any twelve-month period by or on behalf of the same entity in violation of the regulations prescribed under that subsection may bring an action in an appropriate State court to recover actual monetary loss or to receive up to $500 in damages for each such violation, whichever is greater, and the court may award up to three times that amount for a knowing or willful violation.

242. Damages. Because the required procedures were never instituted, every call was placed in violation of § 64.1200(d). One hundred seven (107) separate violations at $500 each. amcomlabs, Mortgage Pipeline and IHL are jointly and severally liable to Plaintiff in the amount of $53,500. The violations were knowing and willful: ten Maryland numbers were purchased forty-two days before the first call, forty-three do-not-call requests were ignored, calls continued after a certified cease-and-desist, after a regulatory complaint, after this suit was served, and after this Court denied IHL's motion to dismiss. Plaintiff accordingly seeks treble damages of $1,500 per violation, totaling $160,500, together with such other relief as the Court deems just and proper.

**INDEPENDENT BASIS FOR CONCURRENT FEDERAL AND STATE CLAIMS**

243. Plaintiff asserts claims under both the federal Telephone Consumer Protection Act (47 U.S.C. § 227) and Maryland's state consumer protection statutes. These claims arise under distinct statutory schemes, protect different interests, impose different obligations, and provide independent remedies. The concurrent assertion of both federal and state claims is proper for the following reasons:

(a) The federal TCPA (47 U.S.C. § 227) and the Maryland Telephone Consumer Protection Act (Md. Code, Com. Law § 14-3201 et seq.) are separate and independent statutory enactments. The federal TCPA was enacted by Congress in 1991 as part of the Federal Communications Act. The Maryland TCPA was enacted by the Maryland General Assembly as part of the Commercial Law Article. Each provides its own private right of action, its own damages calculation, and its own treble-damages provision.

(b) The federal TCPA claims (Count XVII) are brought directly under 47 U.S.C. § 227(c)(5), which provides an independent private right of action in state court with damages measured per call. The Maryland TCPA claims (Counts I–III, VIII, XI–XII, XV) are brought under Md. Code, Com. Law § 14-3201, which incorporates violations of the Telemarketing Sales Rule (16 C.F.R. Part 310) — a separate federal regulatory scheme administered by the FTC, not the FCC. The federal TCPA (47 U.S.C. § 227) and the Telemarketing Sales Rule (16 C.F.R. Part 310) are different federal statutes administered by different agencies (FCC vs. FTC), with different definitions, different prohibited conduct, and different remedial frameworks.

(c) The federal TCPA expressly preserves the rights of states to impose additional protections. Subject to the standards prescribed under subsection (d), 47 U.S.C. § 227(f)(1) provides that "nothing in this section or in the regulations prescribed under this section shall preempt any State law that imposes more restrictive intrastate requirements or regulations on, or which prohibits ... the making of telephone solicitations." Congress thus intended for federal and state TCPA claims to coexist, and recovery under one does not preclude recovery under the other.

(d) No court in Maryland or any other jurisdiction has held that a plaintiff may not simultaneously recover under both the federal TCPA and a state TCPA analogue for the same telemarketing conduct. The federal TCPA damages are calculated PER CALL, while the Maryland statutory damages are calculated PER VIOLATION of each specific provision. These are not duplicative remedies — they redress distinct statutory harms under separate legal frameworks.

(e) The "double recovery" or "double dipping" doctrine applies only where a plaintiff seeks duplicative damages for the same injury under the same legal theory. Here, the federal and state claims address different prohibited conduct: the federal TCPA prohibits violations of DNC regulations (§ 227(c)), while the Maryland TCPA prohibits violations of the TSR's disclosure requirements, abusive practices, and deceptive telemarketing acts. Each statute requires proof of different elements and addresses different aspects of the defendants' unlawful conduct.

(f) Courts routinely permit concurrent recovery under both federal TCPA claims and state TCPA analogue claims for the same telemarketing conduct, because each statutory scheme protects a different interest and requires proof of different elements. The same logic applies here.

**Count XVIII — Intrusion Upon Seclusion (Against AM Communication Labs Inc., Mortgage Pipeline LLC, and Independence Home Loans, LLC) (Restatement (Second) of Torts § 652B; Pemberton v. Bethlehem Steel Corp., 66 Md. App. 133 (1986))**

244. Plaintiff realleges and incorporates all preceding paragraphs.

245. Statutory standard. One who intentionally intrudes, physically or otherwise, upon the solitude or seclusion of another or his private affairs or concerns is subject to liability if the intrusion would be highly offensive to a reasonable person. Restatement (Second) of Torts § 652B (1977); Pemberton v. Bethlehem Steel Corp., 66 Md. App. 133, 156 (1986). No physical trespass is required: under § 652B "the gist of the offense is the intrusion into a private place or the invasion of a private seclusion that the plaintiff has thrown about his person or affairs." Id. Persistent unwanted telephone contact directed into a person's home is such an intrusion.

246. Conduct alleged. Mortgage Pipeline placed one hundred seven (107) calls to Plaintiff's personal cellular telephone between July 7, 2025 and February 18, 2026, into the home where Plaintiff lives as a totally disabled veteran, on a near-daily basis through the most intensive stretches of the campaign, and continued after forty-three (43) demands that it stop.

247. Conduct alleged. amcomlabs made the intrusion inescapable. It supplied fifteen rotating numbers so that blocking one changed nothing, spoofed Maryland caller ID so

that screening changed nothing, inbound rejection so that calling back changed nothing, and Grade “A” attestation so that carrier spam filtering changed nothing. An intrusion engineered so that the person intruded upon has no available means of stopping it is intentional in the fullest sense of the tort.

248. IHL as principal, and independently. IHL is liable for the intrusion as the seller on whose behalf the calls were made, and separately for the intrusion that continued after it knew of the calls, represented that they had stopped, and permitted them to continue. IHL's liability under this Count does not depend on any finding that Mortgage Pipeline acted as IHL's agent.

249. Highly offensive to a reasonable person. The intrusion would be highly offensive to a reasonable person: one hundred seven calls over seven months, as many as seven in a day and three within two minutes; a deliberate architecture of evasion; the exploitation of Plaintiff's status as a disabled veteran through names falsely implying an affiliation with the Department of Veterans Affairs; and a refusal to stop that survived forty-three verbal demands, a certified letter, a regulatory complaint, and the service of a lawsuit.

250. Damages. As a direct and proximate result, Plaintiff suffered the emotional distress, sleep disruption, aggravation of service-connected disability, erosion of trust in legitimate communications concerning his VA benefits, marital and household strain, and diversion of personal time set out in the section of this Complaint describing the impact on Plaintiff's daily life, in an amount to be proven at trial.

**Count XIX — Intentional Infliction of Emotional Distress (Against AM Communication Labs Inc., Mortgage Pipeline LLC, and Independence Home Loans, LLC) (Harris v. Jones, 281 Md. 560 (1977))**

251. Plaintiff realleges and incorporates all preceding paragraphs.

252. Statutory standard. Recovery requires conduct that is intentional or reckless, that is extreme and outrageous, a causal connection between the conduct and the emotional distress, and distress that is severe. Harris v. Jones, 281 Md. 560, 566 (1977).

253. Intentional conduct. The campaign was designed, not blundered into. Ten Maryland telephone numbers were purchased in a four-minute window forty-two days before the first call and configured to refuse return calls. Scripts and trade names were chosen. Agents were instructed to end calls when asked who they were. The design shows intent, and the continuation of the campaign after forty-three demands, a cease-and-desist, a regulatory complaint, service of suit, and the denial of a motion to dismiss shows, at the least, deliberate disregard of a high probability of severe distress.

254. Extreme and outrageous conduct. The conduct exceeded the bounds of decency tolerated in a civilized community: a totally disabled veteran was targeted with names falsely implying an affiliation with the agency administering his benefits; every avenue by which he could have stopped the calls was closed in advance by design; and when he pursued the only avenues left to him, a regulator and this Court, IHL answered that its vendors had confirmed compliance while the calls went on.

255. IHL as principal, and independently. IHL is liable as the seller on whose behalf the campaign was conducted and separately for its own conduct after it learned of the campaign. IHL's liability under this Count does not depend on any finding that Mortgage Pipeline acted as IHL's agent.

256. Severe distress and damages. The distress Plaintiff suffered is set out in the section of this Complaint describing the impact on his daily life and is incorporated here.

Plaintiff seeks compensatory damages in an amount to be proven at trial, together with punitive damages for conduct undertaken with actual malice, in the sense of conscious and deliberate wrongdoing. Bowden v. Caldor, Inc., 350 Md. 4, 22–25 (1998); Owens-Illinois, Inc. v. Zenobia, 325 Md. 420, 460 (1992).

**Count XX — Declaratory Judgment Against Defendant Independence Home Loans, LLC (Md. Code, Courts & Judicial Proceedings §§ 3-401 through 3-415; Md. Code, Com. Law §§ 13-101 et seq., 14-3201 et seq., 14-4501 et seq.)**

257. Plaintiff realleges and incorporates all preceding paragraphs.

258. Under Md. Code, Courts & Judicial Proceedings § 3-402, the Maryland Declaratory Judgment Act is "remedial" in nature, and its purpose is "to settle and afford relief from uncertainty and insecurity with respect to rights, status, and other legal relations." The statute "shall be liberally construed and administered."

259. Under § 3-409, a court may grant declaratory relief in a civil case where it will serve to terminate an uncertainty or controversy, an actual controversy exists between contending parties, or a party asserts a legal relation, status, right, or privilege that is challenged or denied by an adversary party.

260. An actual controversy exists between Plaintiff and Defendant IHL regarding whether IHL's telemarketing operations constitute a pattern of unfair, abusive, and deceptive business practices under Maryland law. IHL has denied wrongdoing through representations to Plaintiff, to the Maryland Office of Financial Regulation, and to this Court that "no statutory violations occurred" and that its vendors have "confirmed compliance." These representations are directly contradicted by the evidence set forth in this Complaint.

261. Plaintiff seeks a judicial declaration that:

(a) Unfair and Deceptive Trade Practices: Defendant IHL is a business entity engaged in a pattern of unfair, abusive, and deceptive trade practices within the meaning of Md. Code, Com. Law §§ 13-301, 14-3201, and 14-4502, by contracting with third-party telemarketers to conduct an unlawful telemarketing campaign targeting Maryland consumers (including veterans) using spoofed caller-ID numbers, fictitious trade names falsely implying VA affiliation, and systematic refusal to honor do-not-call requests, while simultaneously denying knowledge of and responsibility for the campaign, yet continuing to benefit from the mortgage leads generated by the illegal conduct.

(b) Conspiracy: Defendant IHL knowingly entered into and participated in a civil conspiracy with Defendants amcomlabs and Mortgage Pipeline LLC to conduct the illegal telemarketing campaign at issue. IHL, as the "seller" within the meaning of 16 C.F.R. § 310.2(ee) whose mortgage products were promoted through the campaign, was the ultimate beneficiary of the conspiratorial scheme. IHL's engagement of third-party marketing affiliates to generate leads, its retention of the benefits derived from those leads, including the opening of a mortgage file in Plaintiff's name, and its subsequent false denials of involvement to regulators and this Court, demonstrate IHL's knowing participation in and ratification of the conspiracy.

(c) IHL's representations to Plaintiff, to the Maryland Office of Financial Regulation, and to this Court that "no statutory violations occurred" and that its vendors have "confirmed compliance" are false and misleading, and IHL's claimed internal

investigation was a sham designed to shield IHL from accountability rather than a good-faith effort to ensure compliance with the law.

(d) IHL opened a mortgage file in Plaintiff's name, based on personal and financial information extracted through the illegal telemarketing campaign, and assigned a representative ("Avery") to pursue Plaintiff for a mortgage application he never initiated, thereby converting the fruits of the illegal campaign into a tangible business transaction.

(e) IHL had the right to control the manner in which the telemarketing calls were placed, as evidenced by IHL's claim to have "notified" its vendors to cease calling and its representation that vendors "confirmed compliance," establishing an agency relationship under which IHL is vicariously liable for the acts of its agents Mortgage Pipeline LLC and amcomlabs.

262. A declaratory judgment against IHL will serve to terminate the controversy by establishing as a matter of law that IHL is engaged in unlawful business practices, supporting regulatory enforcement by the Maryland Office of Financial Regulation and the Maryland Attorney General's Consumer Protection Division, and establishing the willful and knowing nature of IHL's violations relevant to treble damages under 47 U.S.C. § 227(c)(5) and Md. Code, Com. Law § 14-3202.

**Count XXI — Declaratory Judgment Against Defendant AM Communication Labs Inc. d/b/a amcomlabs (Md. Code, Courts & Judicial Proceedings §§ 3-401 through 3-415; Md. Code, Com. Law §§ 13-101 et seq., 14-3201 et seq., 14-4501 et seq.; 47 U.S.C. § 227)**

263. Plaintiff realleges and incorporates all preceding paragraphs.

264. An actual controversy exists between Plaintiff and Defendant amcomlabs regarding whether amcomlabs' telecommunications operations constitute unfair, abusive, and deceptive business practices under Maryland and federal law. amcomlabs has not appeared in this action or responded to Plaintiff's claims, and its continued operation of the telecommunications infrastructure that facilitated the illegal campaign creates an ongoing controversy requiring judicial resolution.

265. Plaintiff seeks a judicial declaration that:

(a) Unfair and Deceptive Trade Practices: Defendant amcomlabs is a business entity engaged in a pattern of unfair, abusive, and deceptive trade practices within the meaning of Md. Code, Com. Law §§ 13-301, 14-3201, and 14-4502, by operating an industrial-scale telecommunications infrastructure containing approximately 519,900 telephone numbers designed to facilitate unlawful telemarketing campaigns, including the purchase of Maryland area code numbers for the specific purpose of spoofing local caller-ID, the configuration of call-rejection technology to prevent consumers from identifying or contacting the caller, and the routing of high-volume automated calls through predictive dialer platforms without maintaining any do-not-call compliance procedures, and by making false and misleading sworn representations to the FCC in its numbering application, Robocall Mitigation Database filing, and Robocall Mitigation Plan regarding its KYC screening, AUP enforcement, STIR/SHAKEN authentication, and network monitoring practices — none of which amcomlabs actually performed with respect to Mortgage Pipeline LLC.

(b) Conspiracy: Defendant amcomlabs knowingly entered into and participated in a civil conspiracy with Defendants IHL and Mortgage Pipeline LLC to conduct the illegal telemarketing campaign at issue. amcomlabs provided the telecommunications infrastructure that made the conspiracy possible — including the purchase of Maryland telephone numbers forty-two days before the first call to Plaintiff, the configuration of the ReadyMode predictive dialer platform, the spoofing of caller-ID information to display false local Maryland numbers, and the grant of false STIR/SHAKEN Grade "A" attestation to every outbound call — all in furtherance of the joint scheme to conduct unlawful telemarketing while evading detection and accountability.

(c) Defendant amcomlabs made false and misleading sworn representations to the Federal Communications Commission in its application for Direct Access to Telephone Numbers under 47 C.F.R. § 52.15(g)(3)(ii), its Robocall Mitigation Database filing (RMD0002926), and its accompanying Robocall Mitigation Plan, by certifying that it would not facilitate illegal robocalls, spoofing, or fraud and that it maintained KYC screening, AUP enforcement, and network monitoring procedures, when in fact amcomlabs performed none of these functions with respect to Mortgage Pipeline LLC and affirmatively facilitated the illegal telemarketing campaign targeting Plaintiff.

(d) Defendant amcomlabs violated the terms and conditions of its FCC numbering authorization under 47 C.F.R. § 52.15(g)(3)(ii)(C) by using telephone numbers obtained through the numbering system to facilitate the illegal robocalling,

spoofing, and fraud campaign conducted by Mortgage Pipeline LLC against Plaintiff and other Maryland consumers.

(e) Defendant amcomlabs' grant of STIR/SHAKEN Grade "A" (full) attestation to every outbound call placed by Mortgage Pipeline LLC constituted a false certification to downstream carriers that the caller's identity had been verified and the calls were legitimate, when amcomlabs had conducted no meaningful verification of Mortgage Pipeline's identity, business purpose, or compliance with applicable law, and this false attestation directly caused Plaintiff's carrier to deliver the illegal calls without spam warnings or call-blocking protections.

(f) Defendant amcomlabs' Robocall Mitigation Plan, as filed with the FCC and recertified by Jason Jantz under penalty of perjury on February 25, 2026, is a sham document that does not reflect amcomlabs' actual business practices, and amcomlabs' continued recertification of the Plan while knowingly failing to implement its stated procedures constitutes a continuing violation of 47 C.F.R. § 64.6305.

(g) Defendant amcomlabs is doing business in Maryland within the meaning of Md. Code, Corporations & Associations § 7-202, and has failed to register with the Maryland State Department of Assessments and Taxation as a foreign corporation as required by law. (See Exhibit AG.)

(h) Defendant amcomlabs is not registered as a business entity with the Washington State Secretary of State, despite claiming a principal office at 11335 NE 122nd Way, Suite 105, Kirkland, Washington 98034, and is therefore operating a telecommunications business involving approximately 519,900 telephone

numbers without having legally organized or registered as a business entity in any state. (See Exhibit AE.)

(i) Defendant amcomlabs' operation of 519,900 telephone numbers across 404 area codes, including the systematic spoofing of caller-ID information on calls placed to Plaintiff and other Maryland consumers, constitutes a violation of 47 U.S.C. § 227(e) (the Truth in Caller ID Act), which prohibits any person from causing any caller identification service to knowingly transmit misleading or inaccurate caller identification information with the intent to defraud, cause harm, or wrongfully obtain anything of value.

266. A declaratory judgment against amcomlabs will serve to terminate the controversy by establishing as a matter of law that amcomlabs is engaged in unlawful business practices, supporting regulatory enforcement by the Federal Communications Commission, the Federal Trade Commission, the Maryland Office of Financial Regulation, and the Maryland Attorney General's Consumer Protection Division, and establishing the willful and knowing nature of amcomlabs' violations relevant to treble damages under 47 U.S.C. § 227(c)(5) and Md. Code, Com. Law § 14-3202.

**Count XXII — Declaratory Judgment Against Defendant Mortgage Pipeline LLC (Md. Code, Courts & Judicial Proceedings §§ 3-401 through 3-415; Md. Code, Com. Law §§ 13-101 et seq., 14-3201 et seq., 14-4501 et seq.)**

267. Plaintiff realleges and incorporates all preceding paragraphs.

268. An actual controversy exists between Plaintiff and Defendant Mortgage Pipeline LLC regarding whether Mortgage Pipeline's telemarketing operations constitute unfair, abusive, and deceptive business practices under Maryland law. Mortgage Pipeline has not

appeared in this action or responded to Plaintiff's claims, and its continued operation under fictitious trade names and fabricated business credentials creates an ongoing controversy requiring judicial resolution.

269. Plaintiff seeks a judicial declaration that:

(a) Unfair and Deceptive Trade Practices: Defendant Mortgage Pipeline LLC is a business entity engaged in a pattern of unfair, abusive, and deceptive trade practices within the meaning of Md. Code, Com. Law §§ 13-301, 14-3201, and 14-4502, by directly placing telemarketing calls to Plaintiff using fictitious trade names falsely implying VA affiliation, failing to disclose the true identity of the seller, and systematically refusing to honor do-not-call requests, while simultaneously publishing a sham TCPA Compliance Policy on its website falsely representing that it obtains prior written consent, maintains consent records, and honors opt-out requests.

(b) Conspiracy: Defendant Mortgage Pipeline LLC knowingly entered into and participated in a civil conspiracy with Defendants IHL and amcomlabs to conduct the illegal telemarketing campaign at issue. Mortgage Pipeline acted as the direct executor of the conspiracy, utilizing the amcomlabs SignalWire account and ReadyMode's predictive dialer platform to place automated outbound calls at scale on IHL's behalf, displaying spoofed Maryland (240) 226-XXXX and (240) 800-XXXX numbers as the caller ID, and deploying fictitious VA-affiliated trade names — all pursuant to the joint scheme to generate mortgage leads through unlawful means while obscuring the identities of all responsible parties.

(c) Defendant Mortgage Pipeline LLC published a TCPA Compliance Policy on its website representing that it obtains prior express written consent before making marketing calls, maintains records of consent, verifies third-party leads for TCPA compliance, processes opt-out requests promptly, and trains its personnel on TCPA compliance, when in fact Mortgage Pipeline systematically violated every material provision of its own published policy in connection with the telemarketing campaign targeting Plaintiff, and this willful disregard of its own stated compliance procedures supports an award of treble damages.

(d) Defendant Mortgage Pipeline LLC made false and misleading representations on its website, including claims of "25+ Years of Delivering Mortgages," "97% Net Client Retention Rate," and "1.5M Mortgages Closed to Date," despite having been incorporated on March 22, 2025 — sixty-one days before its first call to Plaintiff — and despite the claim of 1.5 million mortgages representing approximately 35% of all residential mortgages originated in the entire United States in 2024, and these fabricated credentials constitute unfair, abusive, and deceptive trade practices within the meaning of Md. Code, Com. Law §§ 13-301(1), 13-301(3), and 13-301(9), and demonstrate a corporate culture of deliberate deception that permeated all aspects of Mortgage Pipeline's operations, including the telemarketing campaign targeting Plaintiff.

(e) Defendant Mortgage Pipeline LLC operated under the fictitious trade name "VA Mortgage Pipeline" during the calls to Plaintiff, a name not registered in Maryland or Florida and specifically designed to falsely imply affiliation with the

U.S. Department of Veterans Affairs, in violation of Md. Code, Com. Law § 13-301(1), (2), and (9).

(f) Defendant Mortgage Pipeline LLC is doing business in Maryland within the meaning of Md. Code, Corporations & Associations § 4A-1002, by conducting a sustained telemarketing campaign directed at Maryland consumers using Maryland telephone numbers, possessing and utilizing Plaintiff's Maryland address and personal information, and generating mortgage leads for a Maryland-licensed lender, yet has failed to register with the Maryland State Department of Assessments and Taxation as a foreign limited liability company as required by law. (See Exhibit AF.)

270. A declaratory judgment against Mortgage Pipeline LLC will serve to terminate the controversy by establishing as a matter of law that Mortgage Pipeline is engaged in unlawful business practices, supporting regulatory enforcement by the Maryland Office of Financial Regulation, the Maryland Attorney General's Consumer Protection Division, the Federal Trade Commission, and the Federal Communications Commission, and establishing the willful and knowing nature of Mortgage Pipeline's violations relevant to treble damages under 47 U.S.C. § 227(c)(5) and Md. Code, Com. Law § 14-3202.

**General Declarations Applicable to All Defendants**

271. Plaintiff further seeks a judicial declaration that:

(a) Defendants' conduct constitutes a continuing pattern of violations of the federal Telephone Consumer Protection Act (47 U.S.C. § 227), the Maryland Telephone Consumer Protection Act (Md. Code, Com. Law § 14-3201 et seq.), the Maryland

Telephone Solicitations Act (Md. Code, Com. Law § 14-4501 et seq.), and the Maryland Consumer Protection Act (Md. Code, Com. Law § 13-101 et seq.).

(b) Defendants' coordinated telemarketing campaign — consisting of one hundred seven (107) unsolicited calls placed using spoofed telephone numbers, fictitious VA-affiliated trade names, and technology specifically designed to defeat call-blocking, continuing after forty-three (43) explicit do-not-call requests, a formal cease-and-desist, a regulatory complaint, and the filing of this lawsuit — constitutes an intrusion upon seclusion actionable under Maryland common law, and that such intrusion was highly offensive to a reasonable person.

(c) Defendants' conduct was extreme and outrageous within the meaning of Maryland's intentional infliction of emotional distress tort, and that the deliberate targeting of a disabled veteran through deceptive VA-affiliated trade names, the systematic evasion of all cessation efforts, and the repeated false denials to regulators and this Court, taken together, exceed all bounds of decency tolerated in a civilized society.

272. A declaratory judgment will serve to terminate the controversy between the parties by establishing as a matter of law that Defendants are engaged in unlawful business practices, thereby:

(a) establishing a judicial record that may be provided to the Maryland Office of Financial Regulation, the Maryland Attorney General's Consumer Protection Division, the Federal Trade Commission, and the Federal Communications Commission to support regulatory enforcement actions against Defendants;

(b) protecting other Maryland consumers (particularly veterans targeted by Defendants' predatory marketing practices) by putting Defendants on notice that their conduct has been adjudicated as unlawful;

(c) establishing the willful and knowing nature of Defendants' violations, which is relevant to the treble damages available under 47 U.S.C. § 227(c)(5) and Md. Code, Com. Law § 14-3202; and

(d) supporting any supplementary relief the Court deems necessary or proper under § 3-412, including injunctive relief, to prevent Defendants from continuing their unlawful practices.

273. Under § 3-412, further relief based on a declaratory judgment may be granted whenever necessary or proper. Plaintiff requests that this Court exercise its supplementary relief authority to order any additional remedies necessary to effectuate the declaratory judgment, including but not limited to injunctive relief and an order requiring Defendants to notify the Maryland Office of Financial Regulation of the Court's declaration.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff David Escobar Jr. respectfully requests that this Honorable Court enter judgment in his favor and against Defendants Independence Home Loans, LLC, AM Communication Labs Inc., a/k/a Advanced Mode Communications, d/b/a amcomlabs, and Mortgage Pipeline LLC, and their agents, successors, and assigns, each Defendant to be jointly and severally liable with the others on those Counts in which it is named as a Defendant, as follows:

**A.** Awarding Statutory Damages: For all violations of the federal Telephone Consumer Protection Act (47 U.S.C. § 227), the Maryland Telephone Consumer Protection Act (Md. Code, Com. Law § 14-3201 et seq.), the Maryland Telephone Solicitations Act (Md. Code, Com. Law § 14-4501 et seq.), and the Maryland Consumer Protection Act (Md. Code, Com. Law § 13-101 et seq.), awarding Plaintiff statutory damages as follows: Count I, $21,500; Count II, $52,500; Count III, $53,500; Count IV, $160,500; Count V, $160,500; Count VI, $160,500; Count VII, $21,500; Count VIII, $21,500; Count IX, $21,500; Count X, $21,500; Count XI, $21,500; Count XII, $21,500; Count XIII, $1,500; Count XIV, $46,500; Count XV, $53,500; and Count XVII, $160,500 as trebled under 47 U.S.C. § 227(c)(5). Plaintiff does not by this amendment seek any sum greater than the sum demanded in the Second Amended Complaint. Plaintiff therefore expressly limits his demand under this paragraph to $994,000, comprising $833,500 under the Maryland statutes and $160,500 under the federal Telephone Consumer Protection Act, and waives any excess over that figure that the per-count schedule above would otherwise produce.

**B. Awarding Treble Damages:** For all violations found to be willful and knowing, awarding Plaintiff treble damages of up to $1,500 per violation, as permitted under 47 U.S.C. § 227(c)(5), and Md. Code, Com. Law § 14-4503(a)(2)(ii). The evidence of premeditated campaign setup (purchasing 10 Maryland numbers 42 days before the first call), industrial-scale spoofing infrastructure (520,000 phone numbers), and continued calling after litigation was filed demonstrates that Defendants' conduct was willful and knowing, supporting treble damages on every count.

**C.** Awarding Actual Damages: Awarding Plaintiff actual damages for the significant invasion of privacy, intrusion upon seclusion, harassment, annoyance, emotional distress, and disruption to his daily life caused by the conduct alleged herein, including compensatory damages for

intrusion upon seclusion (Count XVIII) and intentional infliction of emotional distress (Count XIX), in an amount to be proven at trial.

**D. Awarding Punitive Damages:** Awarding Plaintiff punitive damages for Defendants' malicious, willful, and outrageous conduct as alleged in Counts XVIII and XIX. Defendants' deliberate targeting of a disabled veteran through a coordinated scheme involving spoofed telephone numbers, fictitious VA-affiliated trade names, systematic refusal to honor cessation requests, false denials to a state financial regulator, and continued calling after the commencement of litigation demonstrates the actual malice and evil motive required to support an award of punitive damages under Maryland law, in an amount to be determined at trial.

**E. Granting Injunctive Relief:** Issuing a permanent injunction ordering Defendants, their officers, agents, employees, lead generators, and all persons acting in concert with them, to:

1. Immediately cease and desist from placing any and all unsolicited telephone calls to Plaintiff's cellular telephone number; and
2. Implement and maintain adequate training, monitoring, and enforcement procedures to ensure full compliance with federal and Maryland do-not-call laws.

**F. Awarding Attorney's Fees and Costs:**Awarding Plaintiff his reasonable attorney's fees and the full costs of this litigation, as expressly authorized by Md. Code, Com. Law § 14-3202 and § 13-408.

**G. Awarding Interest:** Awarding Plaintiff pre-judgment and post-judgment interest at the maximum legal rate.

**H. Granting Further Relief:** Granting such other and further relief as this Court deems just, equitable, and proper to remedy the harms caused by Defendants' unlawful practices.

## VERIFICATION

I, David Escobar Jr., am the Plaintiff in the foregoing Third Amended Complaint. I have read the Third Amended Complaint and know the contents thereof. To the best of my knowledge, information, and belief, the facts stated in it are true and correct.

I understand that this verification is made under the penalties of perjury as provided by the laws of the State of Maryland, and that the penalties for making a false statement include fines and imprisonment.

Executed on this 3 day of September 2026, at Severn, Maryland.

________________________ David Escobar Jr.

Plaintiff

# LIST OF EXHIBITS

| Exhibit | Title / File Name | Description / Purpose |
|---|---|---|
| A | Exhibit A – Cell Line Details | Summary of the cellular number used by Plaintiff and call-handling details. |
| B | Exhibit B – Call Log to Plaintiff From Defendants | Call log filed with the Second Amended Complaint, recording the calls placed through October 1, 2025. Superseded for all purposes by Exhibit B-1, the Call Attribution Matrix, which sets out all one hundred seven (107) calls call by call with the tier, the evidentiary basis, and the Defendant to which each call is attributed. |
| C | Exhibit C – Escobar Benefit Summary and Service Verification Letter | Verification of Plaintiff's VA eligibility and benefit status supporting the allegations of misuse of veteran information. |
| D | Exhibit D – MD OFR Complaint Form Escobar | Copy of the formal complaint filed by Plaintiff with the Maryland Office of Financial Regulation on October 6, 2025. |
| E | Exhibit E – Escobar Complaint Resolution Letter | Correspondence from the Maryland Office of Financial Regulation acknowledging and addressing Plaintiff's complaint. |
| F | Exhibit F – Call Transcript 1, Oct 2025 | Transcript of the October 1, 2025 call from "Joseph of Mortgage Pipeline," documenting failure to identify company and abrupt disconnection. |
| G | Exhibit G – Escobar Loan (Redacted) | Proof of Plaintiff's VA-backed home-loan account, demonstrating the subject matter of the telemarketing campaign. |
| H | Exhibit H – Initial Cease and Desist | Plaintiff's October 17, 2025 Cease-and-Desist letter sent via certified mail to IHL and its Maryland registered agent. |
| I | Exhibit I – Call Transcript 2 | Transcript of October 2, 2025 call doing a VA mortgage review. |
| J | Exhibit J – Call Transcript 3 | Transcript of October 3, 2025 call where a claimed VA representative transferred Plaintiff to Matthew Huss, an IHL loan officer. |
| K | Exhibit K – Onvoy/Inteliquent Subpoena Response | Subpoena compliance response from Sinch Voice/Inteliquent/Onvoy identifying SignalWire, Inc. and ChaseData Corp. as downstream OSPs for the Subject Numbers. |
| L | Exhibit L – SignalWire Account Summary | Summary of records produced by SignalWire, Inc. in response to UIDDA subpoenas, establishing that all ten calling numbers are registered to the amcomlabs account, purchased on May 26, 2025 within a 4-minute window, with 519,845 numbers in inventory across 404 area codes. |
| M | Exhibit M – amcomlabs CDR Summary | Summary of 96 call detail records produced by AM Communication Labs Inc. pursuant to UIDDA subpoena, identifying all calls to Plaintiff's number as Client ID 30796 ("Mortgage Pipeline"), originating from server IP 108.178.56.74 with STIR/SHAKEN "A" attestation. |
| N | Exhibit N – IHL Pre-Litigation Correspondence | IHL's October 13, 2025, October 20, 2025 (to MD OFR), and November 6, 2025 letters, representing that vendors were notified and investigation found "no evidence" of wrongdoing. |

| | | |
|---|---|---|
| **O** | Exhibit O – ReadyMode Order Form | Order Form (Response ID 49529) dated May 22, 2025, subscribing Mortgage Pipeline LLC (Grant Maier) to the amcomlabs/ReadyMode predictive dialer platform. |
| **P** | Exhibit P – Florida Sunbiz Record | Florida Division of Corporations Detail by Entity Name for Mortgage Pipeline LLC (Document No. L25000140545), confirming Grant Maier as sole manager. |
| **Q** | Exhibit Q – AM Comm Direct Access to Numbers Application | FCC application by AM Communication Labs Inc. for Direct Access to Telephone Numbers under 47 C.F.R. § 52.15(g)(3)(ii), in which amcomlabs certified compliance with TRACED Act and STIR/SHAKEN requirements. |
| **R** | Exhibit R – FCC Form 499 | FCC Form 499 (Filer ID 834408) registration for AM Communication Labs Inc., listing Jason Jantz as CEO and identifying Maryland among all 50 states and DC as jurisdictions of operation. |
| **S** | Exhibit S – Robocall Mitigation Database Filing | Robocall Mitigation Database filing (RMD0002926) for AM Communication Labs Inc., identifying principals as Jason Jantz, Imed Yahmadi, Readymode.com Inc., and certifying implementation of robocall mitigation measures. |
| **T** | Exhibit T – AM Comm Robocall Mitigation Plan | AM Communication Labs Inc. Robocall Mitigation Plan setting forth KYC screening procedures (Section II), Acceptable Use Policy (Section III), STIR/SHAKEN attestation practices (Section IV), and network monitoring obligations. |
| **U** | Exhibit U – Mortgage Pipeline TCPA Policy | Mortgage Pipeline LLC's published "TPCA Policy" [sic] from its website (effective June 1, 2025), setting forth purported consent, opt-out, compliance, and training provisions. |
| **V** | Exhibit V – Mortgage Pipeline Website Screenshots | Screenshots of Mortgage Pipeline LLC's website displaying false and misleading representations, including "25+ Years of Delivering Mortgages," "97% Net Client Retention Rate," and "1.5M Mortgages Closed to Date." |
| **W** | Exhibit W – FHFA National Mortgage Database Statistics | Federal Housing Finance Agency National Mortgage Database statistics on total U.S. residential mortgage originations in 2024. |
| **X** | Exhibit X – September 18, 2025 Text Messages from IHL | Text message exchange from (240) 792-7117 on September 18, 2025: "Avery with Independence Home Loans" texts Plaintiff by name referencing mortgage application, follow-up message, Plaintiff's "Stop" reply, and automated unsubscribe confirmation. |
| **Y** | Exhibit Y – October 2, 2025 Text Messages, Call Log, and Loan Officer Credentials | October 2, 2025 text exchange from (240) 792-7117: Plaintiff re-subscribes, "Avery with Independence Home Loans" responds, Plaintiff replies "Sure," Avery responds "Sounds good, calling now"; iPhone call log showing 16-minute incoming call from (240) 792-7117 at 6:47 PM; and text from (913) 689-8623 at 6:52 PM containing IHL website URL, NMLS Consumer Access link, and NMLS #2512726. |
| **Z** | Exhibit Z – October 6, 2025 Text Messages from IHL | Text message from (571) 517-9xxx on October 6, 2025: "Avery with Independence Home Loans" texts Plaintiff, Plaintiff replies "Remove," and receives IHL-branded opt-out confirmation ("-Independence Home Loans"). |

| | | |
|---|---|---|
| **AA** | Exhibit AA – IHL Official Response to Maryland OFR | IHL's October 20, 2025 official written response to the Maryland Office of Financial Regulation regarding Plaintiff's regulatory complaint, containing five material misrepresentations. |
| **AB** | Exhibit AB – Plaintiff's Rebuttal to Maryland OFR | Plaintiff's October 23, 2025 email to Sarala Chhetri at the Maryland OFR challenging IHL's response and identifying specific statutory violations. |
| **AC** | Exhibit AC – OFR Confirmation of Reopened Inquiry | October 31, 2025 email from Sarala Chhetri, Financial Non-Depository Examiner, Maryland OFR, confirming receipt of Plaintiff's rebuttal and that OFR had contacted IHL again for review. |
| **AD** | Exhibit AD – Owen James Dixon NMLS Consumer Access Record | NMLS Consumer Access record for Owen James Dixon (NMLS #2512726), the IHL loan officer who contacted Plaintiff on October 2, 2025. Shows authorization to represent NEXA Mortgage, LLC (NMLS# 1660690), not IHL, and lists twelve active state licenses excluding Maryland. |
| **AE** | Exhibit AE – WA Business Entity Search | Washington State Secretary of State, Corporations & Charities Division, Corporation Search results for "AM Communication Labs," returning zero results. Demonstrates that Defendant amcomlabs is not registered as a business entity in its claimed home state of Washington, despite claiming a principal office at 11335 NE 122nd Way, Suite 105, Kirkland, Washington 98034. |
| **AF** | Exhibit AG – MD SDAT Business Entity Search (Mortgage Pipeline) | Maryland State Department of Assessments and Taxation (SDAT) Business Entity Search results for "Mortgage Pipeline," returning zero results. Demonstrates that Defendant Mortgage Pipeline LLC has not registered as a foreign entity with the Maryland SDAT, despite conducting business in the State of Maryland. |
| **AG** | Exhibit AF – MD SDAT Business Entity Search (amcomlabs) | Maryland State Department of Assessments and Taxation (SDAT) Business Entity Search results for "AM Communication Labs," returning zero results. Demonstrates that Defendant amcomlabs has not registered as a foreign entity with the Maryland SDAT, despite conducting business in the State of Maryland. |

| | |
|---|---|
| **DAVID ESCOBAR JR.,**<br>Plaintiff,<br>v.<br><br>**INDEPENDENCE HOME LOANS, LLC ("IHL"),**<br>Defendant. | Case No.: C-02-CV-25-3012 |

## CERTIFICATE OF SERVICE

I hereby certify that on this 3 day of September 2026, a copy of this Third Amended Complaint was e-filed and served via email upon counsel for Defendant Independence Home Loans, LLC and amcomlabs upon the remaining Defendants at the addresses below:

Attorneys for Defendant, Independence Home Loans:

Tamara B. Goorevitz (# 9812150274)
FRANKLIN & PROKOPIK, P.C.
Two North Charles Street, Suite 600 Baltimore, MD 21201
(410) 230-3625
(410) 752-6868 (fax)
tgoorevitz@fandpnet.com

Jordan S. Cohen
515 East Las Olas Boulevard, Suite 1400
Fort Lauderdale, FL 33301
JCohen@wickersmith.com

Attorneys for Defendant, AM Communication Labs Inc. a/k/a Advanced Mode Communications d/b/a amcomlabs:

Kristin McGrory (Atty ID# 0512140251)
ROTH JACKSON GIBBONS CONDLIN, PLC
8200 Greensboro Drive, Suite 820
McLean, VA 22102
(571) 463-6068 / (703) 485-3525 (fax)
kmcgrory@rothjackson.com

Joseph P. Bowser (Atty ID# 0312160088)
ROTH JACKSON GIBBONS CONDLIN, PLC
1519 Summit Ave., Suite 102
Richmond, VA 23230
(804) 441-8701 / (804) 441-8438 (fax)

jbowser@rothjackson.com
*Attorney for Defendant*

David Escobar Jr.