**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| DAVID ESCOBAR, JR., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:26-cv-03633-JKB |
| | ) | |
| INDEPENDENCE HOME LOANS, LLC, et al. | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

**AM COMMUNICATION LABS INC.'S MEMORANDUM IN SUPPORT OF ITS MOTION TO DISMISS**

# TABLE OF CONTENTS


INTRODUCTION ..........1

BACKGROUND ..........3

I. Statutory and Regulatory Framework ..........3

II. Plaintiff's Allegations ..........6

ARGUMENT ..........7

I. Legal Standard ..........7

II. Plaintiff Fails to Plead that AM Comm Can be Held Liable Under the TCPA. ..........8

A. AM Comm Cannot be Held Liable Under the TCPA Here ..........8

B. Plaintiff's TCPA Claim, and Those Predicated on the TCPA, Fail Because No Private Right of Action Exists for the Alleged Caller-ID Violations ..........11

III. Plaintiff Fails to State Claims Under the MDTCPA (Counts III and XV) ..........13

A. The Plaintiff's MDTCPA Claims Fail Because the Alleged Predicate Violations Do Not Provide a Private Right of Action ..........13

B. AM Comm is not Subject to the TSR Under the Common-Carrier Exemption ..........16

C. Even if the TSR is Applicable, Plaintiff Fails to Plausibly Allege that AM Comm Violated the Regulation ..........17

IV. Plaintiff Fails to State Claims Pursuant to the MTSA (Counts IV-VI) ..........19

A. Plaintiff Fails to Establish that AM Comm Can Be Held Liable Under the MTSA ....19

B. Even Assuming the MTSA Applies, Plaintiff Fails to Plausibly Allege Violations of the Statute ....21

V. Plaintiff Fails to Allege Any Common Law Tort Claim (Counts XVI, XVIII, XIX) ....24

A. Plaintiff Fails to Plausibly Allege Intrusion Upon Seclusion ....24

B. Plaintiff Fails to Plausibly Allege Intentional Infliction of Emotional Distress ....26

C. Plaintiff Fails to Plausibly Allege a Civil Conspiracy ....28

VI. Plaintiff's Request for Declaratory Relief is Without Merit ....29

Defendant AM Communication Labs Inc. ("AM Comm"), through undersigned counsel and pursuant to Local Rule 105, states the following in support of its Motion to Dismiss the Third Amended Complaint ("TAC") as it applies to AM Comm.

## INTRODUCTION

Plaintiff seeks to hold AM Comm liable *not* because it allegedly marketed products or services, placed telemarketing calls, or communicated with Plaintiff, but because it provided telecommunications services to Defendant Mortgage Pipeline LLC ("Mortgage Pipeline"), which was allegedly soliciting mortgage-related services on behalf of Defendant Independence Home Loans, LLC ("IHL"). But Plaintiff's claims against AM Comm fail because the statutes he invokes regulate telemarketers and sellers, not telecommunications carriers. The TAC does not plausibly allege that AM Comm initiated any call, acted as a seller or telemarketer, violated any privately enforceable statutory obligation, or otherwise engaged in conduct that is sufficient to give rise to liability under any statute that Plaintiff identifies.

For instance, Plaintiff's claims under the Telephone Consumer Protection Act ("TCPA") fail because his own allegations identify Mortgage Pipeline as the caller selling mortgage services, while characterizing AM Comm only as the "transmitting party" that provided the telecommunications infrastructure and related services. But the TCPA does not impose liability on every entity involved in the transmission of a call, and the TAC is devoid of any allegations establishing that AM Comm initiated, directed, or controlled the telemarketing calls. Moreover, AM Comm operates within the Federal Communications Commission's ("FCC") regulatory framework, which generally requires carriers to transmit the traffic they receive, not block it. A carrier's liability for transmitting unlawful traffic arises only after the FCC identifies a source of

unlawful traffic, directs all carriers to block it, and the carrier fails to comply with that FCC directive. Plaintiff includes no such allegations here—because *that* never happened.

Plaintiff's claims predicated on the Telemarketing Sales Rule ("TSR") likewise fail for multiple reasons. First, Plaintiff does not satisfy the TSR's threshold requirement that a private plaintiff must allege at least $50,000 in actual damages. Second, Plaintiff's own allegations place AM Comm squarely within the TSR's common-carrier exemption. Congress exempted common carrier activity from the Federal Trade Commission's ("FTC") jurisdiction and delegated the regulation of carrier operations to the FCC. Throughout the TAC, Plaintiff repeatedly alleges that AM Comm supplied the telephone numbers, provided telecommunication services, and transmitted the calls that were placed by Mortgage Pipeline—all of which are classic carrier functions. Third, Plaintiff does not plausibly allege that AM Comm acted as either a "seller" or a "telemarketer" within the meaning of the TSR.

Plaintiff's remaining Maryland statutory claims fail for the same reasons as his federal claims: they attempt to impose liability on AM Comm for serving as a telecommunications carrier rather than on any allegation that AM Comm marketed services, placed the calls, or otherwise orchestrated the calling campaign. But the state statutes are primarily directed at telemarketers and sellers, not underlying carriers.

Plaintiff's tort and declaratory judgment claims fare no better. Like his statutory claims, Plaintiff seeks to impose liability on AM Comm based on its role as a carrier rather than any allegation that AM Comm placed the calls or otherwise directly participated in the alleged solicitations. Moreover, these claims are subject to demanding legal standards that are not satisfied by the TAC's conclusory allegations and speculative inferences. As discussed below, Plaintiff

fails to plausibly allege the elements of civil conspiracy, intrusion upon seclusion, intentional infliction of emotional distress, or declaratory relief.

At bottom, Plaintiff's claims rest on the mistaken premise that a telecommunications carrier may be held liable simply because calls traversed its network. Neither federal nor state laws support that theory.

## BACKGROUND

### I. Statutory and Regulatory Framework

The TCPA, 47 U.S.C. § 227, was enacted in 1991 to address certain telemarketing practices. *See Krakauer v. Dish Network, L.L.C.*, 925 F.3d 643, 649 (4th Cir. 2019) (quoting Pub. L. No. 102-243 § 2(6) (1991)). The TCPA may be enforced by the FCC, by state Attorneys General, and by means of statutory private rights of action to enforce the prerecorded or artificial calling restrictions established in subsection 227(b), and certain do-not-call restrictions the FCC promulgated under subsection 227(c). *See* 47 U.S.C. §§ 227(b)(3) and (c)(5). The TCPA does not create a private right of action to enforce the technical and procedural provisions of § 227(d), or the caller ID provisions of subsection 227(e), or the FCC's regulations implementing those provisions. *See, e.g.*, *Worsham v. Disc. Power Inc.*, No. RDB-20-0008, 2021 U.S. Dist. LEXIS 230937, at *8 (D. Md. Dec. 1, 2021) (47 U.S.C. § 227(d) "does not provide for any private right of action."); *McComb v. Lackey*, No. 3:25-cv-53, 2026 U.S. Dist. LEXIS 142000, at *17 (S.D. Ohio Jun. 25, 2026) (stating 47 U.S.C. § 227(e) "does not provide for a private right of action") (citation omitted)). For those latter two subsections, only the FCC enforces Subsection 227(d), and the FCC and State Attorneys General enforce the Caller ID law.

Where the TCPA provides for a private right of action, plaintiffs can bring a claim against parties under theories of direct or vicarious liability. Direct TCPA liability can be established where the caller is so involved in the salient factors of making a phone call—deciding who to call,

when to call, and what to say—that the person is deemed to have "made" or "initiated" the call at issue. The potential for direct liability under the TCPA can apply only under certain circumstances, and to those entities that "initiate" the telemarketing calls. *See In re Dish Network, LLC*, 28 FCC Rcd. 6574, 6582 ¶ 24 (2013). A person or entity "initiates" a telephone call when "it takes the steps necessary to physically place a telephone call." *Id.* at 6583 ¶ 26. Vicarious liability is also available and can be pled under the federal common law of agency, viz., actual authority, apparent authority, and ratification. *See Bradley v. DentalPlans.com*, 617 F. Supp. 3d 326, 338 (D. Md. July 27, 2022). Generally, however, carriers are not liable for their customers' alleged TCPA violations. *See, e.g.*, *Dobronski v. Glob. Tel Link Corp.*, No. 25-1720, 2026 U.S. App. LEXIS 6097, at *4 (6th Cir. Mar. 2, 2026) ("liability under the TCPA generally does not attach to a common carrier." (citation omitted)); *Zelma v. Halperin*, No. 24-1059 (ES) (JRA), 2026 U.S. Dist. LEXIS 223425, at *13-14 (D.N.J. Sep. 30, 2026) (dismissing TCPA claims and noting that, "Plaintiff fails to explain how Defendant Horizon's call carriage or transmission constitutes initiation of a call under the TCPA and does not cite any case law in support of that inference.").

In 2019, Congress enacted the Pallone-Thune Telephone Robocall Abuse Criminal Enforcement and Deterrence Act ("TRACED Act") and directed the FCC to establish rules aimed at reducing robocalls. Those rules require carriers to, among other things, participate in efforts to help law enforcement mitigate the extent of fraudulent traffic and to authenticate caller ID in certain calls, but they also recognize the practical limits of what carriers are able to know about any particular call.[1] Carriers generally cannot determine what is said on any given call while it is

---

[1] Many of these regulations turn on whether a carrier is acting as an originating carrier, an intermediate carrier, or a terminating carrier. This distinction matters because there are commonly at least three types of phone companies involved in any given call: (1) the "originating" provider that serves the *calling* party, like our wireless carriers or the local phone companies that provide service to our homes, businesses, and government offices, (2) one or more "intermediate" providers that provide the wholesale transmission and routing services that interconnect the nation's wireless carriers and local phone companies, and (3) the "terminating" carriers that complete calls to the *called* party.

being carried, who consented to a call, or whether the call ultimately violates the TCPA. For that reason, the FCC does not require or expect carriers to stop all unlawful calls.[2] Rather, to balance the reliability of the nation's communications network with the need to reduce illegal traffic, the FCC has reserved to itself the authority to direct carriers to block an entire source of traffic. *See, e.g.*, 47 C.F.R. §§ 64.1200(k)(4) and (n)(2). Under the FCC's regulatory framework, a carrier's responsibility to block traffic arises when the FCC identifies an unlawful traffic source and then directs carriers to take action. Absent such notice, carriers are expected to carry the traffic they receive rather than independently determine which calls should be blocked.[3] Thus, under the FCC's rules, carriers have one clear arbiter of who can provide notice and order the carrier community to shut off an entire source of traffic: *only* the FCC.

Telemarketing practices are also regulated by the FTC under the Telemarketing and Consumer Fraud and Abuse Prevention Act ("TCFAPA"), 15 U.S.C. §§ 6101-08. There, Congress directed the FTC to "prescribe rules prohibiting deceptive telemarketing acts or practices and other abusive telemarketing acts or practices." 15 U.S.C. § 6102(a)(1). The FTC's implementing regulations, known as the TSR, appear at 16 C.F.R. Part 310. Like the FCC's TCPA regulations, the TSR regulates telemarketing calls. *See generally* 16 C.F.R. §§ 310.1-9. A person may file a

---

The FCC's carrier rules—which only the FCC can enforce in this arena—vary based on a carrier's role in any given call path. *See, e.g.*, 47 C.F.R. § 64.1200(k), 47 C.F.R. §§ 64.6300-05.

[2] *See In re Advanced Methods to Target & Eliminate Unlawful Robocalls*, 35 FCC Rcd. 7614, 7629-30 ¶ 41 & n.98 (July 17, 2020); *see also In re Advanced Methods to Target and Eliminate Unlawful Robocalls*, 35 FCC Rcd. 15221, 15232-35 ¶¶ 30, 39 n.90 (Dec. 30, 2020) (noting the FCC does not expect perfection in mitigation of illegal calls).

[3] *See, e.g., In re Enforcement of Prohibitions Against the Use of Common Carriers for the Transmission of Obscene Materials*, 2 FCC Rcd. 2819, 2820 ¶ 9 (May 15, 1987) (a common carrier has actual notice when it receives notice that the traffic at issue has been adjudicated by the *FCC* to be unlawful). Under the FCC's new post-TRACED Act rules, the first carrier-wide blocking order came in May 2023. *See In re One Eye LLC*, DA 23-389, 2023 FCC LEXIS 1419 (May 11, 2023).

civil action in federal court to enforce the TSR only if the person was "affected by any pattern or practice of telemarketing" causing "$50,000 in actual damages." 15 U.S.C. § 6104(a).

The Maryland Telephone Consumer Protection Act ("MDTCPA") makes it a violation of state law to violate the TCFAPA, as implemented by the FTC, and the TCPA, as implemented by the FCC, and it creates a private cause of action for violations of the MDTCPA. *See* Md. Code Ann., Com. Law § 14-3201 et seq. But a plaintiff may only pursue a MDTCPA claim where a federal private right of action already exists, and where the plaintiff satisfies the requirements of that underlying action. *See Worsham v. Ehrlich*, 181 Md. App. 711, 730-31, 957 A.2d 161, 172-73 (2008); *see also Worsham v. Disc. Power, Inc.*, No. RDB-20-0008, 2021 U.S. Dist. LEXIS 141842, at *16 (D. Md. Jul. 29, 2021).

Similarly, the Maryland Telephone Solicitation Act ("MTSA") regulates telephone solicitations made by sellers and telemarketers to Maryland residents. *See* Md. Code Ann., Com. Law § 14-4502 et seq. The statute applies to telephone solicitation calls made by or on behalf of a seller and prohibits specified conduct, including calls made in violation of Maryland's do-not-call requirements. *See id*. The MTSA defines several terms relevant to its scope, including "telephone solicitation," and it provides a private right of action for violations of the state statute. *See id.* §§ 14-4501-03. Accordingly, whether a particular communication falls within the MTSA depends upon whether the communication constitutes a "telephone solicitation" and whether a person or entity directed, controlled, or managed the calls. *See id.*

## II. Plaintiff's Allegations

This lawsuit stems from Plaintiff's allegations that he received numerous telephone solicitations from Mortgage Pipeline and IHL promoting their mortgage-related products or services. *See, e.g.*, TAC ¶¶ 15-18, 20-24. Plaintiff alleges that the calls were part of a coordinated

telemarketing campaign involving several defendants acting together to market the services. *See id*. ¶¶ 20-32, 76-79. After taking discovery from IHL (the lone original Defendant) and third-party discovery from AM Comm and one of its phone-number suppliers, SignalWire, Plaintiff's TAC lays out who did what: SignalWire assigns blocks of phone numbers to AM Comm, which are used by its customers, including Mortgage Pipeline, to make calls of their choosing to their own business contacts using AM Comm's telephone services. *See, e.g.*, *id*. ¶¶ 46-49, 87-99. Generally, Plaintiff alleges that Mortgage Pipeline made the challenged calls to Plaintiff, attempting to sell IHL's mortgage services, and used AM Comm's telephone services to make its calls. *See, e.g.*, *id.* ¶74 (stating that AM Comm "supplied the telephone numbers, the dialer capacity and the caller-identification attestation to [Mortgage Pipeline]."); *id.* ¶ 94 (stating that Mortgage Pipeline is the "placing party" and AM Comm is the "transmitting party"). Notably, Plaintiff never alleges that any of AM Comm's services were ever marketed to him, that AM Comm made any calls to him, that AM Comm had any role in deciding who Mortgage Pipeline called, or that AM Comm had any say in the content of the alleged calls. *See generally* TAC. The TAC makes clear that AM Comm was just a phone company. Based on these allegations, Plaintiff seeks to hold AM Comm liable under the TCPA (Counts XVII and XXI), the MDTCPA (Counts III and XV), the MTSA (Counts IV-V), and various common law tort claims (Counts XVI, XVIII, and XIX).

## ARGUMENT

### I. Legal Standard

"Under Federal Rule of Civil Procedure 8(a)(2), a complaint must contain a 'short and plain statement of the claim showing that the pleader is entitled to relief.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 677-78 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). "[T]he pleading standard Rule 8 announces . . . demands more than an unadorned, the-defendant-

unlawfully-harmed-me accusation." *Id*. at 678 (citing *Twombly*, 550 U.S. at 555). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice" to state a claim under Rule 8. *Id.* "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Id*. (quoting *Twombly*, 550 U.S. at 570). "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (citation modified).

## II. Plaintiff Fails to Plead that AM Comm Can be Held Liable Under the TCPA.

Although Plaintiff's lone TCPA claim (Count XVII) does not identify AM Comm in the title, Plaintiff seeks to hold it liable for the alleged TCPA violations underlying that claim. *See* TAC ¶ 242 (claiming AM Comm is liable to Plaintiff for TCPA violations). Likewise, Plaintiff's claim for declaratory relief (Count XXI) is predicated, in part, on alleged TCPA violations. *See, e.g.*, *id*. ¶ 265(i) (requesting declaratory relief for AM Comm's alleged violations of 47 U.S.C. § 227(e) (the Truth in Caller ID Act)). These claims fail for two independent reasons. First, the TAC does not plausibly allege that AM Comm initiated the challenged calls or otherwise may be held liable under the TCPA. Second, to the extent Plaintiff's theory relies on allegations of alleged caller-ID spoofing, STIR/SHAKEN violations, or misleading caller-ID information, Congress created no private right of action to enforce those provisions.

### A. AM Comm Cannot be Held Liable Under the TCPA Here

The TCPA does not impose liability on every entity involved in the transmission of a call. Rather, as noted above, liability generally attaches to the party that initiates the call or, in limited circumstances, to an entity, including a common carrier, whose involvement in the calling

campaign is so substantial that it may be deemed to have initiated the call. *See In re Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 30 FCC Rcd. 7961, 7980 ¶ 30 (July 10, 2015); *see also Landy v. Natural Power Sources, LLC*, Case No. 3:21-cv-00425, 2021 U.S. Dist. LEXIS 154637, *7-8 (D.N.J. Aug. 16, 2021) (noting that a party must be the initiator of a call (or the initiator's agent under federal agency law) to be held liable under the TCPA); *Rinky Dink, Inc. v. Elec. Merch. Sys.*, Case No. C13-1347-JCC, 2015 U.S. Dist. LEXIS 22108, at *18 (W.D. Wash. Feb. 24, 2015) (finding a "high degree of involvement" where a defendant controls recipient lists or message content).

Plaintiff's allegations foreclose any such theory of liability here. Throughout the TAC, Plaintiff distinguishes between the entity that allegedly placed the calls and AM Comm's alleged role in transmitting the challenged calls. Indeed, Plaintiff expressly alleges that Mortgage Pipeline was the "placing party" and that AM Comm was merely the "transmitting party." TAC ¶¶ 88-89. Plaintiff repeatedly separates AM Comm's actions from Mortgage Pipeline's by stating that AM Comm supplied the telephone numbers, provided telecommunications services, including applying FCC-required STIR/SHAKEN attestations for the calls. *See, e.g.*, *id.* ¶ 88 ("Mortgage Pipeline [] is the placing party. It selected the contact list, employed or engaged the agents who spoke to Plaintiff . . . and initiated the calls."); *id.* ¶ 89 ("[AM Comm] [] is the transmitting party. It owns and operates the SignalWire account on which the numbers used to call Plaintiff are held, purchased and configured those numbers, granted the calls STIR/SHAKEN attestation, and routed the calls through the [] dialer platform."). Such allegations pertain to AM Comm's alleged role providing telecommunications services, not the initiation or direction of telemarketing calls promoting mortgage services.

Tellingly, the TAC is devoid of allegations that AM Comm chose the call recipients, created calling lists, determined when Mortgage Pipeline's calls would be placed, or controlled any content of Mortgage Pipeline's calls. *See generally* TAC. Instead, the TAC allegations attribute those functions to Mortgage Pipeline and IHL. *See, e.g.*, *id.* ¶ 2 ("IHL is the 'seller' . . . whose goods or services were promoted"); *id.* ¶ 5 ("the calls . . . originated from the Mortgage Pipeline client account"); *id.* ¶ 90 (IHL "is the seller. The calls were placed to generate mortgage leads for IHL . . . [and] IHL is the entity on whose behalf the calls were made"). Because Plaintiff alleges only that AM Comm transmitted Mortgage Pipeline's calls, and that other entities placed or controlled the calls, Plaintiff has failed to allege that AM Comm initiated any call within the meaning of the TCPA. *See Landy*, 2021 U.S. Dist. LEXIS 154637, at *7-8; *see also Zelma*, 2026 U.S. Dist. LEXIS 223425, at *13-14.

Nor can Plaintiff manufacture TCPA liability by alleging that AM Comm provided the telecommunications infrastructure used by Mortgage Pipeline. Courts consistently distinguish between entities that initiate or direct telemarketing campaigns and those that merely provide the technology or transmission services through which the calls are made. The latter are not liable under the TCPA simply because the calls pass through their systems. *See*, *e.g.*, *Meeks v. Buffalo Wild Wings, Inc.*, No. 17-cv-07129-YGR, 2018 U.S. Dist. LEXIS 52328, at *10-11 (N.D. Cal. 2018) (dismissing plaintiff's TCPA claim because, while the complaint alleged the texts were sent through the Yelp platform, the complaint failed to allege that Yelp had a high degree of involvement in deciding whether, when, and to whom to send messages).

Plaintiff's theory of liability is also entirely inconsistent with the FCC's regulatory framework governing telecommunications carriers. As noted above, with rare exception, carriers must *carry* the traffic they receive, not independently determine which calls should be blocked,

which is almost invariably impossible to do in real-time. The FCC has repeatedly recognized that carriers often lack the information necessary to determine whether a particular call is lawful *ex ante*, and therefore has reserved for itself the authority to direct carriers to block specific sources of unlawful traffic. *See, e.g.*, 47 C.F.R. §§ 64.1200(k)(4) and (n)(2). Here, Plaintiff does not allege that AM Comm violated any FCC blocking directive, that it received any FCC order concerning Mortgage Pipeline, or that it failed to comply with any FCC directive concerning the challenged calls. Accordingly, the TAC fails to plausibly allege TCPA liability against AM Comm.

### B. Plaintiff's TCPA Claim, and Those Predicated on the TCPA, Fail Because No Private Right of Action Exists for the Alleged Caller-ID Violations.

Plaintiff also claims that AM Comm may be held liable under the TCPA based on its alleged provision of telephone numbers, call routing, and STIR/SHAKEN attestations on Mortgage Pipeline's calls. *See, e.g.*, TAC ¶¶ 24-25, 46-49, 76-77, 89; *see also id.* ¶ 265(i) (requesting declaratory relief for alleged spoofing activities under § 227(e)). But, to the extent these allegations concern caller-ID information, spoofing, or STIR/SHAKEN attestations, the claims fail as a matter of law because Congress did not provide a private right of action for such claims.

The TCPA's caller-ID provisions were enacted via the Truth in Caller ID Act of 2009 ("TCIA"), which makes it unlawful to knowingly transmit misleading or inaccurate caller identification information with the intent to defraud, cause harm, or wrongfully obtain something of value. *See* 47 U.S.C. § 227(e)(1). Congress expressly vested enforcement authority over these provisions in the FCC and the state attorneys general. *See* 47 U.S.C. § 227(e)(5)-(6). But Congress did not create a private right of action for alleged violations of Subsection 227(e). *See McDermet v. Heath,* No. CV-17-12327-FDS, 2018 U.S. Dist. LEXIS 14735, at *7 (D. Mass. Jan. 30, 2018) ("Accordingly, it is clear that Congress did not create a private right of action to enforce the TCIA.").

Here, Plaintiff repeatedly alleges that the challenged calls involved spoofed caller-ID information. *See, e.g.*, TAC ¶¶ 24-25, 46-49, 59, 76-77, 89. But even accepting those allegations as true, they concern conduct that is expressly governed by 47 U.S.C. § 227(e). Because no private right of action exists under that provision, Plaintiff cannot base a claim against AM Comm (or anyone else) based on alleged spoofing or other caller-ID irregularities.

Plaintiff also appears to contend that AM Comm improperly assigned an A-level STIR/SHAKEN attestation to Mortgage Pipeline's calls. But Plaintiff's own allegations show why those calls required that level of attestation under the FCC's rules. An A-level attestation means that the originating provider is the first FCC-registered carrier in a call path, has a direct authenticated relationship with the caller-customer, and a verified association with the telephone number the caller used for the call. *See In re FCC Proposes $2M Fine Against Carrier Behind N.H. Robocalls*, 39 FCC Rcd. 6027, 6030 (May 28, 2024). Here, Plaintiff alleges that AM Comm was the originating provider, knew Mortgage Pipeline was the customer making the calls, and assigned certain telephone numbers used for those calls. *See, e.g.*, TAC ¶¶ 22, 46-49, 88-89. Those allegations describe precisely the circumstances warranting A-level attestation, and thus AM Comm would have violated the FCC's rules if it attested these calls with anything but an "A."

Plaintiff appears to treat an A-level attestation as evidence that AM Comm has vouched for the legality of the calls. That is not what an A-level certification signifies. The FCC has recognized that unlawful calls may nevertheless receive A-level certifications. *See In re Advanced Methods to Target and Eliminate Unlawful Robocalls*, CG Docket No. 17-59, Ninth Further Notice of Proposed Rule Making, FCC 25-76, ¶ 49 (Oct. 29, 2025), https://docs.fcc.gov/public/attachments/FCC-25-76A1.pdf (citing evidence that nearly half of "illegal calls are A-attested."). Rather, an A-level certification reflects only that the originating

provider knows the identity of its customer and has verified the customer's authority to use the telephone number associated with the call, facts that Plaintiff himself alleges. *See, e.g.*, TAC ¶¶ 46-49. Accordingly, to the extent that Plaintiff's TCPA claim, and those predicated on it, rely on such allegations, the claims should be dismissed.

## III. Plaintiff Fails to State Claims Under the MDTCPA (Counts III and XV)

Plaintiff also alleges violations of the MDTCPA against AM Comm premised on alleged underlying violations of the TSR, 16 C.F.R. § 310.4 et seq. Specifically, Plaintiff alleges violations of TSR §§ 310.4(a)(8) (Count III) and 310.4(b)(1)(i) (Count XV). However, these claims must be dismissed because (1) Plaintiff fails to allege that he has suffered $50,000 in actual damages, a statutory prerequisite for pleading a viable TSR claim; (2) AM Comm, as a common carrier, is exempt from the TSR pursuant to the FTC's common-carrier exemption; and (3) Plaintiff otherwise fails to plausibly allege claims under the TSR.

### A. Plaintiff's MDTCPA Claims Fail Because the Alleged Predicate Violations Do Not Provide a Private Right of Action

Several courts have interpreted the MDTCPA to provide a private right of action only where a federal action already exists. *See, e.g.*, *Ehrlich*, 181 Md. App. at 730; *see also Worsham v. Accounts Receivable Mgmt.*, 497 Fed. App'x 274, 278 (4th Cir. 2012) ("Although the question of whether the MTCPA creates this cause of action has not been answered by Maryland's highest court, we nevertheless see no reason to reject the determination of the state's intermediate appellate court that this cause of action does not exist under state law"). To bring a case under the TSR, a plaintiff must allege actual damages in excess of $50,000. 15 U.S.C. § 6104(a). Congress did not establish a private right of action under the TSR unless actual damages exceed $50,000 and, therefore, if a plaintiff fails to make that requisite showing there is no private right of action under the MDTCPA. *See Worsham v. Direct Energy Servs., LLC*, No. SAG-20-00193, 2021 U.S. Dist.

LEXIS 46837, at *10 (D. Md. Mar. 12, 2021). Statutory and punitive damages do not constitute actual damages for purposes of the TSR. *Id.* at *10-11 (dismissing a MDTCPA claim because the plaintiff alleged only statutory damages, not actual damages.); *Shostack v. Diller*, No. 15-CIV-2255-GBD-JLC, 2016 U.S. Dist. LEXIS 30354, at *16-17 (S.D.N.Y. Mar. 8, 2016) (dismissing claim because plaintiff alleged only statutory damages, not actual damages). Thus, to assert a viable TSR claim, a plaintiff must allege *actual* damages in excess of $50,000. *See* 15 U.S.C. § 6104(a).

Plaintiff fails to make this requisite showing. Although Plaintiff references "actual damages" arising from his alleged tort-based claims, he does not allege any amount of actual damages associated with those claims. *See* TAC, Prayer for Relief. Nor does he plead facts from which the Court could reasonably infer that his actual damages exceeded $50,000. *See, e.g.*, *id.* ¶ 250 (noting that Plaintiff allegedly suffered emotional distress, but providing no indication of the amount of actual damages associated with the alleged injury, such as $50,000 in medical expenses); *id.* ¶ 256 (seeking compensatory damages but failing to quantify those damages or plead facts demonstrating the alleged damages exceed $50,000). Instead, the TAC seeks statutory damages, punitive damages, and attorneys' fees. *See* TAC, Prayer for Relief. Those categories of relief, however, do not constitute "actual damages" for purposes of satisfying the TSR's private right of action requirements. *See Direct Energy Servs.*, 2021 U.S. Dist. LEXIS 46837, at *10-11; *see also Shostack*, 2016 U.S. Dist. LEXIS 30354, at *16-17. As such, Plaintiff fails to establish the actual-damages threshold needed to pursue a TSR claim or any corresponding MDTCPA claim.

Plaintiff also cannot establish a private right of action against AM Comm because he fails to plead facts that plausibly suggest that it is a "telemarketer" or "seller," as defined in 16 C.F.R.

§ 310.2(ee) and (hh). *See Worsham v. Disc. Power, Inc.*, No. RDB-20-0008, 2021 U.S. Dist. LEXIS 1931, at *18-19 (D. Md. Jan. 21, 2021) (finding no private right of action under the TSR where plaintiff failed to establish that defendant was a "telemarketer" or "seller" pursuant to the TSR). The FTC defines "seller" as "any person who, in connection with a telemarketing transaction, provides, offers to provide, or arranges for others to provide goods or services to the customer in exchange for consideration." 16 C.F.R. § 310.2(ee). A "telemarketer" is defined as "any person who, in connection with telemarketing, initiates or receives telephone calls to or from a customer or donor." 16 C.F.R. § 310.2(hh).

Here, the TAC's allegations establish that AM Comm functioned solely as a telecommunications carrier. Plaintiff does not allege that AM Comm marketed, offered, or sold goods or services to Plaintiff; nor does he allege that AM Comm solicited Plaintiff on behalf of a seller. *See generally* TAC. Instead, the allegations establish only that AM Comm provided telephone numbers, telecommunications services, STIR/SHAKEN attestations, and related infrastructure to Mortgage Pipeline. *See, e.g.*, *id.* ¶¶ 3, 24-25, 46-49, 89. Such allegations are insufficient to plausibly establish that AM Comm was a "seller" or "telemarketer" under the TSR. *See Disc. Power, Inc.*, 2021 U.S. Dist. LEXIS 1931, at *18-19. Plaintiff's own allegations identify IHL as the "seller" whose services were promoted, and Mortgage Pipeline as the entity that initiated the calls. *See* TAC ¶¶ 88, 90. Having expressly assigned those roles to the other defendants, and having established AM Comm's role as a carrier, Plaintiff cannot plausibly allege that AM Comm is a "seller" or "telemarketer" that is subject to the TSR. Accordingly, because Plaintiff has neither alleged the requisite $50,000 in actual damages nor plausibly alleged that AM Comm is a "seller" or "telemarketer," Plaintiff cannot establish a private right of action under the TSR. Thus, his MDTCPA claims that are predicated upon it fail as a matter of law.

### B. AM Comm is not Subject to the TSR Under the Common-Carrier Exemption

Even if Plaintiff could establish a private right of action under the TSR, his MDTCPA claims still fail because his own allegations place AM Comm squarely within the TSR's common-carrier exemption. The allegations directed at AM Comm concern only its provision of telecommunications infrastructure and related carrier services in connection with the challenged calls. *See, e.g.*, TAC ¶¶ 46, 89. The *sine qua non* of Plaintiff's TSR claim against AM Comm is that it *carried phone calls* and/or *provided carrier-related services.* That is precisely the type of conduct, however, that is covered by the common-carrier exemption.

Subsection 5(a)(2) of the FTC Act exempts common carriers from the FTC's jurisdiction. *See* 15 U.S.C. § 45(a)(2). The same is true of the TSR. *See* 60 Fed. Reg. 43842, 43843 (1995) Instead, Congress vested regulation of common carriers' carriage duties in the FCC. *See generally FTC v. AT&T Mobility LLC*, 883 F.3d 848, 850, 853-56 (9th Cir. 2018). Courts assess whether a given provider is a "common carrier" for purposes of the exemption through an activity-based analysis, as opposed to a status-based one. *Id.* at 850 (a carrier can claim immunity to the extent that a common carrier is engaging in common-carrier services). Thus, courts examine the actual conduct being challenged in the Complaint "to determine if it is a common carrier for purposes of the FTC Act exemption." *FTC v. Verity Int'l, Ltd.*, 443 F.3d 48, 60 (2d Cir. 2006).

In the TAC, Plaintiff is clearly attacking AM Comm's *carriage* of Mortgage Pipeline's calls to him (and the associated STIR/SHAKEN attestation level). Again, the TAC alleges only that AM Comm supplied the telephone numbers, provided telecommunications services, furnished the call attestations, and carried the calls that Mortgage Pipeline initiated. *See, e.g.*, TAC ¶¶ 3, 24, 46-49, 89. In other words, Plaintiff's allegations concern AM Comm's provision of telecommunications and call-transmission services, not independent telemarketing conduct.

Because the conduct challenged by Plaintiff consists entirely of FCC-regulated carrier functions, the common-carrier exemption applies here. Plaintiff therefore cannot rely on the TSR to impose liability on AM Comm for performing the very telecommunications services that the TAC alleges it provided. Accordingly, Plaintiff's MDTCPA claims must be dismissed because they are both predicated on the TSR.

### C. Even if the TSR is Applicable, Plaintiff Fails to Plausibly Allege that AM Comm Violated the Regulation

Even if the TSR were applicable here (which it is not), the TAC fails to allege facts sufficient to state a plausible claim under that regulation. Plaintiff therefore cannot establish the predicate violation necessary to support his MDTCPA claims, which should be dismissed.

With respect to Count III, Plaintiff fails to plausibly allege that AM Comm violated the TSR's caller-identification requirements. The TSR prohibits "[f]ailing to transmit or cause to be transmitted the telephone number, and, when made available by the telemarketer's carrier, the name of the telemarketer." 16 C.F.R. § 310.4(a)(8). Here, Plaintiff's own allegations establish that the caller-identification information was transmitted on each of the challenged calls. Indeed, the TAC identifies the numbers that were allegedly used and asserts that those numbers consistently displayed Maryland caller-identification information. *See, e.g.*, TAC ¶ 22 (listing each of the phone numbers). Plaintiff therefore does not plausibly allege a failure to transmit a telephone number. *See Worsham v. Travel Options, Inc.*, No. JKB-14-2749, 2016 U.S. Dist. LEXIS 118774, at *23 (D. Md. Sept. 1, 2016) ("Certainly, Worsham has brought this case because his Caller ID *did* capture the caller's number on each of the four calls" (emphasis in original)).

Furthermore, Plaintiff fails to plausibly allege a TSR violation based on the absence of a displayed telemarketer's name. On this point, Plaintiff simply assumes that because *no name* allegedly appeared, a statutory violation necessarily occurred. But that assumption is implausible

given the FCC's repeated recognition that caller-name information ("CNAM") is not reliably available through existing, private CNAM systems. The FCC has repeatedly acknowledged that existing CNAM databases are "insufficient," "error prone," and "unreliable," and has recognized a broad industry consensus that carriers should not be required to rely on them for caller-name delivery. *See, e.g.*, *In re FCC Expands Use of Tool to Block Fake Gov't Robocallers*, 40 FCC Rcd. 1902, 1913-14 (2025); *In re FCC Takes First Step in Fresh Approach to Combatting Illegal Robocalls*, 40 FCC Rcd. 8640, 8643, 8645-46 (2025). Given this repeated recognition, Plaintiff's allegation that a name did not appear on his caller ID does not plausibly support an inference that AM Comm violated the TSR.

Plaintiff's allegation that AM Comm configured the numbers to reject inbound calls likewise does not plausibly establish a TSR violation. *See, e.g.*, TAC ¶ 135. The TSR contains no requirement that a displayed telephone number accept return calls, and Plaintiff cites to no authority suggesting otherwise. *See generally* TAC. Rather, the TAC offers only the bare conclusion that AM Comm configured the numbers to reject inbound calls, unsupported by any well-pleaded factual allegations. But such conclusory allegations are insufficient to state a plausible claim. S*ee United Black Firefighters v. Hirst*, 604 F.2d 844, 847 (4th Cir. 1979) (noting a court need not accept unsupported conclusory allegations devoid of any reference to actual events or legal conclusions couched as factual allegations).

With respect to Count XV, Plaintiff fails to allege facts plausibly suggesting that AM Comm caused the telephone to ring, engaged any person in a telephone conversation at any time, or that it had the intent to annoy, abuse, or harass Plaintiff. *See* 16 C.F.R. § 310.4(b)(1)(i); *see generally* TAC. Instead, Plaintiff attempts to rely on speculation of rotating numbers, call blocking, and purported caller-ID spoofing. *See, e.g.*, TAC ¶ 216. But not only are these

allegations unsupported by well-pleaded facts, they are contradicted by the TAC itself, which alleges that the calls originated from Mortgage Pipeline's client account, were associated with identifiable telephone numbers and call records, and can be traced to a specific dialing platform and customer. *See id.* ¶¶ 22, 46. Plaintiff further alleges that the Subject Numbers were obtained from SignalWire, assigned to Mortgage Pipeline, and associated with verified STIR/SHAKEN attestations. *See id*. ¶¶ 22, 46-49. These allegations defeat, rather than support, any inference of spoofing or harassment by AM Comm. The TAC is likewise devoid of facts supporting an inference that AM Comm had any intent to harass or annoy Plaintiff. Plaintiff's allegations instead concern ordinary telemarketing calls with identifiable numbers and a known customer, not the conduct from which harassing intent may reasonably be inferred. Accordingly, Count XV must be dismissed.

## IV. Plaintiff Fails to State Claims Pursuant to the MTSA (Counts IV-VI)

Plaintiff's MTSA claims suffer from the same fundamental defect as his TCPA and MDTCPA claims: Plaintiff does not plausibly allege that AM Comm directed, managed, supervised or otherwise controlled the calls at issue. Moreover, even assuming AM Comm could be subject to liability under the MTSA, Plaintiff fails to plausibly allege any MTSA violation.

### A. Plaintiff Fails to Establish that AM Comm Can Be Held Liable Under the MTSA

Although case law interpreting specific provisions of the MTSA is sparse**,** the statute's text makes clear that liability is limited to those who play an active role in making the solicitation call. While Section 14-4502 applies to a person or entity that "makes" or "causes to be made" a telephone solicitation, the Act incorporates Section 8-205's definition of "telephone solicitation," which extends liability beyond the caller, but only to those who manage, direct, or supervise individuals engaged in the solicitation. *See* Md. Code Ann., Pub. Util. § 8-205; *see also* Md. Code

Ann., Com. Law § 14-4501(f). The use of these limiting terms reflects a legislative intent to mirror the TCPA's scope by reaching those persons who actively make or control the solicitation itself—not every entity that merely provides the technology or platform used for transmitting a call. If the phrase "causes to be made" were interpreted to encompass any entity that merely provides the technology or platform used for a call, the statute's references to "managing, directing, and supervising" would be superfluous and effectively have no meaning. *See Fuentes v. United States Citizenship & Immigr. Servs.*, No. 25-1005, 2026 U.S. App. LEXIS 22259, at *8 (4th Cir. July 24, 2026) ("A statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant.") (quoting *Hibbs v. Winn*, 542 U.S. 88, 101 (2004)).

This interpretation is reinforced by the ordinary meaning of the terms, which generally require active involvement in an activity. *See, e.g.*, "Manage," Merriam-Webster Dictionary (12th ed. 2025) (defining "manage" as to "handle or direct"). The interpretation also aligns with analogous TCPA authority, which distinguishes between entities that initiate, direct or oversee the telemarketing solicitation and those that merely provide a platform for the messages. *See, e.g.*, *Glob. Tel Link*, 2026 U.S. App. LEXIS 6097, at *4 ("liability under the TCPA generally does not attach to a common carrier." "[Plaintiff's] own allegations—even when construed in his favor—indicated that GTL connected rather than initiated the calls and therefore did not violate" the TCPA). Thus, to establish liability under the MTSA, Plaintiff must plausibly plead that AM Comm managed, directed, or supervised the communications at issue. *See* Md. Code Ann., Pub. Util. § 8-205.

As with his other claims, Plaintiff fails to make this requisite showing. As explained above, Plaintiff's own allegations establish that Mortgage Pipeline, not AM Comm, was responsible for

the challenged calls. The TAC alleges that Mortgage Pipeline initiated the calls, determined when the calls would take place, and to whom the calls would be made. *See* TAC ¶ 88. Conversely, with respect to AM Comm, Plaintiff alleges only that AM Comm provided the telephone numbers, telecommunications services, STIR/SHAKEN attestations, and call-routing functions. *See id.* ¶ 89. The TAC lacks any factual allegations that AM Comm managed, directed, supervised, controlled, or otherwise participated in the challenged calls. Further, Plaintiff does not allege that AM Comm selected the call recipients, determined when calls would be placed, scripted the communications, employed the agents who spoke with consumers, or decided what products or services would be marketed. Plainly, the allegations directed at AM Comm describe a telecommunications carrier, not an entity that managed, directed, supervised, or controlled mortgage solicitations. Accordingly, Plaintiff fails to plausibly allege that AM Comm is subject to liability under the MTSA.

### B. Even Assuming the MTSA Applies, Plaintiff Fails to Plausibly Allege Violations of the Statute.

Counts IV through VI rest on a series of conclusory allegations and speculative assumptions, not well-pleaded facts. Plaintiff points to technical details concerning call-routing, caller-ID presentation, and network configuration, and then leaps to the conclusion that AM Comm concealed identities, transmitted false caller-ID information, and engaged in spoofing. *See, e.g.*, TAC ¶¶ 142, 149-51, 157-58. Plaintiff, however, fails to set forth any well-pleaded factual allegations to support those conclusions and requests that the Court simply accept his speculation about how the calls were routed and configured as proof of statutory violations. That is insufficient to state a claim.

With respect to Counts IV and V, Plaintiff's allegations regarding the telephone numbers largely fail for the same reasons discussed with respect to Count III. Plaintiff fails to plausibly

allege that AM Comm failed to transmit, or intentionally prevented the transmission of, certain caller-identification information. *See* Md. Code Ann., Com. Law §§ 14-4502(b)(1)(i)-(ii). Specifically, Plaintiff alleges that the numbers displayed on his caller ID were not the "originating" numbers because the calls were allegedly routed through a predictive dialer platform. *See, e.g.*, TAC ¶¶ 46(e), 142, 149-50. But that allegation is at odds with Plaintiff's own well-pleaded factual allegations, which are based on third-party discovery: SignalWire assigned telephone numbers to AM Comm, which assigned 10 of them to Mortgage Pipeline, which were accurately displayed on Plaintiff's Caller ID. *See, e.g.*, *id.* ¶¶ 22, 48-49. Plaintiff alleges no well-pleaded facts demonstrating that those numbers were *not* the originating numbers within the meaning of the statute. *See generally* TAC. Plaintiff then goes on to allege that the telephone numbers rejected inbound calls and therefore must have been configured to conceal the caller's identity. *See, e.g.*, TAC ¶ 149. But the MTSA prohibits the intentional prevention of caller-identification information; it does not require that a displayed number be capable of receiving inbound calls. *See* Md. Code Ann., Com. Law § 14-4502. Plaintiff alleges no facts showing that the numbers displayed were inaccurate or otherwise failed to constitute caller-identification information. At most, Plaintiff alleges that his attempts to call those numbers were unsuccessful, which does not come close to establishing an MTSA violation.

Plaintiff's caller-name allegations suffer from similar pleading deficiencies. As with Count III, Plaintiff just assumes that the absence of a caller name necessarily establishes a statutory violation. *See* TAC ¶ 150. But as discussed above, the FCC has repeatedly recognized that CNAM information is frequently unavailable, inaccurate, and dependent on systems and providers beyond the control of any originating carrier. *See* 40 FCC Rcd. 1902, at 1913-14. In light of the FCC's repeated recognition of these limitations, Plaintiff's conclusory allegation that no caller name

appeared on his caller ID does not plausibly support an inference that AM Comm intentionally prevented the transmission of information in violation of the MTSA.

Plaintiff's reliance on the STIR/SHAKEN attestations does not cure those deficiencies. *See* TAC ¶ 150. Plaintiff acknowledges that telephone numbers that AM Comm received from SignalWire and assigned to Mortgage Pipeline were displayed on Mortgage Pipeline's calls, and that the calls were, as required by the FCC's rules, given a STIR/SHAKEN "A" attestation. TAC ¶¶ 22, 46, 49. The TAC does not allege facts showing that the caller-identification information transmitted on the calls was false, unauthorized, or inaccurate. *See generally* TAC. Plaintiff simply assumes that because AM Comm's platform was capable of transmitting caller-identification information and assigning STIR/SHAKEN attestation, any perceived shortcoming in that information must have resulted from a deliberate effort to conceal identities. That conclusory inference does not follow from the facts alleged.

Count VI rests on the same speculative premise. The MTSA prohibits using technology that, "[i]n order to conceal the true identity of the caller . . . deliberately displays a different caller identification number than the number the call is originating from." Md. Code Ann., Com. Law § 14-4502(b)(1)(iii). Plaintiff alleges the numbers displayed on his caller ID were merely "presentation numbers" rather than the calls' true originating numbers. TAC ¶ 157. But Plaintiff's own allegations establish the chain of custody for the numbers at issue: SignalWire assigned the numbers to AM Comm, which assigned them to Mortgage Pipeline. *See, e.g.*, TAC ¶¶ 22, 48-49. Plaintiff's theory appears to rest, in part, on the premise that businesses may only use telephone numbers associated with their office location. *See id.* ¶ 158. But Plaintiff identifies no statute, regulation, or FCC rule imposing such a requirement. Indeed, the FCC has never issued such a rule regarding phone-number assignment (which would be impossible to apply in cases where

callers use non-geographically linked numbers, like toll-free numbers and SMS "short codes"). This illustrates why Congress has created private rights of action in narrow circumstances. Private litigants may enforce obligations that Congress made actionable, but they may not use those claims to expand national telecommunications law beyond those adopted by Congress or the FCC.

Ultimately, Counts IV-VI rest on Plaintiff's speculative interpretations of call-routing technology, caller-ID presentation, and network configuration rather than well-pleaded facts. Because the TAC alleges no facts plausibly showing that AM Comm failed to transmit required caller-identification information, intentionally prevented its transmission, or engaged in caller-ID spoofing, these claims should be dismissed.

## V. Plaintiff Fails to Allege Any Common Law Tort Claim (Counts XVI, XVIII, XIX)

Plaintiff's common-law tort claims fare no better than his statutory claims. Although labeled as civil conspiracy, intrusion upon seclusion, and intentional infliction of emotional distress, each count rests on the same speculative and conclusory allegations discussed above. Plaintiff repeatedly attempts to transform AM Comm's alleged provision of telecommunications services into actionable tortious conduct, but he fails to plead facts sufficient to satisfy the elements of any of these causes of action.

### A. Plaintiff Fails to Plausibly Allege Intrusion Upon Seclusion

To state a claim for intrusion upon seclusion under Maryland law, a plaintiff must allege facts showing "an intentional intrusion upon another person's solitude, seclusion, private affairs or concerns in a manner which would be highly offensive to a reasonable person." *Payne v. Ford Motor Credit Co., LLC*, No. SAG-20-00034, 2020 U.S. Dist. LEXIS 160755, at *13-14 (D. Md. Sept. 3, 2020) (quoting *Trundle v. Homeside Lending, Inc.*, 162 F. Supp. 2d 396, 401 (D. Md. 2001)). Plaintiff fails to plausibly allege that AM Comm committed any such intrusion.

Plaintiff attributes the alleged calls to Mortgage Pipeline, alleging that Mortgage Pipeline placed 107 calls to Plaintiff over a seven-month period. TAC ¶ 246. As to AM Comm, Plaintiff does not allege that it selected Plaintiff as a call recipient, initiated any calls to Plaintiff, participated in any conversations with Plaintiff, or directed the timing, frequency, or content of any calls. *See generally* TAC. Rather, Plaintiff alleges only that AM Comm provided telecommunications services that Mortgage Pipeline used in connection with the campaign. Plaintiff then attempts to bridge that gap by alleging that AM Comm "made the intrusion inescapable" through the provision of multiple telephone numbers, caller-ID services, inbound-call settings, and STIR/SHAKEN attestation. *Id.* ¶ 247. But even accepting those allegations as true, they do not establish that AM Comm itself intentionally intruded upon Plaintiff's solitude or private affairs. These allegations describe the services used by Mortgage Pipeline to place the calls. Plaintiff cannot transform AM Comm's role as a carrier into an intentional invasion of privacy through conclusory allegations that the calling system was designed to evade call blocking, screening, or return calls. *See id.*

In any event, the TAC does not plausibly allege conduct that would be highly offensive to a reasonable person as required for an intrusion-upon-seclusion claim. Maryland courts have found that call volume alone does not suffice, particularly absent allegations of abusive or otherwise egregious conduct. *See Drake v. Synchrony Bank*, No. CCB-19-2134, 2023 U.S. Dist. LEXIS 182503, at *12-13 (D. Md. Oct. 11, 2023) (finding that 109 calls within one month was not highly offensive and noting that "no case applying Maryland law has sustained an intrusion upon seclusion claim based on call volume alone"). Here, as in *Drake*, Plaintiff's claim is driven primarily by the volume of the calls rather than the type of conduct Maryland courts have found sufficiently offensive to constitute an actionable intrusion-upon-seclusion claim. Because the

TAC alleges no facts plausibly showing that AM Comm itself committed an intentional and highly offensive intrusion, Count XVIII should be dismissed.

### B. Plaintiff Fails to Plausibly Allege Intentional Infliction of Emotional Distress

In Count XIX, Plaintiff attempts to set forth a claim for intentional infliction of emotional distress ("IIED") based on allegations that the defendants conducted a telemarketing campaign, used caller-identification and calling practices allegedly designed to evade detection, and continued contacting Plaintiff after he requested that the calls cease. *See* TAC ¶¶ 253-54. Plaintiff fails, however, to plausibly allege the elements of such a claim.

To state a claim for IIED under Maryland law, a plaintiff must allege facts showing: "(1) the conduct must be intentional or reckless; (2) the conduct must be extreme and outrageous; (3) there must be causal connection between the conduct and the emotional distress; and (4) the emotional distress must be severe." *Chambers v. Sheppard Pratt Health Sys.*, No. SAG-24-02316, 2025 U.S. Dist. LEXIS 80632, at *24 (D. Md. Apr. 29, 2025) (quoting *Harris v. Jones*, 281 Md. 560, 380 A.2d 611, 614 (1977)). Maryland courts have repeatedly emphasized that the IIED claim is a "rarely viable" cause of action and that it is not to be widely invoked. *Moore v. Balt. City Bd. of Sch. Comm'rs*, No. SAG-19-00154, 2020 U.S. Dist. LEXIS 223147, at *14-15 (D. Md. Nov. 30, 2020). Moreover, even "[i]f a defendant intends to cause a plaintiff emotional distress and succeeds in doing so, the defendant is nonetheless not liable unless his or her conduct is also extreme and outrageous." *Id.* at *15 (citation omitted).

The TAC falls far short of that demanding standard. Even accepting Plaintiff's allegations as true, the conduct alleged does not approach the type of behavior Maryland courts have found to be extreme and outrageous. *See Burke v. Ally Fin. Inc.*, No. 25-3933-BAH, 2026 U.S. Dist. LEXIS 150158, at *23 (D. Md. Jul. 8, 2026) (noting that liability accrues only for "opprobrious behavior

that includes truly outrageous conduct.") (citation omitted)). Here, Plaintiff alleges only unwanted telemarketing calls. While Plaintiff characterizes those actions as part of a deliberate scheme, his conclusory allegations of intent cannot substitute for facts showing conduct "exceeding all bounds usually tolerated by decent society" and "especially calculated to cause, and [that] does cause, mental distress of a very serious kind." *Moore*, 2020 U.S. Dist. LEXIS 223147, at *15 (citing *Kentucky Fried Chicken Nat'l Mgmt. Co. v. Weathersby*, 326 Md. 663, 670, 607 A.2d 8 (1992)).

The claim is particularly deficient with respect to AM Comm. Plaintiff does not allege that AM Comm selected Plaintiff as a call recipient, communicated with Plaintiff, directed the content of any calls, or otherwise engaged in conduct plausibly constituting extreme and outrageous behavior. *See generally* TAC. Rather, Plaintiff seeks to impose liability based on AM Comm's alleged provision of telecommunications services and infrastructure. *See, e.g.*, TAC ¶ 253. Those allegations fall well short of the rigorous and demanding standard governing IIED claims under Maryland law. *See Moore*, 2020 U.S. Dist. LEXIS 223147, at *15-16. Nor does Plaintiff plausibly allege the severe emotional distress required to sustain this tort. Maryland courts have made clear that the tort's "balm [is] reserved for those wounds that are truly severe and incapable of healing themselves." *Id.* at 15 (quoting *Figueiredo-Torres v. Nickel*, 321 Md. 642, 653, 584 A.2d 69, 75 (1991)). Although the TAC alleges emotional distress, sleep disruption, and aggravation, it alleges no facts demonstrating the type of severe and disabling emotional injury contemplated by Maryland law. Plaintiff's allegations simply do not describe the sort of extraordinary circumstances for which Maryland courts have reserved this "rarely viable" cause of action. Count XIX should be dismissed.

### C. Plaintiff Fails to Plausibly Allege a Civil Conspiracy

To state a claim for civil conspiracy under Maryland law, a plaintiff must plausibly allege an agreement between two or more persons to accomplish an unlawful purpose or a lawful purpose by unlawful means. *See Rivadeneira v. Uy*, No. DKC 26-139, 2026 U.S. Dist. LEXIS 180779, at *46-47 (D. Md. Aug. 13, 2026) ("In Maryland, a claim for civil conspiracy requires proof of the following elements: 1) a confederation of two or more persons by agreement or understanding; 2) some unlawful or tortious act done in furtherance of the conspiracy or use of unlawful or tortious means to accomplish an act not in itself illegal; and 3) actual legal damage resulting to the plaintiff." (citation omitted)). Plaintiff does not do so here.

Plaintiff's conspiracy claim is premised on the allegation that AM Comm, Mortgage Pipeline, and IHL agreed to operate an unlawful telemarketing campaign. *See, e.g.*, TAC ¶ 224. The TAC, however, is devoid of any well-pleaded facts showing the existence of such an agreement. Instead, Plaintiff points to ordinary commercial relationships among entities that provided different services in connection with a telemarketing campaign and asks the Court to infer a conspiracy agreement from those relationships. *See id.* Beyond those generalized assertions, Plaintiff offers only conclusory allegations regarding the existence of an agreement. Plaintiff alleges that the defendants operated a "single integrated system," shared financial incentives, and engaged in a coordinated "concealment architecture." *See id.* ¶¶ 226-227. But those labels are not facts. The TAC alleges no facts showing when any agreement was formed, who entered into it on AM Comm's behalf, what AM Comm allegedly agreed to do, or any communication demonstrating a meeting of the minds to engage in unlawful conduct. *See generally* TAC. Put simply, Plaintiff asks the Court to infer an unlawful agreement from the mere

fact that the parties had a business relationship with one another. But such allegations are insufficient to plausibly allege the agreement or understanding required for a civil conspiracy.

Furthermore, the conspiracy claim fails for the independent reason that civil conspiracy is not a stand-alone tort under Maryland law. *See Hernandez v. Lloyd*, No. 1:23-cv-01016-JRR, 2024 U.S. Dist. LEXIS 55787, at *45 (D. Md. Mar. 28, 2024) (stating that civil conspiracy is not a stand-alone tort). Here, Plaintiff expressly acknowledges that Count XVI depends on the intrusion upon seclusion and IIED claims asserted elsewhere in the TAC. *Id.* ¶ 223. Because those underlying tort claims fail, the conspiracy claim necessarily fails as well.

## VI. Plaintiff's Request for Declaratory Relief is Without Merit

Plaintiff's request for declaratory relief likewise fails. Declaratory relief is a remedy, not a stand-alone cause of action, and where the requested declaration depends on deficient underlying claims, dismissal is appropriate. *See Davis v. Universal Am. Mortg. Co., LLC,* No. MJG-17-3110, 2018 U.S. Dist. LEXIS 14394, at *12 (D. Md. Jan. 30, 2018) ("Declaratory relief is not a substantive allegation by itself, but a remedy that this Court may provide if a party prevails on a substantive claim."). As discussed in connection with Plaintiff's TCPA and other statutory claims, the TAC's declaratory-relief allegations largely reflect Plaintiff's misunderstanding of FCC compliance obligations and carrier liability. For example, Plaintiff assumes that the time it took AM Comm's customer to complete an Order Form demonstrates a failure of KYC procedures, that AM Comm had a legal duty to predict and prevent a customer's future conduct, and that the use of STIR/SHAKEN attestation, local telephone numbers, and other telecommunications features establishes knowing participation in unlawful activity. *See* TAC ¶¶ 263-66. Those allegations, however, reflect disagreement with the adequacy of AM Comm's compliance practices, for which Congress never created a private right of action, not facts plausibly establishing liability.

Moreover, Plaintiff's theory seems to assume that any alleged violation of an FCC regulation gives rise to a private right of action. *See, e.g.*, TAC ¶ 265. This premise is incorrect. Not every alleged violation of an FCC regulation is actionable by a private litigant. *See Glob. Crossing Telecomms., Inc. v. Metrophones Telecomms., Inc.*, 550 U.S. 45, 56 (2007) ("Nor do we suggest that every violation of FCC regulations is an unjust and unreasonable practice" under Section 201(b) of the Communications Act, a necessary predicate to a cause of action for a violation of the Act). Rather, a plaintiff must identify conduct that the FCC has already determined constitutes an unjust or unreasonable practice under 47 U.S.C. § 201(b). *See Havens v. Mobex Network Servs., LLC*, 820 F.3d 80, 91 (3d Cir. 2016) (affirming the district court's dismissal of plaintiffs' Communications Act claim "because plaintiffs d[id] not identify any particular actions taken by [the carrier] that ha[d] been determined by the FCC to be unreasonable or unjust."). Plaintiff does not do so here. Instead, he attempts to convert alleged noncompliance with FCC regulations governing call authentication, customer onboarding, and other carrier practices into privately actionable claims, asking this Court to supplant the FCC's role in such matters. *See Zelma*, 2026 U.S. Dist. LEXIS 223425, at *20-21 (dismissing claims for carrier's alleged violation of FCC regulations). Accordingly, because Plaintiff fails to plausibly allege any underlying violation by AM Comm, his request for declaratory relief should be dismissed as well.

For the reasons stated above, Plaintiff's claims against AM Comm should be dismissed in their entirety.

Dated: October 13, 2026

Respectfully submitted,
AM COMMUNICATION LABS INC.

By Counsel

/s/ *Joseph P. Bowser*
Joseph P. Bowser
ROTH JACKSON
1519 Summit Ave., Suite 102
Richmond, VA 23230
Phone: 804-441-8701
Fax: 804-441-8438
Email: jbowser@rothjackson.com

**CERTIFICATE OF SERVICE**

I hereby certify that on this 13th day of October 2026, a true and correct copy of this Memorandum in Support of AM Comm's Motion to Dismiss was served via this Court's Electronic Case Filing (ECF) system upon:

David Escobar, Jr.
1628 Severn Run Ct.
Serven, MD
david.j.escobar2@gmail.com
*Plaintiff Pro Se*

Noam B Fischman
Akerman LLP
750 Ninth Street, NW, Ste. 750
Washington, DC 20001
Email: noam.fischman@akerman.com

Jeffrey B. Pertnoy
Akerman LLP
98 Southeast Seventh St., Ste. 1100
Miami, FL 33131
Jeffrey.pertnory@akerman.com
*Counsel for Mortgage Pipeline LLC*

Tamara B Goorevitz
Franklin & Prokopik P.C.
Two North Charles Street, Suite 600
Baltimore, MD 21201
tgoorevitz@fandpnet.com

Jordan S. Cohen
Wicker Smith O'Hara McCoy & Ford, P.A.
515 East Las Olas Blvd, Ste. 1400
Fort Lauderdale, FL 33314
jcohen@wickersmith.com
*Counsel for Independence Home Loans, LLC*

/s/*Joseph P. Bowser*
Joseph P. Bowser