**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| DAVID ESCOBAR, JR., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Civil Action No. |
| v. | ) | 1:26-cv-03633-JRR |
| | ) | |
| INDEPENDENCE HOME LOANS, LLC, et al., | ) | |
| | ) | |
| Defendants. | ) | |

# PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANT MORTGAGE PIPELINE LLC'S MOTION TO DISMISS THE THIRD AMENDED COMPLAINT (ECF No. 28)

## INTRODUCTION

Defendant Mortgage Pipeline LLC ("MP") placed the calls at issue, as the agent of the seller, Independence Home Loans, LLC ("IHL"). Third Am. Compl. ("TAC") ¶¶ 74, 88–90. The call detail records produced by its calling platform list MP's client account as the source of 96 of the 107 calls to Plaintiff's personal cellular number, and Plaintiff attributes seven more to MP on carrier and number-registration records. TAC ¶¶ 5, 9, 49, 93–95. One of MP's agents told Plaintiff, on a recorded call, that he was calling for "Mortgage Pipeline." *Id.* ¶ 29 & Ex. F.

The TAC describes a campaign built so that Plaintiff could neither identify the caller nor make the calls stop. MP's agents called from rotating Maryland numbers that refused return calls and changed as Plaintiff blocked them. They gave only a first name, used names like "VA Mortgage Pipeline" and "VA Home Loan Center" with a disabled veteran, and hung up when he asked who they worked for. And they kept calling for nearly three months after Plaintiff told them, on the first call he answered and on every answered call after that, to stop. *Id.* ¶¶ 19, 22–26, 30, 76–79, 118, 151, 158. That design runs through this opposition. It is what makes the

caller-ID and disclosure violations intentional, what separates this case from the call-volume cases MP cites, and what shows that MP knew its conduct was unlawful.

MP's Motion (ECF No. 28) and supporting memorandum (ECF No. 28-1, "Mem.") rest largely on things the TAC does not say: facts outside the complaint, such as a "good faith commercial purpose" and procedures MP says were "unquestionably in place," Mem. at 2, 12; statements from calls the TAC attributes to other parties; and out-of-circuit decisions about cellular telephones. MP does not challenge Count XIII. And although MP repeatedly calls Plaintiff's claims "duplicative," it seeks dismissal on that ground only as to Count XXII. The Circuit Court rejected the same contention in this case when IHL moved to dismiss, ruling that "Plaintiff's remaining claims are not duplicative." Order, *Escobar v. Independence Home Loans, LLC*, No. C-02-CV-25-003012 (Cir. Ct. Anne Arundel Cnty. Feb. 4, 2026) (Alban, J.) (Exhibit 1). Whether overlapping recoveries may be cumulated is a question for judgment, not pleading.

Plaintiff concedes three narrow points (Part I). He acknowledges adverse authority on the Maryland TCPA counts and explains why it does not control (Part III). He opposes the rest of the Motion. Where the Court finds a pleading gap, Plaintiff asks for leave to amend (Part XV).

## STANDARD OF REVIEW

A complaint survives a Rule 12(b)(6) motion if it contains "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). The Court accepts the well-pleaded facts as true and draws reasonable inferences in the plaintiff's favor. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "A document filed pro se is 'to be liberally construed.'" *Erickson v. Pardus*, 551 U.S. 89, 94 (2007).

A Rule 12(b)(6) motion tests the complaint, not the defendant's version of events. Assertions that MP acted with a "good faith commercial purpose," Mem. at 12, that its trade

name is "descriptive, not deceptive," *id.* at 9, or that its procedures were in place, *id.* at 14, are matters outside the pleadings, and the Court should exclude them rather than convert the Motion. Fed. R. Civ. P. 12(d). Nor does attaching an exhibit to a complaint make every statement in it an admission: "it is not always appropriate to conclude that the plaintiff has adopted the contents of the document as true." *Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159, 167 (4th Cir. 2016). And an affirmative defense can be decided on a motion to dismiss only if all facts necessary to it "clearly appear[ ] on the face of the complaint." *Goodman v. Praxair, Inc.*, 494 F.3d 458, 464 (4th Cir. 2007) (en banc).

## ARGUMENT

### I. Points Plaintiff Does Not Contest

To narrow the issues, Plaintiff does not oppose three requests, each without prejudice. First, he does not oppose dismissal of Count XXII, including ¶¶ 271–273, as applied to MP, because the declarations it seeks overlap the damages counts. The facts pleaded there remain relevant to willfulness. Second, he does not oppose dismissal of the request for $500 per violation in Counts VII, IX and X, because a private MCPA plaintiff recovers for actual "injury or loss" rather than a statutory amount. *Citaramanis v. Hallowell*, 328 Md. 142, 613 A.2d 964 (1992). Plaintiff maintains those counts for actual damages (Part II) and asks leave to conform Count VII's damages paragraph (Part XV). Third, he does not oppose dismissal of the request for attorney's fees while he proceeds *pro se*, without prejudice to fees incurred if counsel appears.

### II. The MCPA Counts (VII, IX, X) State a Claim

#### A. The TAC Pleads Actual Injury

MP argues that the MCPA reaches only "actual economic harm." Mem. at 5. Maryland's highest court has held otherwise. A private MCPA plaintiff must establish "the nature of the

actual injury or loss," *Citaramanis*, 328 Md. 142, and emotional injury qualifies when it is "capable of objective determination," a category that includes insomnia, depression, and extreme nervousness and irritability. *Wheeling v. Selene Fin. LP*, 473 Md. 356, 250 A.3d 197 (2021) (citing *Hoffman v. Stamper*, 385 Md. 1, 34–35 (2005), and *Vance v. Vance*, 286 Md. 490, 500–01 (1979)). In *Wheeling* the Court held that allegations of emotional injury with physical manifestations "supply the minimum necessary to state a claim." *Id.*

The TAC pleads injuries of that kind: sleep disruption and agitation, anxiety each time the phone rang, missed calls from medical providers and the VA, aggravation of a service-connected disability, and strain on Plaintiff's marriage, with his wife as a corroborating witness. TAC ¶¶ 84(a)–(d), (g), 85. Those injuries flow from the practices these counts challenge. The VA-styled names eroded Plaintiff's trust in real VA communications and made him feel that his veteran status was being used against him. *Id.* ¶ 84(e)–(f). And because the callers never said who they were or what they were selling, Plaintiff could not direct a demand to the responsible company, so the calls and the harm continued. *Id.* ¶¶ 25, 29–30, 84(h).

MP's authorities establish only that some actual injury is required, which Plaintiff does not dispute. None holds that emotional injury is excluded, and MP does not cite *Wheeling*. Several do not concern the question at all. *Queen v. Talib*, No. 25-cv-04215-LKG, ECF No. 11 (D. Md. Sept. 3, 2026), denied a motion to dismiss an MCPA claim. *Geiger v. United Wholesale Food*, No. 8:25-cv-0443-TDC, ECF No. 34 (D. Md. Aug. 24, 2026), is a report and recommendation on default judgment that rejected an MCPA claim because the plaintiffs, models whose images a restaurant had used, did not allege that they were consumers who relied on anything. *Lyons v. PNC Bank, N.A.*, No. SAG-20-02234, ECF No. 107 (D. Md. Feb. 10, 2026), defined "actual damages" under the Truth in Lending Act, not the MCPA. And the latest

decision in *Queen v. OliveTree Mgmt. LLC*, No. 24-3474-BAH (D. Md.), which MP also cites, points the other way. The court dismissed an MCPA claim because the plaintiff alleged no loss beyond rent she already owed, and it gave, as an example of what was missing, that she did not allege "that Queen suffered emotional damages as a result of OliveTree's lack of licensure and subsequent collections." *OliveTree*, ECF No. 26, at 15–16 (D. Md. Aug. 13, 2026).

### B. The TAC Pleads Reliance with Particularity

MP says Plaintiff relied on nothing because he declined the refinance. Mem. at 5. The TAC alleges that the callers' use of his VA loan details and VA-styled names "misled Plaintiff into believing the call was made under the authority of, or with information provided by, the U.S. Department of Veterans Affairs," and that, relying on that belief, he confirmed personal and financial information he otherwise would not have given. TAC ¶¶ 17–18. Declining the product does not erase reliance on the misrepresentation that came first.

To the extent Rule 9(b) applies, the TAC satisfies it. It identifies the speakers (MP's agents, ¶ 88), the names used (¶¶ 26, 164), the statements about the call's purpose (¶ 173), the calls by date and number (Ex. B-1), and what Plaintiff did in response (¶¶ 17–19).

### C. Count VII: Whether the VA-Styled Names Were Deceptive Is a Question of Fact

MP says "VA Mortgage Pipeline" is "nearly identical" to its legal name and "descriptive, not deceptive." Mem. at 9. MP does not deny that its agents used the name; it defends it. But the only difference between the two names is the Department of Veterans Affairs' initials, and that difference is the claim.

MP invokes common sense. Mem. at 9 (quoting *Jarrett v. Home Depot U.S.A., Inc.*, No. SAG-21-1514 (D. Md. Aug. 2, 2021)). Follow that argument to its end. If "VA Mortgage Pipeline" is merely "descriptive," then every veteran who took that call for the VA lacked

common sense. On MP's account, the fault lies not with the company that put the Department of Veterans Affairs' initials in front of its name, but with the veterans who believed it. Maryland does not measure deception by whether a careful listener could have seen through it. It asks how the statement strikes the unsophisticated consumer. *Golt v. Phillips*, 308 Md. 1, 10 (1986). The Act protects the trusting, not just the skeptical. And a veteran who hears "VA Mortgage Pipeline" from a caller who already knows his name, his address and the balance of his VA-backed loan does not think of an unregistered Florida telemarketer. TAC ¶¶ 16–17, 164. He thinks of the VA. MP chose the VA's initials because veterans trust the VA, and it now asks the Court to hold, in effect, that veterans should have had the common sense to know they were being scammed.

The transcripts MP says "align with" its explanation, Mem. at 9, show how the campaign used these names. Although IHL attributes the October 3 call to a different vendor, *see* Part VIII, MP itself relies on it, and it was placed in the same campaign. On the October 3 call, a caller introduced himself as from "Veterans Financial Services" and described a program "for the veterans only . . . based on G.I. bill." Ex. J at J-1. When Plaintiff asked, "you're from the VA right?", the caller paused and answered, "Ugh, yeah, like VA financial services." *Id.* at J-3. He then transferred Plaintiff to IHL's loan officer, who answered "Veteran Services." When Plaintiff asked, "this is the VA I'm talking to?", the line went silent and the call ended. *Id.* at J-5 to J-6; TAC ¶ 164(b).

MP's argument also addresses only one of the names. The others, "Veteran Financial Services," "VA Mortgage Review" and "VA Home Loan Center," bear no resemblance to "Mortgage Pipeline LLC" and describe no loan product. TAC ¶ 26. And § 13-301(10)(i) does not ask whether a caller's name resembles its own. It requires the solicitor to state "the trade name of

a person represented by the solicitor." The person represented was IHL, the lender whose loans were being sold, and no caller ever named it. *Id.* ¶¶ 166, 173.

Finally, MP cites *Tellabs* for the rule that courts consider "the complaint in its entirety." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007). The same passage requires courts to "accept all factual allegations in the complaint as true," *id.*, and the complaint in its entirety alleges that the names were chosen to imply VA affiliation, that Plaintiff was misled into believing the first call came from or through the VA, and that the campaign's scale forced him to question whether each call was the VA, until he could no longer trust the VA's real calls. TAC ¶¶ 16–17, 78, 84(a), (e). Whether the names were deceptive is a question of fact.

**D. Counts IX and X: Working Out the Truth Is Not Being Told It**

MP argues that because Plaintiff eventually recognized the calls as sales calls, nothing was concealed. Mem. at 8–9. It frames a dilemma: either Plaintiff knew the calls were solicitations, so nothing was concealed, or he did not, so he cannot plead that solicitations occurred. *Id.* at 8. The dilemma is false, because the statutes regulate timing, not what the consumer eventually figures out. Section 13-301(10) prohibits soliciting by telephone "without *first* clearly, affirmatively, and expressly stating" the purpose of the call and the kind of service solicited (emphasis added), and the TSR requires those disclosures "truthfully, promptly, and in a clear and conspicuous manner." 16 C.F.R. § 310.4(d). The violation is complete when the call proceeds without them.

Plaintiff did not receive those disclosures. He realized what the first call was "[o]nly near the end of the less-than-two-minute conversation," TAC ¶ 18, after the callers had already given him a false account of its purpose, *id.* ¶ 173. MP calls ¶ 18 an admission that Plaintiff "realized" what the call was. It is. But realizing is not being told. A consumer who works out the truth near

the end of the call, or who reconstructs it afterward from carrier records and subpoenas, has not received the disclosure.

Nor did the callers merely stay silent. On every answered call they offered a cover story, describing the call as a way to "help veterans understand their VA home-loan benefits" or to "review eligibility for VA programs," under names such as "VA Mortgage Pipeline" and "VA Home Loan Center." TAC ¶¶ 164, 173. A false statement of purpose is the opposite of the disclosure the statutes require. Because it was repeated on every call, Plaintiff's eventual recognition of the campaign's subject matter, *id.* ¶ 20, cures none of them. The paragraphs MP calls "admissions" (¶¶ 173, 179) are the allegations of what the callers said instead.

MP's rule would reward the most persistent deception. The longer a concealment continues, the more certain it becomes that the consumer will eventually see through it. Under MP's rule, every concealment would excuse itself the moment it was discovered, and no consumer who uncovered the truth could ever sue. But a misrepresentation does not become lawful because it ultimately failed. The General Assembly has said so expressly: "[a]ny practice prohibited by this title is a violation of this title, whether or not any consumer in fact has been misled, deceived, or damaged as a result of that practice." Md. Code, Com. Law § 13-302. That section defines what is a violation; a private plaintiff must also show injury caused by it, *Citaramanis*, 328 Md. 142, and the TAC pleads that injury, as shown in Part II.A.

The same answer disposes of MP's identical argument against Counts XI and XII, which require no reliance at all. The TSR makes the telemarketer's failure to disclose the call's sales purpose and the nature of what is being sold the violation itself. 16 C.F.R. § 310.4(d)(2)–(3). MP's separate challenge to those counts under the Maryland TCPA is addressed in Part III.

## III. The Maryland TCPA Provides Its Own Remedy for TSR Violations (Counts I–III, VIII, XI, XII, XV)

### A. Section 14-3202 Sets Its Own Measure of Recovery

Maryland's statute does two separate things. Section 14-3201 is a conduct rule: a person "may not violate" the Telemarketing and Consumer Fraud and Abuse Prevention Act "as implemented by the Federal Trade Commission in the Telemarketing Sales Rule" ("TSR"). It borrows the federal rulebook to define what is prohibited in Maryland. Section 14-3202 is a separate Maryland remedy. It makes a violation an unfair or deceptive trade practice under Maryland's Consumer Protection Act, § 14-3202(a), and then provides, "[i]n addition to the remedies provided in § 13-408," that "an individual who is affected by a violation of this subtitle" may recover "[d]amages in the amount of the greater of" $500 for each violation or actual damages, and "each prohibited telephone solicitation and each prohibited practice during a telephone solicitation is a separate violation." § 14-3202(b)–(c). Plaintiff sues under § 14-3202. He does not sue under the federal statute.

The $50,000 figure on which MP relies, Mem. at 6, is a condition of the federal cause of action, not of the federal conduct rules. It appears in 15 U.S.C. § 6104(a), which allows a person to "bring a civil action in an appropriate district court of the United States" only "if the amount in controversy exceeds the sum or value of $50,000 in actual damages for each person adversely affected by such telemarketing." In the same section, Congress provided that "[n]othing in this section shall restrict any right which any person may have under any statute or common law." 15 U.S.C. § 6104(e). Section 14-3201 incorporates what the TSR prohibits, not § 6104's terms for suing in federal court, and § 6104(e) forecloses reading those terms as a limit on a right that another statute provides. Section 14-3202 is such a statute.

Reading § 6104(a) into the Maryland statute would also defeat it in two ways. First, § 14-3202's $500 minimum could never matter in a TSR-based claim, because every plaintiff who first proved more than $50,000 in actual damages would already recover more than the minimum. A statutory-damages floor reflects a legislative choice to give a remedy to consumers whose losses are real but not large. *Cf. Citaramanis*, 328 Md. 142 (contrasting statutes that provide minimum statutory damages with the MCPA, which does not). Second, if § 14-3201(1) did no more than borrow § 6104(a), it would open no Maryland courthouse at all, because a § 6104(a) action can be brought only "in an appropriate district court of the United States."

**B. *Ehrlich* Does Not Address This Question**

Because the Supreme Court of Maryland has not decided this question, this Court's task is to predict how that court would rule. *Private Mortg. Inv. Servs., Inc. v. Hotel & Club Assocs., Inc.*, 296 F.3d 308, 312 (4th Cir. 2002). Decisions of Maryland's intermediate appellate court are "the next best indicia" of state law, "although such decisions may be disregarded if the federal court is convinced by other persuasive data that the highest court of the state would decide otherwise." *Id.* (citation omitted). Maryland's highest court starts with the statute itself, because "[t]he cardinal rule of statutory interpretation is to ascertain and effectuate the real and actual intent of the Legislature." *Lockshin v. Semsker*, 412 Md. 257 (2010). The text of §§ 14-3201 and 14-3202 is that persuasive data.

*Worsham v. Ehrlich*, 181 Md. App. 711 (2008), does not point the other way. *Ehrlich* considered a TCPA provision, 47 U.S.C. § 227(d), that carries no private right of action at all; it did not consider the TSR. It reasoned that "it is likely that the General Assembly enacted the MDTCPA merely to enable a private right of action under the TCPA, not to create new causes of action," *id.*, an observation drawn from the history of *R.A. Ponte Architects, Ltd. v. Investors'*

*Alert, Inc.*, 382 Md. 689 (2004), where the question was whether Maryland courts would hear private TCPA claims at all. Plaintiff's claim fits *Ehrlich*'s description. It is not a new cause of action. It is the action § 14-3202 provides, in so many words, for violations of § 14-3201(1), a provision that names the TSR by title. MP glosses *Ehrlich* as barring any use of the statute "to expand the scope of governed conduct," Mem. at 6, but those are MP's words, not the court's. Plaintiff's TSR counts expand nothing: the conduct they challenge is conduct the TSR already prohibits.

The two appellate decisions that repeat *Ehrlich* add nothing to it. *Worsham v. Accounts Receivable Mgmt., Inc.*, 497 F. App'x 274, 278 (4th Cir. 2012), an unpublished decision, concerned the same kind of claim as *Ehrlich*, a prerecorded-message identification rule, 47 C.F.R. § 64.1200(b), and simply deferred to *Ehrlich* as the decision of Maryland's intermediate appellate court. And in *AGV Sports Grp., Inc. v. Protus IP Sols., Inc.*, 417 Md. 386 (2010), which answered a certified question about the limitations period for TCPA fax claims, the Supreme Court of Maryland recited that the statute's history "reflects that it was enacted 'merely to enable a private right of action under the TCPA,'" quoting *Ehrlich*. That background statement did not concern the TSR, § 14-3201(1) or § 6104, and the Court did not repeat *Ehrlich*'s further statement about new causes of action. The Supreme Court of Maryland has never decided the question presented here.

### C. *Discount Power* and *Direct Energy* Do Not Control

Plaintiff acknowledges that two judges of this Court have read *Ehrlich* to require the § 6104(a) threshold for TSR-based claims, one of them rejecting the argument that *Ehrlich* is distinguishable and the other following *Ehrlich* while acknowledging that it did not consider the TSR. *Worsham v. Discount Power, Inc.*, No. RDB-20-0008, ECF No. 137, at 12–13 (D. Md.

Dec. 1, 2021), *aff'd per curiam*, No. 22-1942 (4th Cir. Mar. 20, 2023) (unpublished); *Worsham v. Direct Energy Servs., LLC*, No. SAG-20-00193, 2021 WL 948819 (D. Md. Mar. 12, 2021), *reconsideration denied* (D. Md. May 12, 2021), *aff'd per curiam*, No. 21-1677 (4th Cir. Apr. 28, 2022) (unpublished). Those decisions do not bind this Court. "A decision of a federal district court judge is not binding precedent in either a different judicial district, the same judicial district, or even upon the same judge in a different case." *Camreta v. Greene*, 563 U.S. 692, 709 n.7 (2011) (citation omitted).

The affirmances do not change that. The Fourth Circuit "ordinarily do[es] not accord precedential value to [its] unpublished decisions," *Collins v. Pond Creek Mining Co.*, 468 F.3d 213, 219 (4th Cir. 2006), and each affirmance is a single paragraph adopting "the reasons stated by the district court" without discussing the question. Asked to treat the *Direct Energy* affirmance as a ruling on an issue the appellant had briefed, Judge Messitte declined "to embark on such a venture," because it "is a summary affirmance without any substantive reasoning or analysis." *Ford v. NaturaLawn of Am., Inc.*, No. 8:24-cv-00354-PJM, 2024 WL 3161762 (D. Md. June 25, 2024). The *Discount Power* affirmance is no different. It adopted both the reconsideration order and the later summary judgment, which rested on the absence of any agency relationship between the seller and its callers, ECF No. 302 (D. Md. Aug. 4, 2022), without saying which ground it relied on.

More fundamentally, none of these courts considered the text on which Plaintiff relies. None cited § 6104(e) or addressed § 6104(a)'s limitation to actions in federal court, and in *Discount Power* the court measured claims pleaded at $500 per violation against an actual-damages threshold. ECF No. 137, at 12; *see id.*, ECF No. 54, ¶ 95. *Direct Energy* was decided on summary judgment, acknowledged that "*Ehrlich* did not expressly consider whether the MTCPA

would provide a vehicle for a violation of the TSR," and rested in the alternative on the absence of any evidence of actual damages.

The Circuit Court in this case read the statute as Plaintiff does. When IHL moved to dismiss the TSR-based counts of the original complaint, the court denied the motion and ruled that "Plaintiff's claims may proceed under Md. Code, Com. L. 14-3201-14-3202." Order (Cir. Ct. Anne Arundel Cnty. Feb. 4, 2026) (Exhibit 1). IHL's challenge rested on a different condition of the federal action, the TSR's notice provision, 16 C.F.R. § 310.7, rather than the $50,000 threshold. But the ruling reflects the same reading Plaintiff urges: § 14-3202 supplies a Maryland remedy on its own terms.

### D. If the Court Follows *Discount Power*, It Should Permit Re-Pleading or Certification

If the Court follows those decisions, the proper course for Counts I and II is leave to amend, not dismissal with prejudice. Section 14-3201(2) separately makes a violation of the federal TCPA, "as implemented by the Federal Communications Commission in the Restrictions on Telemarketing and Telephone Solicitations Rule (47 C.F.R. Part 64, Subpart L)," a Maryland violation. Section 64.1200 is part of that Subpart. In the same *Discount Power* order, following *Worsham v. Lifestation, Inc.*, No. 661, Sept. Term 2020, 2021 WL 5358876 (Md. Ct. Spec. App. Nov. 17, 2021) (unreported), this Court reinstated claims under the FCC's internal do-not-call rule, 47 C.F.R. § 64.1200(d), brought through both the TCPA and § 14-3201(2), holding that the rule was promulgated under § 227(c) and is privately enforceable. ECF No. 137, at 6–10. That is one of the rulings the Fourth Circuit affirmed for the reasons stated.

*Ford* "concur[red] with the reasoning of *Discount Power*," 2024 WL 3161762, and distinguished *Worsham v. Travel Options, Inc.*, No. JKB-14-2749, ECF No. 20, 2016 WL 4592373 (D. Md. Sept. 2, 2016). *Travel Options* concerned failures to identify the caller under §

64.1200(d)(4). A claim that a company kept calling after being asked to stop is different: it is a failure to honor a do-not-call request under § 64.1200(d)(3). Counts I and II are claims of the second kind. Plaintiff asked MP's agents to stop on every call he answered, and the calls continued for months. TAC ¶¶ 19, 118, 127. Re-pleading them under § 14-3201(2) and § 64.1200(d)(3) would cure the defect MP identifies. Because § 227(c)(5) gives a federal private right of action for that violation, the re-pleaded claims would satisfy even MP's reading of *Ehrlich*.

Plaintiff does not seek to re-plead the remaining TSR-based counts (III, VIII, XI, XII, XV) in that form and asks that any dismissal of them be without prejudice. Alternatively, because neither the Supreme Court of Maryland nor *Ehrlich* decided whether §§ 14-3201(1) and 14-3202 provide a Maryland remedy for TSR violations, so that there is no "controlling appellate decision," and that question is determinative of Counts I, II, III, VIII, XI, XII and XV, Plaintiff asks that, if the Court is inclined to follow *Discount Power* and *Direct Energy*, it permit Plaintiff to move to certify the question under Md. Code, Cts. & Jud. Proc. § 12-603.

## IV. Count XV Pleads Intent to Annoy, Abuse, or Harass

MP argues that Count XV fails because "[v]olume of calls alone does not equal intent" to "annoy, abuse, or harass," and that Plaintiff "alleges nothing else." Mem. at 3, 10–12. That ignores the TAC's central allegation about the campaign's design. The TAC alleges that the campaign was "architecturally designed to function as a system of psychological coercion," in which every feature closed a different avenue of escape: rotating numbers defeated blocking, local caller ID defeated screening, rejected return calls and first-name-only callers defeated identification, and ignored requests defeated opting out. TAC ¶¶ 76–77. The calls escalated as Plaintiff kept refusing, "rising from sporadic contact in late July and August to multiple calls per

day" and as many as seven in a day. *Id.* ¶ 77(f). The campaign "was not designed to inform, educate, or even persuade; it was designed to exhaust," so that "the cost of continued resistance" would exceed "the cost of capitulation." *Id.* ¶ 79. Calling a consumer more often each time he says no, through a system built so that he cannot make it stop, is the conduct the rule describes. Intent "may be alleged generally," Fed. R. Civ. P. 9(b), and these facts allege it.

*Pugliese* and *Martin*, on which MP relies, do not hold otherwise. Neither was decided on the pleadings, and neither involved telephone solicitations. *Martin* involved a mortgage servicer's debt collection calls and was decided on findings of fact after a bench trial. *Martin v. Select Portfolio Servicing Holding Corp.*, No. 1:05-cv-273, 2008 WL 618788, at *1, *6–7 (S.D. Ohio Mar. 3, 2008). *Pugliese* was decided on summary judgment, after discovery, and involved calls to collect a debt the plaintiffs owed, which the court called "legitimate, while persistent efforts to reach Plaintiff." *Pugliese v. Pro. Recovery Serv., Inc.*, No. 09-12262, ECF No. 79, at 19 (E.D. Mich. June 29, 2010). The *Pugliese* plaintiffs "did not answer their phone because they recognized numbers from PRS on their caller ID," *id.*, and their TCPA claims failed because debt-collection calls are not telephone solicitations, *id.* at 13–14.

This case differs on every one of those points. Plaintiff owed MP nothing and had asked on every answered call that the calls stop. He could not recognize the calls: the numbers were local, rejected return calls and changed as he blocked them, and he learned that MP was the caller only by tracing the numbers through successive subpoenas to the carrier, from Onvoy to SignalWire and then to Amcomm. TAC ¶¶ 46, 48, 118, 136, 149, 158; Ex. K. And the standard MP quotes from *Pugliese* examines volume "along with the pattern in which [the calls] were made and whether or not they were accompanied by oppressive conduct." Mem. at 11 (quoting

*Pugliese*, ECF No. 79, at 17). That pattern and that conduct are what the TAC alleges. MP's "good faith commercial purpose," Mem. at 12, is its own characterization, not a fact in the TAC.

## V. MP Is Liable for the Caller-ID and Seller-Identification Violations (Counts III–VI, VIII)

MP argues that it "simply used the platform as configured" by co-defendant AM Communication Labs Inc. ("Amcomm"). Mem. at 7. The statute does not ask who configured the platform. Section 14-4502(b)(1) applies to "[a] person who makes or causes to be made a telephone solicitation," and MP made these. Nor does the TAC "admit" that MP did not control what was displayed on caller ID, as MP claims. Mem. at 2, 7. It alleges the opposite, in one of the very paragraphs MP cites: "Mortgage Pipeline selected those numbers as the caller-ID presented on the calls it placed." TAC ¶ 136. Amcomm provisioned the numbers. MP selected them for display on its calls based on its knowledge of Plaintiff's residence (¶¶ 136, 142), rotated among them as Plaintiff blocked them (¶ 158), placed every Tier A, A-2 and B call "with knowledge that the return path was closed" (¶ 151), and instructed its agents to give only a first name and end the call when asked for identifying information (¶ 30).

Those facts also plead the intent that Counts V and VI require. Count V, under § 14-4502(b)(1)(ii), requires that the person "intentionally act" to prevent transmission, and Count VI, under § 14-4502(b)(1)(iii), requires use of technology that deliberately displays a different number in order to conceal the caller's identity. Intent and knowledge "may be alleged generally." Fed. R. Civ. P. 9(b). MP says Plaintiff alleges no "purposeful intent to conceal." Mem. at 7. But intent is rarely admitted; it is inferred from conduct, and here concealment was the method of every call MP placed in IHL's campaign. The number shown was not the seller's but a Maryland-area presentation number. TAC ¶¶ 136, 157–158. The platform could transmit accurate caller identification, which § 14-4502(b)(1)(ii) makes an element, so the failure was a

choice, not a limitation. *Id.* ¶ 150. On the line, the agents gave only a first name and a "VA"-styled trade name, never identified the seller or said the call was a sales call, and ended the call whenever Plaintiff asked who they worked for or who was licensed to make the loan. *Id.* ¶¶ 30, 151, 164, 166, 185. Plaintiff learned who was calling only through subpoenas after he sued. *Id.* ¶ 166. A caller who exploits a disabled veteran's trust in the agency that administers his benefits, hides its number, its name, its seller and its purpose, and hangs up when asked, has plausibly acted with the intent to conceal.

MP's account of its relationship with Amcomm does not help it. On MP's own reading of the TAC, Amcomm built the concealment and MP used it to place the calls. That division of labor is a reason to hold both responsible, not neither. How MP and Amcomm divide responsibility between themselves is a question for them, not a defense to Plaintiff's claims. It is also the coordination that supports the conspiracy count. *See* Part XII.

MP's challenge to the TSR count, Count III, fails for the same reason. The TSR makes it a violation "for any seller or telemarketer" to fail "to transmit or cause to be transmitted the telephone number, and, when made available by the telemarketer's carrier, the name of the telemarketer, to any caller identification service in use by a recipient of a telemarketing call." 16 C.F.R. § 310.4(a), (a)(8); TAC ¶ 137. MP is the telemarketer, and the duty is MP's. It does not shift to a vendor because the vendor set up the numbers. At most, MP's point that Amcomm configured the display raises a factual question about who controlled what, and that question cannot be resolved against Plaintiff on a motion to dismiss, where inferences favor him.

Count VIII is not a caller-ID count at all. It alleges that MP's own agents, on every answered call, failed to disclose the identity of the seller, gave a first name and a fictitious trade

name, and ended the call when asked who they worked for. TAC ¶ 166; 16 C.F.R. § 310.4(d)(1). Nothing about how Amcomm configured the numbers bears on what MP's agents said.

## VI. Count XIV Is Pleaded Call by Call

Section 14-4502(c)(2) prohibits more than three solicitations to the same person in 24 hours "on the same subject matter or issue, regardless of the telephone numbers used to make the call." The TAC lists all 31 offending calls by date, time and number, notes which were answered, and marks them in Exhibit B-1. TAC ¶ 208. Thirty of them came from numbers on MP's client account in the platform's records, and the thirty-first is attributed to MP on the Tier B basis described in ¶ 95. *Id.* ¶¶ 49(a), 95, 207. Thirteen of the 31 were themselves answered. *Id.* ¶ 208 (Ex. B-1 call nos. 28, 29, 51–53, 69, 78, 80, 90, 92, 93, 95, 98).

The TAC also alleges that every call concerned the same sales campaign, "mortgage refinancing and VA-related loan products," *id.* ¶¶ 20, 207, as shown by the callers' use of Plaintiff's VA loan details and their offers to transfer him to a "licensed mortgage professional" for refinancing, *id.* ¶¶ 17–18, 29. This is not *Gillam*, Mem. at 10, where the plaintiff answered one call of seventeen and alleged little beyond the calls' timing and numbers. Here, calls from the same Amcomm account, the same rotating set of numbers and the same campaign, many answered and scripted alike, support the inference that the unanswered calls on the same days concerned the same subject.

## VII. The "Unanswered Calls" Argument Attacks Claims the TAC Does Not Make

MP argues that disclosure claims cannot rest on unanswered calls, and that Plaintiff lacks standing as to them. Mem. at 12. The TAC's disclosure counts are already limited to answered calls. TAC ¶¶ 164, 166, 173, 179, 185, 192.

The other counts do not depend on whether a call was answered. The false Maryland caller ID was displayed on Plaintiff's phone on every call, answered or not, *id.* ¶ 24, and an unanswered call still rings into the household. That is the injury the caller-ID statute addresses. The same is true of the counts that turn on the calls themselves rather than on what was said in them. Count II reaches "[i]nitiating any outbound telephone call" to a person who has asked not to be called, 16 C.F.R. § 310.4(b)(1)(iii)(A); Count XV reaches "[c]ausing any telephone to ring . . . repeatedly or continuously with intent to annoy, abuse, or harass," *id.* § 310.4(b)(1)(i); and Count XVII reaches telephone solicitations, which the TCPA defines as "the initiation of a telephone call," 47 U.S.C. § 227(a)(4). An answered call is not an element of any of them.

## VIII. Plaintiff Told MP's Agents to Stop

MP says Plaintiff never alleges an opt-out "directed directly to MP." Mem. at 13. The TAC alleges that on the first answered call, on July 7, 2025, and on every answered call MP placed after that, Plaintiff told MP's agents that he did not consent, wanted no further calls, and wanted his number removed. TAC ¶¶ 19, 118, 237. Those were MP's agents calling on behalf of the seller, so the requests satisfy 16 C.F.R. § 310.4(b)(1)(iii)(A), which turns on whether the person "previously has stated that he or she does not wish to receive an outbound telephone call made by or on behalf of the seller whose goods or services are being offered."

The exhibits MP cites for Plaintiff's supposed interest do not show it. Mem. at 12–13. Exhibit F is MP's own October 1 call, on which Plaintiff asked for the company's licensing number and website and the caller hung up when Plaintiff questioned the company's legitimacy. TAC ¶ 29. Exhibits I and J are not MP's calls at all. Exhibit I documents a call from a number outside MP's account, placed by a vendor not yet identified and attributed to IHL as the seller. Exhibit J is an October 3 call that IHL says another vendor placed and that IHL's own loan

officer took. *Id.* ¶¶ 35, 96. By then Plaintiff had made more than forty requests to stop and was engaging with IHL to confirm who was calling him. *Id.* ¶ 35. His statements on calls with other parties in October say nothing about whether he consented to MP's calls in July, August and September. The October 2 "re-subscribe" in ¶ 35 concerned IHL's texts, not MP's calls.

Nor does Count II fail because Plaintiff denies ever consenting. Count II alleges revocation of "any consent that may have existed," TAC ¶ 127, which Rule 8(d)(2) permits, and the rule it invokes turns on the consumer's prior statement, not on whether consent existed first.

## IX. Count XVII States a Claim Under the TCPA

### A. MP Did Not Institute Do-Not-Call Procedures

Section 64.1200(d) bars telemarketing calls unless the caller "has instituted procedures" meeting minimum standards, including training personnel in the use of the do-not-call list and recording and honoring requests within ten business days. 47 C.F.R. § 64.1200(d)(2), (3). MP reads the TAC's description of its website policy as an admission that compliant procedures were in place. Mem. at 14. The TAC alleges the opposite: that MP's "systematic violation of every material provision of its own policy" shows the policy was a public statement rather than a practice, TAC ¶ 67, and that MP recorded none of Plaintiff's requests, kept no list on which to record them, and trained no one in its use, *id.* ¶¶ 118, 238. Publishing a policy is not instituting procedures. Courts infer that do-not-call procedures are deficient when calls to a person who asked not to be called continue long afterward, relying in part on *Buja*, one of MP's own authorities. *Watkins v. EyeBuyDirect, Inc.*, No. 1:25-cv-00538 (W.D. Tex. Aug. 28, 2025) (collecting cases).

The statute's only safe harbor is an affirmative defense, and it requires more than a document. The defendant must show that it "established and implemented, with due care,

reasonable practices and procedures to effectively prevent telephone solicitations in violation of the regulations." 47 U.S.C. § 227(c)(5). That is MP's burden, and nothing on the face of the TAC establishes it. *Goodman*, 494 F.3d at 464. A policy that promised to honor opt-outs, followed by months of calls to a consumer who asked on every answered call that they stop, does not show due care. It shows that MP knew what the rules required and did not follow them, which is evidence of a knowing violation, *see* Part XIV, not a defense to one.

Plaintiff acknowledges this Court's decision in *Travel Options* that § 64.1200(d)(4) is not privately enforceable, *aff'd per curiam*, 678 F. App'x 165 (4th Cir. 2017) (unpublished). But as explained in Part III.D, this Court later held, following *Lifestation*, that § 64.1200(d) is enforceable under § 227(c), *Discount Power*, ECF No. 137, at 6–10, and *Ford* agreed, 2024 WL 3161762. In any event, Count XVII does not depend on (d)(4), because the failure to record and honor Plaintiff's requests under (d)(3) independently states the claim. TAC ¶¶ 236–238.

**B. Plaintiff Is a Residential Telephone Subscriber**

MP argues that a cellular telephone can never belong to a "residential telephone subscriber." Mem. at 14–15. This Court has rejected that argument, "join[ing] the majority of courts throughout the country who have held that cell phones like [the plaintiff's] are entitled to the TCPA's protection as residential telephones." *Tessu v. AdaptHealth, LLC*, No. SAG-23-0364, 2023 WL 5337121, at *5 (D. Md. Aug. 17, 2023); *see also Hudson v. Palm Beach Tan, Inc.*, No. 1:23-cv-00486 (M.D.N.C. Aug. 12, 2024). Plaintiff alleges the number has been his "primary personal telephone" since 2021 and that the calls reached him in the home where he lives with his family and disrupted the household. TAC ¶¶ 12, 14, 84(g). That is a residential use. If more detail is needed, Plaintiff can allege additional facts about the household's use of the number. *See* Part XV.

*McLaughlin* does not change the result. *Tessu* rested on the Hobbs Act, and the Supreme Court has since held that district courts interpret the TCPA for themselves, "affording appropriate respect to the agency's interpretation." *McLaughlin Chiropractic Assocs., Inc. v. McKesson Corp.*, 606 U.S. 146 (2025). The result is the same on the statute's text. Section 227(c) protects a class of subscribers, not a type of device; where Congress meant devices it said so, referring in § 227(b) to a "residential telephone line" and to "cellular telephone service." *Lirones v. Leaf Home Water Sols., LLC*, No. 5:23-cv-02087 (N.D. Ohio Sept. 16, 2024). The regulation points the same way: it makes the do-not-call rules "applicable to any person or entity making telephone solicitations or telemarketing calls or text messages to wireless telephone numbers . . . ." 47 C.F.R. § 64.1200(e). Interpreting § 227(c) without deference after *McLaughlin*, another court relied on that regulation and the statute's focus on the subscriber rather than the technology to hold that residential telephone subscribers "encompass wireless *subscribers* for purposes of § 227(c)." *Rubin v. Staples, Inc.*, No. 2:25-cv-15515 (D.N.J. Mar. 31, 2026). Courts in this Circuit have likewise continued to deny motions to dismiss on this ground after *McLaughlin*. *Newman v. SGMS, Inc.*, No. 3:25-cv-00042-KDB-SCR (W.D.N.C. Sept. 2, 2025) (collecting cases, including *Tessu*).

The two out-of-circuit decisions MP cites, Mem. at 15, do not bind this Court and do not reflect the weight of authority, and the same answer disposes of MP's footnote 2. MP's own authority concedes the point MP omits. *Koeller* acknowledges that "no court of appeals has ruled on whether § 227(c)(5) of the TCPA applies to wireless subscribers" and that "[m]any district courts" have held that it does, including a court in MP's home state, *Harriel v. Bealls, Inc.*, No. 8:25-cv-1165-TPB, 2025 WL 2379617 (M.D. Fla. Aug. 15, 2025), and then "sees the issue differently." *Koeller v. Ox AppSec Sec., Inc.*, No. 4:25-cv-0641-MTS, ECF No. 46, at 4–5 (E.D.

Mo. Sept. 30, 2026). *Koeller* also does not address § 64.1200(e). A split among district courts elsewhere, which MP presents as settled, is no reason to depart from this Court's own decision in *Tessu*.

Whatever the answer under § 227(c)(5), it does not reach Plaintiff's Maryland claims. The Maryland Telephone Solicitations Act protects the "called party," defined as "a person who is a regular user of a telephone number that receives a telephone solicitation," Md. Code, Com. Law § 14-4501(b), and § 14-3202(b) gives a remedy to "an individual who is affected by a violation." Neither asks whether the line is residential. Nor do the Maryland do-not-call counts depend on the TCPA. Counts I and II invoke the TSR, 16 C.F.R. § 310.4(b)(1)(ii), (iii)(A), which reaches "any outbound telephone call to a person" and contains no residential-subscriber limitation. MP's assertion that Plaintiff's state claims "necessarily rely" on the TCPA's do-not-call provisions, Mem. at 15, misdescribes them.

## X. Count XVIII States a Claim for Intrusion Upon Seclusion

MP relies on *Drake v. Synchrony Bank*, No. CCB-19-2134 (D. Md. Oct. 11, 2023), and *Shlikas*. Mem. at 16. Whether an intrusion is "highly offensive" can be decided as a matter of law when the allegations fall short, as they did in those cases. But both turned on volume; *Drake* observed that no case applying Maryland law had sustained the tort "based on call volume alone." *Drake* also recognized the line of cases in which calls continued after the plaintiff asked that they stop, citing *Lipscomb v. Aargon Agency, Inc.*, No. PWG-13-cv-2751, 2014 WL 5782040, at *3 (D. Md. Nov. 5, 2014), where summary judgment was denied on evidence of approximately 20 to 25 calls over forty-five days, some of which may have occurred after the plaintiff asked that they stop.

This case is not volume alone, and Plaintiff does not ask the Court to decide whether a number of calls is enough. MP's own test, from *Summit Loans, Inc. v. Pecola*, 265 Md. 43, 45 (1972) (citing *Household Fin. Corp. v. Bridge*, 252 Md. 531 (1969)), weighs "the degree of persistency" and the "vicious quality" of the invasion, and in that case the Court of Appeals (now the Supreme Court of Maryland) affirmed a jury verdict on evidence of both. The TAC pleads both. The persistence: MP's calls continued for nearly three months after Plaintiff first asked its agent to stop, and through his repeated requests on every call he answered after that. TAC ¶¶ 19–20, 118. The vicious quality: the campaign was built at every turn so that it could not be stopped, with numbers that rotated as he blocked them, caller ID that could not be returned, callers who hung up when asked who they were, and calls that escalated each time he refused, all under names chosen to exploit a disabled veteran's trust in the VA. *Id.* ¶¶ 24–26, 76–79, 151, 249. Those facts go well beyond the allegations found insufficient in *Drake* and *Shlikas*.

MP's contrary point, that Plaintiff "showed an interest" and took a sixteen-minute call, Mem. at 16–17, rests on the October 2 and 3 calls with IHL described in Part VIII, not on any call MP placed.

## XI. Count XIX States a Claim for Intentional Infliction of Emotional Distress

The TAC pleads each element. *Harris v. Jones*, 281 Md. 560, 566 (1977).

*Intent.* MP carried out IHL's campaign as its agent. TAC ¶¶ 74, 88. It chose whom to call, engaged the agents, supplied their scripts and VA-styled trade names, and initiated every call through a predictive dialer account that tracked how often each consumer was called and could enforce time-of-day limits. *Id.* ¶¶ 88, 119, 203, 211. It rotated its numbers as Plaintiff blocked them, placed its calls knowing the return path was closed, and instructed its agents to give only a first name and hang up when asked who they were. *Id.* ¶¶ 30, 151, 158, 253.

*Extreme and outrageous conduct.* A disabled veteran was targeted with names implying an affiliation with the agency that administers his benefits, and every avenue by which he could have stopped the calls was closed in advance. *Id.* ¶ 254. MP's agents implied that affiliation on the calls themselves, refused to identify the company they worked for, and hung up whenever Plaintiff pressed for a company name, license number or website. *Id.* ¶¶ 16–17, 26, 29–30, 151, 166. MP's own Memorandum reads the TAC as attributing those statements to MP's agents. Mem. at 8–9 (citing TAC ¶¶ 173, 179). That is a deliberate, months-long campaign. MP's cases involved far less. *Dick v. Mercantile-Safe Deposit & Trust Co.*, 63 Md. App. 270 (1985), involved repeated repossessions, a shouted collection call to the plaintiff's office, and an adverse credit report. *Casto*, a West Virginia case, was decided on a summary-judgment record that showed calls after a cease-and-desist letter. Lewis-Davis and Chambers were workplace cases.

*Severe distress.* The TAC alleges aggravation of a service-connected disability, sleep disruption, avoidance of medical and VA calls a disabled veteran cannot afford to miss, and strain on his marriage that his wife will corroborate, harms that "materially altered his daily life." TAC ¶¶ 84–85. *Takacs* assumed the first three elements and dismissed only because the plaintiff did not allege that her distress "disrupted her ability to function on a daily basis," and her own allegations showed she could work. *Takacs v. Fiore*, 473 F. Supp. 2d 647, 652 (D. Md. 2007). The TAC alleges that disruption.

The Circuit Court reached the same conclusion on this count. Before removal, Co-Defendant IHL moved to dismiss Count XIX, and after full briefing and argument on August 14, 2026, the Circuit Court for Anne Arundel County denied the motion. Order, *Escobar v. Independence Home Loans, LLC*, No. C-02-CV-25-003012 (Cir. Ct. Anne Arundel Cnty.) (Malone, J.) (docketed Aug. 27, 2026) (Exhibit 2). Plaintiff offers that ruling as context, not

authority: it applied Maryland pleading standards to the prior complaint, it was entered on IHL's motion rather than MP's, and it does not bind this Court. But the TAC that followed did not add claims. Its amendments are "confined to identifying which Defendant is alleged to have done what," TAC at 1, so the allegations against MP are now more specific than those the Circuit Court found sufficient.

## XII. Count XVI States a Claim for Civil Conspiracy

MP raises three points. Mem. at 19–20. The first two are quickly answered. As to the underlying tort, Plaintiff agrees that conspiracy is not a freestanding tort; Count XVI rests on Counts XVIII and XIX, TAC ¶ 223; *Hoffman*, 385 Md. at 24–25, and because those counts survive, so does this one. As to damages, the injury is the tortious injury pleaded in those counts, TAC ¶¶ 84–85, not statutory damages, and MP's damages authorities apply Michigan and Sixth Circuit law.

The third point is agreement. Under Maryland law "a conspiracy may be proved by circumstantial evidence, for in most cases it would be practically impossible to prove a conspiracy by means of direct evidence alone," and may be inferred from "the nature of the acts complained of, the individual and collective interest of the alleged conspirators, [and] the situation and relation of the parties at the time of the commission of the acts." *Hoffman*, 385 Md. at 25–26 (quoting *W. Md. Dairy, Inc. v. Chenowith*, 180 Md. 236, 243–44 (1942)); *see Finley Alexander Wealth Mgmt., LLC v. M&O Mktg., Inc.*, No. 8:19-cv-01312 (D. Md. Mar. 31, 2021) (finding agreement adequately alleged on that basis in a proposed amended complaint). This is not the parallel conduct of independent competitors at issue in *Twombly*. The TAC alleges a single chain in which each defendant performed a necessary and complementary role. Amcomm bought Maryland numbers in bulk and configured them to refuse return calls. MP used those

numbers to place the calls under VA-styled names. And IHL took the warm transfers, opened a file in Plaintiff's name, and told a regulator its vendors had confirmed compliance while the calls continued. TAC ¶¶ 224–231. MP's own caller-ID argument depends on that division of labor. Mem. at 7; *see* Part V. MP cannot rely on the coordination to shift the caller-ID counts to Amcomm and then deny that any coordination occurred.

**XIII. Injunctive Relief Should Be Decided on a Developed Record**

MP says "the allegations all concern calls that Plaintiff purportedly received in 2025." Mem. at 22. They do not. The TAC alleges calls on December 9, 2025, after IHL was served, and on February 18, 2026. TAC ¶¶ 44, 97–98, 127. Plaintiff acknowledges that the TAC attributes those two calls to numbers outside MP's client account, and that the last call attributed to MP's account was on October 1, 2025. Ex. B-1. But the TAC also alleges that this campaign has stopped before and resumed: after Plaintiff's first request on July 7, 2025, the calls paused for two weeks, then came back and continued for months. TAC ¶ 20. And the campaign that MP's calls were part of continued into February 2026, after IHL assured Plaintiff and a state regulator that its vendors had stopped. *Id.* ¶¶ 38–44, 98.

Nor can the Court take the absence of later calls Plaintiff can attribute to MP as proof that MP stopped. Identifying MP as the caller on its own calls took successive subpoenas to the carrier, SignalWire and Amcomm, because MP hid its number, its name and its seller. *Id.* ¶¶ 46, 48, 166. The February 18, 2026 number is assigned to Amcomm, the platform through which MP placed every call attributed to it, and the client account behind that call has not yet been identified. *Id.* ¶ 98. A defendant that has gone to these lengths to avoid being identified cannot rely on Plaintiff's present inability to identify it. Plaintiff still lives in the same home and uses the same number, *id.* ¶¶ 12, 14, and MP remains in business, *id.* ¶¶ 5, 68. Whether the threat of

renewed calls from MP is "real and immediate," *City of Los Angeles v. Lyons*, 461 U.S. 95, 102 (1983), should be decided on a developed record.

**XIV. The Request for Treble Damages Is Supported by Pleaded Facts**

Treble damages are a remedy, not a claim, and MP identifies no rule that permits striking a remedy on a Rule 12(b)(6) motion. In any event, the TAC does not rest on the bare word "willful." It alleges that MP published a TCPA policy promising to honor opt-outs and then ignored Plaintiff's requests on every call he answered; placed calls through a predictive dialer capable of enforcing time-of-day and frequency limits; used numbers configured to defeat call-backs; and instructed agents to hang up when asked who they were. TAC ¶¶ 62–67, 118, 151, 203, 211. MP's Memorandum underscores the point. It relies on MP's published TCPA policy, Mem. at 14, and that policy is itself evidence that MP knew what the rules required. TAC ¶ 67. The concealment described in Part V is further evidence: a caller that hides who it is knows that what it is doing will not survive scrutiny. Knowledge may be alleged generally, Fed. R. Civ. P. 9(b), and the Fourth Circuit has affirmed trebling under § 227(c)(5) where a defendant knew of telemarketing violations and continued to profit from them. *Krakauer v. Dish Network, L.L.C.*, 925 F.3d 643 (4th Cir. 2019).

MP's authorities do not hold otherwise. Mem. at 23 n.4. In *Sterling* and *Hunsinger*, the treble request fell with the underlying TCPA claim, and in *Blair* the complaint did not allege willfulness at all. *Sterling v. Securus Techs., Inc.*, No. 3:18-cv-1310 (VAB), ECF No. 127, at 11 (D. Conn. May 6, 2020); *Weingrad v. Top Healthcare Options Ins. Agency Co.*, No. 23-5114, 2024 WL 4228149 (E.D. Pa. Sept. 17, 2024); *Hunsinger v. Dynata LLC*, No. 3:22-CV-00136-G-BT, 2023 WL 2377481 (N.D. Tex. Feb. 7, 2023), *report and recommendation adopted*, 2023 WL 2386710 (N.D. Tex. Mar. 4, 2023); *Blair v. Assurance IQ LLC*, No. C23-0016-KKE, ECF No.

28, at 8 (W.D. Wash. Oct. 11, 2023). In *Weingrad*, the plaintiff alleged only that the violations were "negligent, willful or knowing" and that the caller used a false name, which the court held "insufficiently pleaded." 2024 WL 4228149. The TAC alleges far more: a published policy MP ignored, more than forty requests to stop, numbers rotated as Plaintiff blocked them, and instructions to hang up when asked who was calling. TAC ¶¶ 30, 35, 62–67, 118, 158. *Hunsinger* also recognized that a willful or knowing violation "does not requir[e] bad faith, but only that the person have reason to know, or should have known, that his conduct would violate the statute." *Hunsinger*, 2023 WL 2377481, at *7 (quotation omitted). MP's own policy shows it knew.

## XV. Alternatively, Plaintiff Requests Leave to Amend

MP asks for dismissal with prejudice. If the Court finds any count deficient, Plaintiff asks for leave to amend, which the Court "should freely give when justice so requires." Fed. R. Civ. P. 15(a)(2); *Foman v. Davis*, 371 U.S. 178, 182 (1962). This is the first motion to dismiss decided in this Court, and the TAC was ordered by the state court for a more definite statement, not because its claims failed. MP shows no prejudice, bad faith or futility. MP's own authorities followed that course. *Weingrad* dismissed the TCPA, treble-damages and injunction claims without prejudice. 2024 WL 4228149. And in *OliveTree*, the court dismissed the original complaint without prejudice and with leave to seek amendment, ECF No. 15 (D. Md. Sept. 22, 2025), then granted leave to amend and denied in part the motion to dismiss the amended complaint, *id.*, ECF No. 27 (D. Md. Aug. 13, 2026).

If granted leave, Plaintiff would (a) re-plead Counts I and II under § 14-3201(2) and 47 C.F.R. § 64.1200(d)(3), as described in Part III.D; (b) add facts about his household's use of the number for Count XVII; (c) add count-specific allegations of actual injury to Counts VII, IX and X and conform Count VII's damages paragraph; (d) correct the number of answered calls

attributed to MP, which Exhibit B-1 shows as 40 of the 43 answered calls in the campaign; and (e) if the Court accepts Plaintiff's reading of § 14-3202 in Part III, plead the "VA" trade names alleged in Count VII as a violation of § 14-3201(1), through the Telemarketing Sales Rule's prohibition on misrepresenting "[a] seller's or telemarketer's affiliation with, or endorsement or sponsorship by, any person or government entity," 16 C.F.R. § 310.3(a)(2)(vii).

## CONCLUSION

Plaintiff does not oppose dismissal, without prejudice, of Count XXII as to MP, the $500-per-violation measure in Counts VII, IX and X, and attorney's fees while he proceeds *pro se*. MP does not address Count XIII at all, so its request to dismiss the TAC in its entirety cannot be granted in any event. MP's request for its own fees appears only in its conclusion and rests on no statute or rule. The only provision at issue that shifts fees to a defendant requires a finding that the action was brought in bad faith or is frivolous, Md. Code, Com. Law § 13-408(d), and MP does not argue that it was. Plaintiff respectfully asks the Court to deny the remainder of MP's Motion; to deny MP's requests for attorney's fees and dismissal with prejudice; and, if the Court finds any other count deficient, to dismiss it without prejudice and grant leave to file an amended complaint within 21 days, or, as to the TSR-based counts, to permit Plaintiff to move to certify the question described in Part III.D to the Supreme Court of Maryland under Md. Code, Cts. & Jud. Proc. § 12-603.

Respectfully submitted,

David Escobar, Jr.
1628 Severn Run Ct.
Severn, Maryland 21144
(240) 429-2465
david.j.escobar2@gmail.com
Plaintiff, pro se

Dated: November 2, 2026

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on November 2, 2026, a copy of the foregoing Plaintiff's Memorandum in Opposition to Defendant Mortgage Pipeline LLC's Motion to Dismiss the Third Amended Complaint, Exhibits 1 and 2 (Orders of the Circuit Court for Anne Arundel County docketed February 4, 2026 and August 27, 2026), and proposed Order was served through the Court's CM/ECF system and by electronic mail on:

Tamara B. Goorevitz
Franklin & Prokopik, P.C.
Two North Charles Street, Suite 600
Baltimore, Maryland 21201
tgoorevitz@fandpnet.com

Jordan S. Cohen
Wicker Smith O'Hara McCoy & Ford, P.A.
515 East Las Olas Boulevard, Suite 1400
Fort Lauderdale, Florida 33301
jcohen@wickersmith.com
*Counsel for Independence Home Loans, LLC*

Joseph P. Bowser
Roth Jackson Gibbons Condlin, PLC
1519 Summit Avenue, Suite 102
Richmond, Virginia 23230
jbowser@rothjackson.com
*Counsel for AM Communication Labs Inc.*

Noam B. Fischman
Akerman LLP
750 Ninth Street, NW, Suite 750
Washington, DC 20001
noam.fischman@akerman.com

Jeffrey B. Pertnoy
Akerman LLP
98 Southeast Seventh Street, Suite 1100
Miami, Florida 33131
jeffrey.pertnoy@akerman.com
*Counsel for Mortgage Pipeline LLC*

David Escobar, Jr.

**[PROPOSED] ORDER**

Upon consideration of Defendant Mortgage Pipeline LLC's Motion to Dismiss the Third Amended Complaint (ECF No. 28), Plaintiff's Opposition, any reply, and the record, it is this ____ day of _______________, 2026, by the United States District Court for the District of Maryland, ORDERED that:

1. The Motion is GRANTED IN PART, without prejudice, as to (a) Count XXII as pleaded against Mortgage Pipeline LLC; (b) the request for $500 per violation in Counts VII, IX and X; and (c) Plaintiff's request for attorney's fees while he proceeds pro se;

2. The Motion is otherwise DENIED;

3. Mortgage Pipeline LLC's request for attorney's fees and costs is DENIED; and

4. [Alternatively, to the extent any other claim is dismissed, the dismissal is without prejudice, and Plaintiff may file an amended complaint within twenty-one (21) days of this Order or move to certify the question described in Part III.D of Plaintiff's Opposition.]

____________________________________
Julie Rebecca Rubin
United States District Judge